## EXHIBIT B

**Deutsch Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

PACIFIC ANDES ENTERPRISES (HONG KONG) LIMITED,

      Debtor.

Chapter 11

Case No. 21-11588 (JLG)

## <u>DECLARATION OF DOUGLAS E. DEUTSCH</u>

I, Douglas E. Deutsch, declare as follows:

1.      I am a lawyer admitted to practice in the State of New York and a partner in the law firm of Clifford Chance US LLP ("<u>Clifford Chance</u>"). Clifford Chance is counsel for the Liquidators of the Hong Kong Plaintiffs.

2.      I submit this declaration in support of the *Motion of the Hong Kong Plaintiffs for Entry of an Order Dismissing and Abstaining from the Chapter 11 Case of Pacific Andes Enterprises (Hong Kong) Limited* (the "<u>Motion</u>") filed contemporaneously herewith. Capitalized terms not defined herein have the meaning ascribed to such terms in the Motion.

3.      Annexed hereto as <u>Exhibit B-1</u> is a true and correct copy of the petition filed in Case No. 21-11588 (JLG) as ECF No. 1.

4.      Annexed hereto as <u>Exhibit B-2</u> is a true and correct copy of the *Declaration of Ng Puay Yee Annie (Jessie) in Support of First Supplement to Motion of Pacific Andes International Holdings Limited (Bermuda) and Pacific Andes International Holdings (BVI) Limited, Pursuant to Bankruptcy Code Sections 105, 363 and 502, and Bankruptcy Rules 2002, 3001(e), 3007, 4001, 6004, 9014 and 9019, (I) to Approve Compromise among Movants, Certain Creditors and Investors, (II) to Authorize Certain Corporate Governance Actions in Furtherance of Compromise, (III) to Approve the Compromise and Allowance of Certain Claims Related to the*

*Proposed Transaction, and (IV) to Grant Related Relief* and the exhibits thereto filed in Case No.

16-11895 (JLG) as ECF No. 2341-2 through ECF No. 2341-9.

5.      Annexed hereto as <u>Exhibit B-3</u> is a true and correct copy of an excerpt from

the *Periodic Report of Debtors Pursuant to Bankruptcy Rule 2015.3 Regarding Value,*

*Operations and Profitability of Entities in which the Estate of Pacific Andes International*

*Holdings Limited (Bermuda) Holds a Substantial or Controlling Interest* filed in Case No. 16-

11895 (JLG) as ECF No. 1493.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on September 13, 2021

                                          */s/ Douglas E. Deutsch*
                                          Douglas E. Deutsch

## Exhibit B-1

21-11558-shl Doc 1 Filed 09/09/21 Entered 09/08/21 23:34:21 Main Document 1 of 16

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

SOUTHERN DISTRICT OF NEW YORK

Case number *(if known)* _____ Chapter **11**

☐ Check if this an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy          04/20

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| 1. | Debtor's name | **Pacific Andes Enterprises (Hong Kong) Limited** |
|---|---|---|

| 2. | All other names debtor used in the last 8 years <br><br> Include any assumed names, trade names and *doing business as* names | |
|---|---|---|

| 3. | Debtor's federal Employer Identification Number (EIN) | |
|---|---|---|

**4. Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **Room 3312, Hong Kong Plaza, 186 Connaught Road West HONG KONG** <br> Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| County | Number, Street, City, State & ZIP Code |

| 5. | Debtor's website (URL) | |
|---|---|---|

**6. Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

| Debtor | **Pacific Andes Enterprises (Hong Kong) Limited** | Case number (*if known*) |
|---|---|---|
| | Name | |

**7.** **Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.

_____

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply*:

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| | District _____ | When _____ | Case number _____ |
|---|---|---|---|
| | District _____ | When _____ | Case number _____ |

| Debtor | **Pacific Andes Enterprises (Hong Kong) Limited** | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

**10.** **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No

■ Yes.

List all cases. If more than 1, attach a separate list

| Debtor | **See Attachment** | | Relationship | |
| District | | When | Case number, if known | |

**11.** **Why is the case filed in *this district*?**

*Check all that apply:*

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

■ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12.** **Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard?

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other

**Where is the property?**

Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency

Contact name

Phone

---

■ **Statistical and administrative information**

**13.** **Debtor's estimation of available funds** .

*Check one:*

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14.** **Estimated number of creditors**

| | | |
|---|---|---|
| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15.** **Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50  million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16.** **Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |

Debtor   **Pacific Andes Enterprises (Hong Kong) Limited**
         Name

Case number (*if known*)

| | |
|---|---|
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50  million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

| Debtor | **Pacific Andes Enterprises (Hong Kong) Limited** | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **September 8, 2021**
            MM / DD / YYYY

**X** **/s/ Ng Puay Yee Annie**           **Ng Puay Yee Annie**
     Signature of authorized representative of debtor      Printed name

Title    **Director**

**18. Signature of attorney**

**X** **/s/ Tracy L. Klestadt**         Date   **September 8, 2021**
     Signature of attorney for debtor              MM / DD / YYYY

**Tracy L. Klestadt**
Printed name

**Klestadt Winters Jureller Southard & Stevens, LLP**
Firm name

**200 West 41st Street**
**17th Floor**
**New York, NY 10036-7203**
Number, Street, City, State & ZIP Code

Contact phone   **(212) 972-3000**      Email address   **tklestadt@klestadt.com**

**2089985 NY**
Bar number and State

Debtor  **Pacific Andes Enterprises (Hong Kong) Limited**
    Name

Case number *(if known)*

---

| Fill in this information to identify your case: |
|---|

United States Bankruptcy Court for the:

SOUTHERN DISTRICT OF NEW YORK

Case number *(if known)* _____  Chapter    **11**

☐ Check if this an
   amended filing

## FORM 201. VOLUNTARY PETITION

## Pending Bankruptcy Cases Attachment

| Debtor | **Pacific Andes Enterprises (Hong Kong) Limited** | | | Case number (*if known*) | |
|---|---|---|---|---|---|
| | Name | | | | |

| Debtor | **Admired Agents Ltd.** | | | Relationship to you | **Affiliate** |
|---|---|---|---|---|---|
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11206** |
| Debtor | **CFG Peru Investments Pte. Ltd. (Singapore)** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11914** |
| Debtor | **CFGL (Singapore) Private Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11915** |
| Debtor | **Champion Maritime Ltd. (BVI)** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11922** |
| Debtor | **Chanery Investment Inc. (BVI)** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11921** |
| Debtor | **Chiksano Management Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11207** |
| Debtor | **China Fisheries International Ltd. (Samoa)** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11896** |
| Debtor | **China Fishery Group Limited (Cayman)** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11895** |
| Debtor | **Clamford Holding Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11208** |
| Debtor | **Excel Concept Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11209** |
| Debtor | **Fortress Agents Ltd. (BVI)** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11916** |
| Debtor | **Gain Star Management Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11210** |
| Debtor | **Golden Target Pacific Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **3/27/17** | Case number, if known | **17-10734** |
| Debtor | **Grand Success Investment (Singapore) Private Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11211** |
| Debtor | **Growing Management Ltd. (BVI)** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11919** |
| Debtor | **Hill Cosmos International Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11212** |
| Debtor | **Loyal Mark Holdings Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11213** |
| Debtor | **Metro Island International Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11214** |
| Debtor | **Mission Excel International Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11215** |
| Debtor | **N.S. Hong Investment (BVI) Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11899** |
| Debtor | **Nat Prop Investments Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **5/02/17** | Case number, if known | **17-11216** |
| Debtor | **Nouvelle Foods International Ltd.** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **3/27/17** | Case number, if known | **17-10733** |
| Debtor | **Ocean Expert International Ltd. (BVI)** | | | Relationship to you | **Affiliate** |
| District | **Southern District of New York** | When | **6/30/16** | Case number, if known | **16-11917** |

| Debtor | Pacific Andes Enterprises (Hong Kong) Limited | | | Case number (*if known*) | |
| | Name | | | | |

| | Name | | | Relationship to you | |
|---|---|---|---|---|---|
| Debtor | Pacific Andes International Holdings (BVI) Ltd. | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 4/17/17 | Case number, if known | 17-11201 |
| Debtor | Pacific Andes International Holdings Ltd. (Bermuda) | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 6/30/16 | Case number, if known | 16-11890 |
| Debtor | Pacific Andes Resources Development Ltd. | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 9/29/16 | Case number, if known | 16-12739 |
| Debtor | Pickenpack Europe GmbH | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 9/22/16 | Case number, if known | 16-12682 |
| Debtor | Pickenpack Holding Germany GmbH | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 9/22/16 | Case number, if known | 16-12681 |
| Debtor | Pickenpack Production Luneburg GmbH | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 9/22/16 | Case number, if known | 16-12683 |
| Debtor | Pioneer Logistics Ltd. | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 5/02/17 | Case number, if known | 17-11217 |
| Debtor | Protein Trading Ltd. (Samoa) | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 6/30/16 | Case number, if known | 16-11923 |
| Debtor | Sea Capital International Ltd. | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 5/02/17 | Case number, if known | 17-11218 |
| Debtor | Shine Bright Management Ltd. | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 5/02/17 | Case number, if known | 17-11219 |
| Debtor | Smart Group Ltd. (Cayman) | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 6/30/16 | Case number, if known | 16-11910 |
| Debtor | South Pacific Shipping Agency Ltd. (BVI) | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 6/30/16 | Case number, if known | 16-11924 |
| Debtor | Super Investment Ltd. | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 6/30/16 | Case number, if known | 16-11903 |
| Debtor | Superb Choice International Ltd. | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 5/02/17 | Case number, if known | 17-11220 |
| Debtor | Target Shipping Ltd. (HK) | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 6/30/16 | Case number, if known | 16-11920 |
| Debtor | Toyama Holdings Ltd. | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 5/02/17 | Case number, if known | 17-11221 |
| Debtor | TST The Seafood Traders GmbH | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 9/22/16 | Case number, if known | 16-12684 |
| Debtor | Zhonggang Fisheries Ltd. | | | Relationship to you | Affiliate |
| District | Southern District of New York | When | 4/17/17 | Case number, if known | 17-11020 |

# United States Bankruptcy Court
## Southern District of New York

In re    **Pacific Andes Enterprises (Hong Kong) Limited**        Case No. _____

                                           Debtor(s)          Chapter    **11**

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
|---|---|---|---|
| **Bonaire Development Limited**<br>**Room 3312, Hong Kong Plaza,**<br>**186 Connaught Road**<br>**Hong Kong** | | **50%** | **Shareholder** |
| **Heng Holdings (BVI) Limited**<br>**Room 3312, Hong Kong Plaza,**<br>**186 Connaught Road**<br>**Hong Kong** | | **50%** | **Shareholder** |

## DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

       I, the **Director** of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing List of Equity Security Holders and that it is true and correct to the best of my information and belief.

Date    **September 8, 2021**                      Signature   **/s/ Ng Puay Yee Annie**

                                                                  **Ng Puay Yee Annie**

*Penalty for making a false statement of concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com               Best Case Bankruptcy

# United States Bankruptcy Court
## Southern District of New York

In re  **Pacific Andes Enterprises (Hong Kong) Limited**

Debtor(s)

Case No. 

Chapter  **11**

# VERIFICATION OF CREDITOR MATRIX

I, the Director of the corporation named as the debtor in this case, hereby verify that the attached list of creditors is true and correct to

the best of my knowledge.

Date:  **September 8, 2021**

**/s/ Ng Puay Yee Annie**

**Ng Puay Yee Annie**/Director

Signer/Title

BONAIRE DEVELOPMENTS LIMITED
ROOM 3312, HONG KONG PLAZA,
186 CONNAUGHT ROAD WEST
HONG KONG


BUSINESS CONSULTANTS LIMITED
18A, 18/F, TWO CHINACHEM PLAZA,
68 CONNAUGHT ROAD CENTRAL
HONG KONG


CHASTERTON GROUP LIMITED
ROOM 3312, HONG KONG PLAZA,
186 CONNAUGHT ROAD WEST
HONG KONG


CLIFFORD CHANCE US LLP
31 WEST 52ND STREET
ATTN: DOUGLAS E. DEUTSCH
NEW YORK, NY 10019


FASTACT GROUP LIMITED
ROOM 3312, HONG KONG PLAZA,
186 CONNAUGHT ROAD WEST
HONG KONG


GRANDLUCK ENTERPRISES LIMITED
ROOM 3312, HONG KONG PLAZA,
186 CONNAUGHT ROAD WEST
HONG KONG


HENG HOLDINGS (BVI) LIMITED
ROOM 3312, HONG KONG PLAZA,
186 CONNAUGHT ROAD WEST
HONG KONG


KOLOMLIN VALERIY FEDOROVICH
APART. 20, 6/7 STROITELEY STREET, 119311
MOSCOW, RUSSIA


MERIDIAN INVESTMENT GROUP PTE LIMITED
138 CECIL STREET, #12-01A CECIL COURT,
SINGAPORE, 069538

PACIFIC ANDES ENTERPRISES (BVI) LTD.
C/O CLIFFORD CHANCE
27/F JARDINE HOUSE, ONE CONNAUGHT PLACE
CENTRAL, HONG KONG


PACIFIC ANDES INT. HOLDINGS (BVI) LTD.
ROOM 3312, HONG KONG PLAZA,
186 CONNAUGHT ROAD WEST
HONG KONG


PELICAN FOOD LIMITED
ROOM 3312, HONG KONG PLAZA,
186 CONNAUGHT ROAD WEST
HONG KONG


RAWLEY TRADING LIMITED
ROOM 3312, HONG KONG PLAZA,
186 CONNAUGHT ROAD WEST
HONG KONG


SMART CPA (HONG KONG) LIMITED
18A, 18/F, TWO CHINACHEM PLAZA,
68 CONNAUGHT ROAD CENTRAL
HONG KONG

# United States Bankruptcy Court
## Southern District of New York

In re    **Pacific Andes Enterprises (Hong Kong) Limited**            Case No.

                                   Debtor(s)           Chapter      **11**

### CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for    **Pacific Andes Enterprises (Hong Kong) Limited**    in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:

**Bonaire Development Limited**
**Room 3312, Hong Kong Plaza,**
**186 Connaught Road**
**Hong Kong**

**Heng Holdings (BVI) Limited**
**Room 3312, Hong Kong Plaza,**
**186 Connaught Road**
**Hong Kong**

☐ None [*Check if applicable*]

| | |
|---|---|
| September 8, 2021 | **/s/ Tracy L. Klestadt** |
| Date | **Tracy L. Klestadt** |
| | Signature of Attorney or Litigant |
| | Counsel for    **Pacific Andes Enterprises (Hong Kong) Limited** |
| | **Klestadt Winters Jureller Southard & Stevens, LLP** |
| | **200 West 41st Street** |
| | **17th Floor** |
| | **New York, NY 10036-7203** |
| | **(212) 972-3000 Fax:(212) 972-2245** |
| | **tklestadt@klestadt.com** |

**PACIFIC ANDES ENTERPRISES (HONG KONG) LIMITED**
(Incorporated in the Hong Kong Special Administrative Region of the People's Republic of China)
(the "**Company**")

## DIRECTORS' RESOLUTIONS IN WRITING PASSED PURSUANT TO THE COMPANY'S ARTICLES OF ASSOCIATION

WHEREAS, each director in the board of directors (the "<u>Board</u>") of the Company has confirmed that he or she has no direct or indirect interest in any way in the matters considered herein;

WHEREAS, the Company is a member of the Pacific Andes Group of companies (the "<u>Pacific Andes Group</u>");

WHEREAS, certain other members of the Pacific Andes Group have been undertaking reorganization efforts under Chapter 11 of the Bankruptcy Code;

WHEREAS, the directors of the Company have been in ongoing discussions with respect to the financial challenges and stress faced by the Company and the Group in determining the most appropriate actions to be taken in order to protect the interests of the Company while taking all due and proper account of the rights and interest of the creditors of the Company;

WHEREAS, the Board has reviewed the Company's liabilities and liquidity, the strategic alternatives available to it, and the impact of such alternatives on the Company's business;

WHEREAS, having considered their duties, including but not limited to their duties to act in good faith, in the best interests of the Company and for proper purpose, the Board has determined that it is desirable and in the best interests of the Company that a petition be filed by the Company seeking relief under the provisions of the Bankruptcy Code in which the authority to operate as a debtor in possession will be sought; and

NOW, THEREFORE, IT IS:

RESOLVED, that in the judgment of the Board, having considered their duties, it is desirable and in the best interests of the Company that a voluntary petition (the "<u>Petition</u>") be filed by the Company under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and it is further

RESOLVED, that the Company shall be, and it hereby is, authorized, directed and empowered (i) to file the Petition, and (ii) to perform any and all such acts as are reasonable, advisable, expedient, convenient, proper or necessary to effect any of the foregoing; and it is further

RESOLVED, that Ng Puay Yee Annie (the "<u>Designated Person</u>") is authorized, directed and empowered, on behalf of and in the name of the Company (i) to execute and verify the Petition as well as all other ancillary documents and to cause the Petition to be filed with the Bankruptcy Court, and to make or cause to be made prior to the execution thereof any modifications to the Petition or ancillary documents, and (ii) to execute, verify and file or cause to be filed all petitions, schedules, lists, motions, applications, disclosure statements, plans, and other papers or documents, agreements, deeds, letters, instruments or certificates necessary or desirable in connection with any of the foregoing; and it is further

RESOLVED, that the law firm of Klestadt Winters Jureller Southard & Stevens, LLP ("Klestadt") be, and it hereby is, subject to Bankruptcy Court approval, authorized, empowered and directed to represent the Company as its counsel in connection with any case commenced by the Company under the Bankruptcy Code ("<u>Bankruptcy Case</u>"), and to take any and all actions to advance the Company's rights, including the preparation of pleadings and filings in the Bankruptcy Case; and in

Page 1 of 3

connection therewith, the Designated Person is authorized, directed and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Bankruptcy Case, and to cause to be filed an appropriate application for authority to retain the services of Klestadt and all related matters; and it is further

RESOLVED, that the firm of RSR Consulting, LLC be, and it hereby is, subject to Bankruptcy Court approval, authorized, empowered and directed to represent the Company as its financial consultant in connection with the Bankruptcy Case, and to take any and all actions in its capacity as such;

RESOLVED, that the firm of Kroll, LLC be, and it hereby is, subject to Bankruptcy Court approval, authorized, empowered and directed to represent the Company as its financial advisor in connection with the Bankruptcy Case, and to take any and all actions in its capacity as such;

RESOLVED, that in addition to the existing signatories of the Company, the Designated Person is authorized to cause the Company to employ other special counsel, financial advisors, investment bankers, accountants and other professionals as appropriate in connection with any Bankruptcy Case and all related matters; and it is further

RESOLVED, that in addition to the specific authorizations heretofore conferred upon the Designated Person, and in addition to the existing signatories of the Company, the Designated Person is authorized, directed and empowered, in the name and on behalf of the Company, to do or cause to be done all such further acts and things, including the payment of all fees, expenses, appropriate retainers and other amounts payable by the Company with respect to the foregoing, and to execute and deliver all such other instruments, certificates, agreements and documents as she may consider necessary or appropriate to enable the Company to carry out the intent and to accomplish the purposes of the foregoing resolutions; and it is further

RESOLVED, that the Designated Person is authorized, directed and empowered, on behalf of and in the name of the Company, to secure the payment and performance of any post-petition financing by (i) pledging or granting liens and mortgages on, or security interest in, all or any portion of the Company's assets, including all or any portion of the issued and outstanding capital stock, partnership interests, or membership interests of any subsidiaries of the Company, whether now owned or hereafter acquired, and (ii) entering into or causing to be entered into such security agreements, pledge agreements, control agreements, intercreditor agreements, mortgages, deeds of trust and other agreements as are necessary, appropriate or desirable to effectuate the intent of, or matters reasonably contemplated or implied by, this resolution in such form, covering such collateral and having such other terms and conditions as are approved or deemed necessary, appropriate or desirable by the officer executing the same, the execution thereof by such officer to be conclusive evidence of such approval or determination; and it is further

RESOLVED, that in addition to the existing signatories of the Company, the Designated Person is authorized, directed and empowered from time to time in the name and on behalf of the Company, to (i) take such further actions and execute and deliver such certificates, instruments, guaranties, notices and documents as may be required or as such officers may deem necessary, advisable or proper to carry out the intent and purpose of the foregoing resolutions, including the execution and delivery of any security agreements, pledges, financing statements and the like, and (ii) perform the obligations of the Company under the Bankruptcy Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices and documents to be executed and delivered in such form as the officers performing or executing the same shall approve, and the performance or execution thereof by such officers shall be conclusive evidence of the approval thereof by such officers and by the Company; and it is further

RESOLVED, that all actions heretofore taken by any officer, manager or director of the Company in connection with the foregoing resolutions, the Petition and related matters be, and they hereby are, confirmed, ratified and approved in all respects; and it is further

Ref: 21-LD-PA025/PAE (HK)
Directors' resolutions_ US Chapter 11 filing

RESOLVED, that the Designated Person is authorized, directed and empowered, on behalf of and in the name of the Company, and in consultation with counsel, to develop, sign and file any and all pleadings, motions, applications, and other documents as are advisable or necessary to further the interests of the Company with respect to the Bankruptcy Case or the Bankruptcy Court; and it is further

RESOLVED, that Designated Person is authorized, directed and empowered, on behalf of and in the name of the Company, and in consultation with counsel, to develop, sign and file a plan of reorganization and disclosure statement for the Company, and amendments thereto as may be necessary from time to time, as are advisable or necessary to further the interests of the Company with respect to the Bankruptcy Case or the Bankruptcy Court and to undertake the process in accordance with applicable law of soliciting votes in favor of any such plan of reorganization so developed; and it is further

RESOLVED, that the Board waives any notice, procedural or other formalities requirements which may be required to hold a meeting of the Company's Board of Directors.


Dated this           day of


_____
NG Joo Puay Frank
Director

_____
NG Puay Yee Annie
Director

Ref: 21-LD-PA025/PAE (HK)
Directors' resolutions_ US Chapter 11 filing

**<u>Exhibit B-2</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | : **Chapter 11** |
| | : |
| **China Fishery Group Limited (Cayman)** *et al.*, | : **Case No. 16-11895 (JLG)** |
| | : |
| **Debtors.**[1] | : **(Jointly Administered)** |
| | : |

## DECLARATION OF NG PUAY YEE ANNIE (JESSIE)IN SUPPORT OF *FIRST SUPPLEMENT* TO MOTION OF PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED (BERMUDA) AND PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI) LIMITED, PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363 AND 502, AND BANKRUPTCY RULES 2002, 3001(e), 3007, 4001, 6004, 9014 AND 9019, (I) TO APPROVE COMPROMISE AMONG MOVANTS, CERTAIN CREDITORS AND INVESTORS, (II) TO AUTHORIZE CERTAIN CORPORATE GOVERNANCE ACTIONS IN FURTHERANCE OF COMPROMISE, (III) TO APPROVE THE COMPROMISE AND ALLOWANCE OF CERTAIN CLAIMS RELATED TO THE PROPOSED TRANSACTION, AND (IV) TO GRANT RELATED RELIEF

I, NG PUAY YEE ANNIE (JESSIE), hereby declare as follows:

1.  I am the Managing Director of Debtors Pacific Andes International Holdings

Limited (Bermuda) ("PAIH") and Pacific Andes International Holdings (BVI) Limited ("PAIH

BVI", and with PAIH as "Movants").

2.  I am making this declaration ("Declaration") in support of the first supplement

("First Supplement") to the motion (the "Motion"), pursuant to sections 105, 363 and 502 of title

---

[1] The Debtors are China Fishery Group Limited (Cayman), Pacific Andes International Holdings Limited (Bermuda), N.S. Hong Investment (BVI) Limited, South Pacific Shipping Agency Limited (BVI), China Fisheries International Limited (Samoa), CFGL (Singapore) Private Limited, Chanery Investment Inc. (BVI), Champion Maritime Limited (BVI), Growing Management Limited (BVI), Target Shipping Limited (HK), Fortress Agents Limited (BVI), Ocean Expert International Limited (BVI), Protein Trading Limited (Samoa), CFG Peru Investments Pte. Limited (Singapore), Smart Group Limited (Cayman), Super Investment Limited (Cayman), Pacific Andes Resources Development Limited (Bermuda), Nouvelle Foods International Ltd., Golden Target Pacific Limited, Pacific Andes International Holdings (BVI) Limited, Zhonggang Fisheries Limited, Admired Agents Limited, Chiksano Management Limited, Clamford Holding Limited, Excel Concept Limited, Gain Star Management Limited, Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited, Loyal Mark Holdings Limited, Metro Island International Limited, Mission Excel International Limited, Natprop Investments Limited, Pioneer Logistics Limited, Sea Capital International Limited, Shine Bright Management Limited, Superb Choice International Limited, and Toyama Holdings Limited (BVI).

11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 3001(e), 3007, 4001, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) to approve a compromise by Movants, certain creditors and the Investor (defined herein) and the Transaction Documents associated therewith, (ii) to authorize certain corporate governance actions in furtherance of the proposed compromise, (iii) to approve the compromise and allowance of certain claims related to the Proposed Transaction, and (iv) to grant related relief [ECF No. 1753], and seek entry of a revised order, substantially in the form annexed hereto as Exhibit 1 (the "Revised Proposed Order").

3.      This Declaration shall supplement (a) *Declaration of David Sutherland in Support of Pacific Andes International Holdings Limited (Bermuda) and Pacific Andes International Holdings (BVI) Limited, Pursuant to Bankruptcy Code Sections 105, 363 and 502, and Bankruptcy Rules 2002, 3001(e), 3007, 4001, 6004, 9014 and 9019, (I) To Approve Compromise Among Movants, Certain Creditors and Investors, (II) To Authorize Certain Corporate Governance Actions in Furtherance of Compromise, (III) To Approve the Compromise and Allowance of Certain Claims Related to the Proposed Transaction, and (IV) To Grant Related Relief* [ECF No. 1753-1] and (b) *Supplemental Declaration of David Sutherland in Support of Pacific Andes International Holdings Limited (Bermuda) and Pacific Andes International Holdings (BVI) Limited, Pursuant to Bankruptcy Code Sections 105, 363 and 502, and Bankruptcy Rules 2002, 3001(e), 3007, 4001, 6004, 9014 and 9019, (I) To Approve Compromise Among Movants, Certain Creditors and Investors, (II) To Authorize Certain Corporate Governance Actions in Furtherance of Compromise, (III) To Approve the Compromise and Allowance of Certain Claims Related to the Proposed Transaction, and (IV) To Grant Related Relief* [ECF No. 1769].

4.      Except as otherwise indicated herein, the facts set forth in this Declaration are based

2

upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the Debtors. If called to testify, I would testify competently to the facts set forth in this Declaration.

5.     Having determined that the sale of the real properties was in the best interest of the creditors at the PAIH level, the Movants have been working on finalizing the sale of the real properties since 2018. The Investor has been ready and willing to purchase the real properties for more than 2 years. During this time period, the Movants have continued to negotiate with the creditors, and most specifically with the Liquidators until those negotiations reached an impasse. Over the last two years, the Hong Kong real estate market has been turbulent and prices have been negatively affected, first, due to the protests in Hong Kong in 2019 and second, with the COVID-19 pandemic in 2020 to present. There is no indication of any improvement in the market anytime soon. It is this reason that we are moving forward with the Proposed Transaction, all in the best interest of the creditors of the estates.

6.     Since the Motion was submitted, Movants have been in continuous negotiations with certain of the affected creditors and other parties. Over the course of the last year, changing circumstances and positions have resulted in the necessity for certain modifications to the Proposed Transaction. By the First Supplement, Movants have outlined the proposed modifications to the Proposed Transaction, all as incorporated in the revised Transaction Documents[2] associated therewith.

7.     The reasoning for the Motion remains intact and integral to these Bankruptcy Cases, namely the intention to bring about a resolution of the majority of the non-PRC Claims at the PAIH

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the revised Settlement and Framework Agreement.

level of the Debtors' corporate structure, and to authorize certain corporate actions that are intended to pave the way for the prompt conclusion of Movants' chapter 11 cases.

8.     The Motion seeks authority to effectuate the Proposed Transaction with an unrelated, third party Investor, in which the Investor has agreed, conditional upon the Bankruptcy Court's approval, to purchase, and the majority of Movants' non-PRC creditors have agreed to sell and assign, the majority of PAIH's non-PRC existing indebtedness, inclusive of certain indebtedness of certain non-debtor affiliates of PAIH.[3]  This is the anticipated first step in the group's ability to finalize and file a plan of reorganization. At Closing, the Investor will contemporaneously agree to assign the Purchased Debt Claims, in exchange for the grant of an exclusive, unconditional and irrevocable call option under the Call Option Deed over PAIH's equity interest in certain indirect wholly owned non-debtor real estate holding entities, i.e. the Property-Owning Companies, and the novation of the Target Group Debt under the Novation Deed.  If the Investor exercises the call option under the Call Option Deed (the consideration therefor which shall be deemed good and sufficient), all Purchased Debt Claims shall be assigned to PAIH BVI in accordance with the Call Option Deed; (ii) the Target Group Debt shall be novated in accordance with the Novation Deed; and (iii) upon such assignment, such Purchased Debt Claims will be deemed settled, satisfied and expunged in full as against Movants.

9.     The direct result of the Proposed Transaction would be (i) an initial compromise and ultimate satisfaction of the Purchased Debt Claims, representing the majority of PAIH's non-PRC indebtedness, in exchange for certain non-core real estate assets for value and certain Target Group Debt associated with such Property Owning Companies, (ii) receipt and release of

---

[3] The aggregate amount of such PAIH's non-PRC existing indebtedness will not exceed US$407.7 million.

4

significant cash proceeds to facilitate the payment of certain accrued and outstanding professional fees and other ongoing administrative expenses incurred in these Bankruptcy Cases, and (iii) the enhanced ability to confirm a plan of reorganization at the PAIH level of the Debtors' corporate structure, thus taking a major step towards moving these Bankruptcy Cases towards ultimate closure.

10.     Except as modified herein, all of the remaining terms of the Proposed Transaction shall be the same as set forth in the Motion. The relief sought in the Motion remains the same, and for avoidance of doubt Movants hereby incorporate the terms of the Motion as if more fully set forth herein.

11.     The modifications to the Proposed Transaction can be broken down into the following categories: (a) Real Properties; (b) Valuation; (c) Purchase Price; (d) Participants; and (e) the Investor.[4]

**a.     Real Properties**

**Modified Term:** Revised Real Properties subject to Proposed Transaction.

12.     The real properties (the "Real Properties") subject to the Proposed Transaction shall be modified to now include the below identified properties. Any other properties identified in the Motion will no longer be included in the Proposed Transaction.

|  | Property Owner | Property Address |
|---|---|---|
|  |  |  |
| 1. | Rawley Trading Limited | Flat A1, 20/F & Roof, Blk A, Evergreen Villa, 43 Stubbs Road and Car Parking Space No. 108, Hong Kong |
| 2. | Fastact Group Limited | Block 1, 14/ F and Car Port Space No. G122 and Car Parking Space No. 250, Repulse Bay Garden, Nos. 18-40 Belleview Drive, Hong Kong |

---

[4] This description herein of the Proposed Transaction and Transaction Documents is qualified in its entirety by reference to the applicable provisions of the Transaction Documents. To the extent there are any inconsistencies between this summary and the provisions of the Transaction Documents, the provisions of the Transaction Documents shall control.

| | Property Owner | Property Address |
|---|---|---|
| | | |
| | | |
| 3. | Chasterton Group Limited | House No. 36, Manderly Garden, 48 Deep Water Bay Road, Hong Kong |
| 4. | Pacific Andes Enterprises (Hong Kong) Limited | House No. 34, Manderly Garden, 48 Deep Water Bay Road, Hong Kong |
| 5. | Bonaire Development Limited | Unit 8B and Car Parking Space No. L39 on Lower Ground Floor, Celestial Garden, 5 Repulse Bay Road, Hong Kong |
| 6. | Grandluck Enterprises Limited | Apartment B33, 2/F, Block B3, Woodgreen Estate, 5 Shouson Hill Road, Hong Kong & Car parking Space No.10 & 20 |

13.     As set forth in the Motion, Movants are the beneficial owners, through certain wholly-owned non-debtor Subsidiaries, of certain real property in Hong Kong. The present Proposed Transaction will involve six (6) parcels of real property, which have a present valuation of approximately HK$ 615,000,000, or estimated US$79,340,000 (with an exchange rate of 0.13 as of December 28, 2020).

14.     All of the relevant Real Properties are owned by non-debtor affiliates (i.e. the Property-Owning Companies), and these non-debtor affiliates are in turn 100% owned by Movants. The Movants recently completed an internal restructuring exercise, such that subsequent thereto: (i) Dynamic Choice Limited, Full Enrich Limited (HK), Glorious Ocean Limited (HK), Grandway Capital Resources Limited (HK), Fortune Midas Limited (BVI), Rich System Limited and Ace Field Limited are no longer Subsidiaries of Heng Holdings and (ii) Rawley Trading Limited (BVI) became a Subsidiary of Heng Holdings (the "Group Restructuring"). Further, the Proposed Transaction contemplates that Fastact Group Limited (BVI), one of the Property-Owning Companies, will no longer be restructured as a Subsidiary of Heng Holdings, and instead will continue to remain as a separate, stand-alone Subsidiary of PAIH BVI, and thus independently

subject to the Call Option Deed. The structure of the Target Group will, following the updated Group Restructuring, be as set forth in **Exhibit 1**. The Group Restructuring did not have any economic effect upon the assets of the Movants, but instead was completed to simplify the Proposed Transaction.

15. When the Chapter 11 petition of PAIH was filed on June 30, 2016, PAIH non-debtor affiliates owned approximately 34 pieces of real estate. Since the filing of the Bankruptcy Cases, the PAIH non-debtor affiliates have disposed of 28 parcels of real estate for a total consideration of approximately US$74 million, leaving 6 parcels of remaining Real Properties that shall be included in the present Proposed Transaction.

16. As related to, and since the filing of, the Motion, the non-debtor affiliates have sold eight (8) parcels identified in the Motion, for a total consideration of US$16,051,484. The sales took place to preserve value, given the decline in the Hong Kong property market at the time, and to satisfy the requirements of DBS Bank (Hong Kong) Limited as secured mortgage holder (the "Mortgage Bank"). All or most of the sale proceeds were applied to satisfy the outstanding first-lien mortgages on the real property owed to the Mortgage Bank. As of the date of this First Supplement, all mortgages have been paid and satisfied in full. Each of the Real Properties are unencumbered.

 **b.**  **Valuation:**

**Modified Term:**  Revised Valuation of Real Properties.

17. At the time of the filing of the Motion, the Real Properties were valued at US$85,348,000. *See* Motion, ¶ 21; Sutherland Declaration, ¶ 17, **Exhibit 6**. Since that time, the Hong Kong property market has undergone a general devaluation as a result of community unrest and the COVID-19 crisis. Accordingly, the latest valuation of the Real Properties shows

an average drop in value of 7.2%. The present valuation of the Real Properties is estimated to be HK\$615,000,000, or US\$79,340,000.

18.    An updated valuation was prepared for the Movants by Vigers Appraisal & Consulting Limited, dated February 9, 2021 (the "Updated Appraisal"). A copy of the Updated Appraisal is annexed as **Exhibit 2**. The quantum of the valuation of the Real Properties set forth in the Updated Appraisal has been accepted by the participating creditors.

**c.**    **Purchase Price**:

**Modified Term:**    The proposed Amended Debt Purchase Price is US\$56.0 million; Novation of Target Group Debt; Mortgage Loan repaid.

19.    Subject to approval of the Bankruptcy Court and subject to satisfaction of certain other agreed conditions in the Proposed Transaction, the Investor has agreed to purchase, and the participating creditors have agreed to sell and assign, the participating Debt Claims (the "Amended Purchased Debt Claims") for the aggregate debt purchase price of US\$56.0 million (the "Amended Debt Purchase Price").

20.    As described in the Motion and as further modified hereunder, the Amended Debt Purchase Price is directly correlated to the value of the Real Properties upon exercise of the call option under the Call Option Deed. That is, the Investor will contemporaneously agree to assign the Purchased Debt Claims, in exchange for the grant of an exclusive, unconditional and irrevocable call option under the Call Option Deed over PAIH's equity interest in the Property-Owning Companies, and the novation of the Target Group Debt under the Novation Deed. The Purchase Price under the Proposed Transaction is an approximate 30% discount to the valuation under the Updated Appraisal. The Amended Debt Purchase Price, which was negotiated in a good faith arms-length transaction, accounts for adjustments to valuation under the current

8

circumstances related to this Proposed Transaction (inclusive of, *inter alia*, the bulk purchase of the Real Properties, the necessary modifications of the terms of the Proposed Transaction, and the uncertainty of the pending bankruptcy cases in the U.S.), as well as the decrease in valuation resulting from the ongoing COVID 19 pandemic and the current state of affairs and unrest in Hong Kong which have significantly affected the Hong Kong real estate market.

21.     With certain exceptions noted in the Motion, the Investor will be purchasing the Debt Claims for 8.75% of the face amount of such Debt Claims.  This represents a reduction on the previous 9.5% agreed to by the Investor at the time of the filing of the Motion, reflecting the reduction in value of the Real Properties.  All creditors agreeing to be Participants have agreed to the Amended Debt Purchase Price and related percentage.  For avoidance of doubt, except as set forth in the Motion or this First Supplement, the same percentage was offered to all creditor Participants.

22.     As set forth in the Motion, the Investor will continue to agree to pay the agreed settlement premium to Maybank of US$4 million, and Maybank will release (i) the share charge over the entire issued share capital of an indirect subsidiary of PAIH, Pacific Andes Food (BVI) Limited, and (ii) the equity pledge over the entire equity of an indirect subsidiary of PAIH, Pacific Andes Food Limited (PRC), resulting in S$5,429,000 (equivalent to approximately US$3,918,161) being released to the Debtors.

23.     The Debt Purchase Agreements between the Investor and the respective Participants have been amended to reflect the modifications to the Proposed Transaction.  The revised Debt Purchase Agreements shall be in substantial form and substance as attached as **Exhibit 3**.  It is expected that the Participants will have executed their respective amended Debt Purchase Agreements prior to the hearing on the Motion.  Movants expect to submit a further

supplemental declaration prior to the hearing to update the Bankruptcy Court on the status of the signed Transaction Documents.

24.     In further consideration, the Movants shall also agree to the novation of the Target Group Debt under the Novation Deed.  Because of the ownership structure of the Target Group, the novation should not have any material economic effect on the Movants under the Proposed Transaction.

d.     **Proposed Participants and Other Payees**:

**Modified Term:**  The classification of participating creditors shall be modified as follows:

- The claims asserted by the joint liquidators ("<u>BVI Liquidators</u>") appointed for Richtown Development Ltd. (BVI), Pacos Trading Ltd. (Cayman) and Pacific Andes Enterprises (BVI) Limited (collectively the "<u>FTI Claims</u>") shall become Optional Unsecured Debt Claims (formerly Mandatory Unsecured Debt Claims).

- In addition to the foregoing changes, the Investor will no longer be required to undertake the following actions as contemplated in the Motion: (a) payment of the FTI Professional Fee Reserve (approx. US$350,000) and (b) transfer of the full amount of the Outstanding Mortgage Amount (approx US$19,777,353) to Chasterton Group Limited (for the full and final discharge of the mortgage loans by Chasterton Group Limited to the Mortgage Bank).

25.     Over the past year, the Debtors, the Investor and BVI Liquidators have had substantial negotiations with respect to the claims asserted by the BVI Liquidators on behalf of Richtown Development Ltd. (BVI), Pacos Trading Ltd. (Cayman) and Pacific Andes Enterprises (BVI) Limited (collectively, the "<u>Liquidation Companies</u>").  As of the filing of the Motion, the Liquidation Companies had yet decided whether to participate in the Proposed Transaction,

10

which gave rise to a number of issues needing to be resolved between the Investor and the Liquidation Companies. To date, despite ongoing negotiations, the Liquidation Companies, by the BVI Liquidators, have still not agreed to participate in the Proposed Transaction. As such, the FTI Claims shall now be classified as Optional Unsecured Debt Claims, and subject to all terms of those other claims identified as Optional Unsecured Debt Claims. The FTI Professional Fee Reserve set forth in the Motion has been removed from the Proposed Transaction.

26. The mortgage loans extended by the Mortgage Bank on account of the mortgages on certain real property owned by the Property-Owning Companies has been repaid in full and satisfied since the date of the filing of the Motion. As the value raised through the sale of the eight parcels (8) identified in the Motion was approximately equal to the value of the Mortgage Loan, the sales do not impact on the return offered to creditors.

27. As set forth in the Motion, the Amended Purchased Debt Claims are exclusive of certain claims asserted against PAIH by creditors in the People's Republic of China ("PRC") (the "PRC Claims"). Movants dispute the validity of the PRC Claims, and it is understood that such claims are secured by and would be ultimately satisfied by certain assets of PAIH located inside the PRC. The PRC Claims will be addressed in a plan of reorganization of PAIH and its affiliates at the PAIH level of the corporate structure.

28. Based upon the proposed modifications to the Proposed Transaction, the payment stream shall be as follows:

| Payee | Debt Claim Amount | Payment Amount |
|---|---|---|
| Mandatory Unsecured Debt Claims | US$259,974,216.03 | US$26,747,743.90 |

11

| Optional Unsecured Debt Claims | US$127,895,872.5 | US$ 11,190,888.84 |
|---|---|---|
| Priority Debt Claim | US$1,479,927.85 | US$887,956.71 |
| Deferred Priority Debt Claims | US$18,340,087 | US$18,340,087 |
| Remaining Cash | - | US$(1,166,676)[5] |

\*The Debt Claim Amount and Payment Amount for those claims in Euro and HK$ are based on the exchange rate of Euro1=US$1.2096 and US$1=HK$7.8 respectively as of January 14,2021

29.     Upon completion of the Proposed Transaction, it is expected that the Debtors' estates shall receive cash of not less than US$4 million from the release of funds held in joint escrow, referred to above. It is intended that these proceeds, along with any other proceeds resulting from any Optional PAIH Unsecured Creditors not participating in the Proposed Transaction, will be immediately available to the Debtors to pay certain accrued and outstanding professional fees and other ongoing administrative expenses of approximately US$4 million incurred in these bankruptcy cases.

e.     **Investor**

**Modified Term: Investor entity**

30.     The purchasing entity has changed to Asia Union Limited  since the filing of the Motion. This is not a modification in substance, as the new investing entity has the same ultimate parent.  The creditors have completed the necessary KYC procedures.

*31.     Except as modified herein, all of the remaining terms of the Proposed Transaction shall be the same as set forth in the Motion.  The relief sought in the Motion*

---

[5] The Remaining Cash shall be increased by any Optional PAIH Unsecured Claim which does not participate in the Proposed Transaction.

*remains the same, and for avoidance of doubt Movants hereby incorporate the terms of the*

*Motion as if more fully set forth herein.*

[SIGNATURE PAGE TO FOLLOW]

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Executed on 12 February 2021
in Hong Kong, Special Administrative
Region of the People's Republic of China

NG PUAY YEE ANNIE (JESSIE)

# Current Holding Structure



Note:

 Entities have filed to US bankruptcy report under Chapter 11

Entities hold Hong Kong properties



# VIGERS
International Property Consultants

27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com

# PROPERTY VALUATION REPORT

in respect of

VARIOUS PROPERTIES
LOCATED IN
HONG KONG SPECIAL ADMINISTRATIVE REGION

Prepared by

## VIGERS APPRAISAL AND CONSULTING LIMITED

~ GENERAL PRACTICE SECTOR ~

Date of Report: 9th February 2021

威格斯 國際物業顧問　香港九龍官塘道388號創紀之城一期澄打中心27樓



# VIGERS

International Property Consultants

27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com

**PAE Limited**

Rooms 3312,
Hong Kong Plaza,
188 Connaught Road West,
Hong Kong

Attn.: Mr Dennis TAK HEI CHAN

Date of Report: 9th February 2021

**Our Ref.:** DC/JL/VA32694-2021
**Your Ref.:** Nil

**Vigers Appraisal and Consulting Limited**
General Practice Sector

Phone: +852 6651-5330
E-mail: GP@Vigers.com
Website: www.Vigers.com

27/F Standard Chartered Tower,
Millennium City 1, 388 Kwun Tong Road,
Kowloon, Hong Kong



Dear Sir / Madam,

**RE:** THE UNENCUMBERED PROPERTY INTEREST(S) OF
VARIOUS PROPERTIES LOCATED IN "HONG KONG SPECIAL ADMINISTRATIVE REGION" ("HONG KONG")
(INDIVIDUALLY REFERRED TO AS "THE PROPERTY" AND COLLECTIVELY REFERRED TO AS "THE PROPERTIES")

We refer to the recent instruction from "PAE Limited" (the "Client") for us to assess the unencumbered property interest(s) of various properties as listed in the attached Summary of Values on a market value basis in existing state and physical condition as at **9th February 2021** (the "Date of Valuation") for **internal management reference** purpose. We confirm that we have inspected the property(ies), conducted land registration record(s) at the Land Registry, made relevant enquiries and investigations as well as obtained such further information as we consider necessary for the purpose of providing with our opinion of value(s) of the property(ies) as at the Date of Valuation.

Regulated by the "Royal Institution of Chartered Surveyors" ("RICS"), **"Vigers Appraisal and Consulting Limited"** ("Vigers" or "we" or "Valuer") hereby confirms that there is no material connection or involvement with the property(ies) or the Client who commissions this assignment. Unless otherwise stated, Vigers is competent to undertake this valuation assignment without seeking material assistance from others in relation to any aspect of the assignment. The Valuer, together with any associates, now declares that the Valuer is acting as an "External Valuer" (as defined in "HKIS Valuation Standards 2020" published by "The Hong Kong Institute of Surveyors" ("HKIS")) who has no material links with the Client, not an agent acting on behalf of the Client nor the subject of this valuation assignment.

Our valuation(s) is/are our opinion of market value(s) of the property(ies) which is defined as intended to mean "the estimated amount for which an asset or liability should exchange on the valuation date between a willing buyer and a willing seller in an arm's-length transaction after proper marketing and where the parties had each acted knowledgeably, prudently and without compulsion". Our valuation(s) has/have been carried out in accordance with "RICS Valuation – Global Standards" published by the RICS and "HKIS Valuation Standards 2020" published by the HKIS, both of which incorporate the "International Valuation Standards" ("IVS") published by the "International Valuation Standards Council" ("IVSC").

Unless otherwise stated, our valuation(s) has/have been made on the assumption that the property(ies) could be sold in the prevailing market without the benefit of any deferred term contract, leaseback, joint venture, management agreement or any other similar arrangement which may serve to affect the value(s) of the property(ies). In addition, no account has been taken into of any option or right of pre-emption concerning or affecting the sale of the property(ies).

In respect of the property(ies) which is/are subject to tenancy(ies), we have adopted income approach which provides an indication of value by converting future cash flow to a single current value. Under the income approach, the value of an asset is determined by reference to the value of income, cash flow or cost savings generated by the asset. In arriving at the market value(s) of the property(ies), we have applied income method of valuation whereby the property net rental income derived from the existing tenancy(ies) is/are capitalised at appropriate term yield(s); and due allowance has been made for the reversionary interest(s).

No responsibility is assumed for any legal matters concerning the legal title to the property(ies) set out in this report. We have conducted land registration record(s) at the Land Registry but we have not searched the original document(s) to ascertain ownership nor to verify any lease amendment(s) which may not appear on the copy(ies) handed to us. In the course of our valuation(s), we have relied to a considerable extent on the information made available to us and we have accepted advice on such matters as planning approval(s) or statutory notice(s), easement(s), tenure(s), occupancy status, site and floor areas as well as all other relevant matters. Unless otherwise stated, no on-site measurement has been made. All information and document(s) provided to us have been used for reference purpose and all dimension(s), measurement(s) and area(s) are therefore approximation(s). Unless otherwise stated, floor area measurements are carried out in accordance with the "Code of Measuring Practice (1st Edition March 1999)" and its "Supplement(s) to the Code of Measuring Practice" published by the HKIS.

In the course of our valuation(s), we have assumed that the owner(s) has/have free and uninterrupted rights to use and assign the property(ies) during the unexpired land-lease term(s) granted subject to the payment of usual Government Rent(s) unless otherwise noted or specified.

We had carried out on-site inspection but we have not carried out any structural survey or test on any building services nor have we inspected the woodwork or other part(s) of the structure(s) which was/were covered, unexposed or inaccessible to us. We are therefore unable to report whether such part(s) of the property(ies) is/are free from rot, infestation or any structural or non-structural defect.

The use of the word "property" throughout this report is intended to mean "land and building" and the word "land" has its normal legal interpretation.

---

Our Ref.: FW/JL/VA32694-2021

威格斯 國際物業顧問　　香港九龍官塘道388號創紀之城一期渣打中心27樓



# VIGERS

International Property Consultants
27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com

Unless otherwise stated, we have carried out our valuation(s) assuming that:
(1) all necessary statutory approvals for the property(ies) of the development of which the property(ies) form(s) part of the use(s) have been obtained;
(2) no deleterious or hazardous materials or techniques have been used in the construction of the property(ies);
(3) the property(ies) is/are not subject to any unusual or especially onerous restrictions, encumbrances or outgoings and that good title can be shown;
(4) for those parts of the property(ies) could not be inspected would not reveal material defects or cause to alter our valuation(s);
(5) the property(ies) is/are connected to main services and sewers which are available on normal terms;
(6) in the case of the property(ies) which is/are under construction, the property(ies) will be satisfactorily completed to the standard in due course and details as described in the latest development schedules as contained in the sales brochure; and
(7) in valuation(s) of the property(ies) which is/are held under multiple ownership, the cost of repairs and maintenance to the development of which the property(ies) form(s) part of the use are shared among all co-owner(s) of the development, unless instructed by the Client or otherwise aware of to the contrary, and that there are not onerous liabilities outstanding.

In the course of our valuation(s), we have taken the following into account:
(1) the tenure of the property(ies);
(2) the age, type, accommodation, location, amenities, fixtures and features of the property(ies) and other significant environment factors within the locality;
(3) the general state of repair, the construction and apparent major defects; and
(4) the overall quality of management of the development of which the property(ies) form(s) part of.

In undertaking our market value assessment(s) of the property(ies) under multiple-ownership, any redevelopment potential attached to the site has been excluded, unless otherwise instructed. Unless otherwise stated, we have not carried out our valuation(s) on redevelopment basis; and the study of any possible alternative development option(s) and/or related economics do/does not come within the service scope of this report.

Any element of value attributable to furnishing and/or removable fitting(s) of any description as well as portable and temporary structure(s) when arriving at our opinion of value(s) of the property(ies) has/have been disregarded or excluded. We have valued the property(ies) in accordance with its/their original approved state. Any premium or discount attached to the unauthorized addition(s) and/or alteration(s) has been disregarded. Nor have we considered any cost(s) required to restore the property(ies) to its/their original state if requested by government authorities, unless otherwise noted.

We have assumed that the property(ies) has/have been constructed, occupied and used in full compliance with all, and without contravention of any, Ordinances, except only where otherwise stated. We have further assumed that, for any use(s) of the property(ies) upon which this report is based, any and all required license(s), permit(s), certificate(s), and/or authorization(s) has/have been obtained, except only where otherwise stated.

Our market value assessment(s) is/are made on the assumption that the owner(s) sell(s) the property(ies) in the prevailing market without the benefit or burden of cash rebate or any other similar arrangement(s) which may serve to affect the value(s) of the property(ies). No allowance has been made in our valuation(s) for any charges, mortgage(s) or amount(s) owing on the property(ies), nor for any expenses or taxation which may be incurred in effecting a sale. Unless otherwise stated, we have assumed that the property(ies) is/are free from encumbrances, restrictions and outgoings of an onerous nature which may serve to affect the value(s) of the property(ies).

All residential properties acquired on or after 20th November 2010 and resold within a certain period will be subject to a "Special Stamp Duty" ("SSD") on top of the existing "Ad valorem Stamp Duty" ("AVD") in relation to sale or transfer of immovable property. Such SSD is payable jointly and severally by both buyer and seller in resale transaction. Unless otherwise stated, we have assumed in our valuation(s) that such SSD liability, if applicable, would be borne by the vendor. Nevertheless, the Client is recommended to further investigate into the potential liability of such SSD which may have impact on the market value(s) of the property(ies) being valued for future transaction(s).

We have relied to a very considerable extent on the information given by the Client; and we have accepted advice given to us on such matters as statutory notice(s), easement(s), tenure(s), occupancy status, site and floor areas, identification of the property(ies) and all other relevant matter(s). No detailed on-site measurement(s) to the property(ies) has/have been taken. The plan(s) in this report, if any, is/are included to assist the Client to visualize the property(ies) and we assume no responsibility for accuracy.

Vigers is registered for regulation by the RICS, and our service rendered may be subject to monitoring under RICS's conduct and disciplinary regulations. Reference to the complaints handling procedure of Vigers is available on the Client's request.

The report is for the Client's exclusive use and for the purpose mentioned earlier only. The contents of this report either in whole or in part shall not be disclosed to any other party(ies) and we accept no responsibility if it is used or relied upon by any other party(ies) or used for any other purpose(s).

The Client has not commissioned a structural survey on the property(ies). The Client must not assume that, if defects are not mentioned in the report, all part(s) of the structure is/are free from defects. Where your attention is drawn to some defects it does not mean that other defects may not exist. Moreover, services have not been tested. If the Client intends to purchase or rent the property(ies) and wants to satisfy himself as to its/their condition, he/she should obtain a surveyor's detailed inspection report of his/her own before deciding whether to enter into any agreement(s).

The Client is reminded that this report has been prepared in accordance with "RICS Valuation – Global Standards" published by the RICS and "HKIS Valuation Standards 2020" published by the HKIS; which entitles Vigers to make assumption(s) as stated in this report which may upon further investigation(s), for instance by your legal representative, prove to be inaccurate or untrue. Any exception is clearly stated below.

The outbreak of the "Novel Coronavirus" ("COVID-19"), declared by the "World Health Organisation" as a "Global Pandemic" on 11th March 2020, has and continues to impact many aspects of daily life and the global economy – with some real estate markets having experienced lower levels of transactional activity and liquidity. Travel restrictions have been implemented by many countries and "lockdowns" applied to varying degrees. Whilst restrictions have now been lifted in some cases, local lockdowns may continue to be deployed as necessary and the emergence of significant further outbreaks or a "second wave" is possible. The pandemic and the measures taken to tackle COVID-19 continue to affect economies and real estate markets globally. Nevertheless, as at the Date of Valuation some property markets have started to function again, with transaction volumes and other relevant evidence returning to levels where an adequate quantum of market evidence exists upon which to base opinion of value(s). Accordingly, and for the avoidance of doubt, our valuation(s) is/are not reported as being subject to "Material Valuation Uncertainty" as defined by VPS3 and VPGA10 of the

---

Our Ref: FW/JL/VA32694-2021                                                                                               Page 3 of 11

威格斯 國際物業顧問   香港九龍官塘道388號創紀之城一期潭打中心27樓



# VIGERS

International Property Consultants

27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com

"RICS Valuation – Global Standards" published by RICS as well as "Material Uncertainty" as set out in "VS9 Reporting" of "HKIS Valuation Standards 2020" published by the HKIS, except as identified below. In respect of the sector(s) in which the property(ies) is/are being classified, as at the Date of Valuation we continue to be faced with an unprecedented set of circumstances caused by COVID-19 and an absence of relevant or sufficient market evidence on which to base our judgement. Our valuation(s) of the property(ies) is/are therefore reported as being subject to "Material Valuation Uncertainty" as set out in VPS3 and VPGA10 of the "RICS Valuation – Global Standards" published by RICS as well as "Material Uncertainty" as set out in "VS9 Reporting" of "HKIS Valuation Standards 2020" published by the HKIS. Consequently, in respect of the valuation less certainty – and a higher degree of caution – should be attached to our valuation(s) than would normally be the case. For the avoidance of doubt, this explanatory note, including the "Material Valuation Uncertainty" declaration, does not mean that the valuation(s) cannot be relied upon. Rather, this explanatory note has been included to ensure transparency and to provide further insight as to the market context under which the valuation opinion was prepared. In recognition of the potential for market conditions to move rapidly in response to changes in the control or future spread of COVID-19 we highlight the importance of the Date of Valuation.

Unless otherwise stated, all monetary amounts stated herein are denoted in "Hong Kong Dollar" ("HK$"), the lawful currency of "Hong Kong Special Administrative Region" ("Hong Kong"); and the conversion factors adopted are 1.00 square metre ("sq.m.") to 10.7639 square feet ("sq.ft.") for area measurement, and 1.00 metre ("m.") to 3.2808 feet ("ft.") for length measurement.

We enclose herewith the Summary of Values and Property Valuation Report(s).

Yours faithfully,
For and on behalf of
**VIGERS APPRAISAL AND CONSULTING LIMITED**

**Sr David W. I. CHEUNG**
MRICS MHKIS RPS(GP) CREA
RICS Registered Valuer
Executive Director

威格斯 國際物業顧問    香港九龍官塘道388號創紀之城一期渣打中心27樓

# VIGERS

International Property Consultants

27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com



## SUMMARY OF VALUES

| No. | Property Address | Market Value in Existing State as at the Date of Valuation |
|---|---|---|
| 1. | Flat A1 on 20th Floor & Roof & 1 Car Parking Space No. 108, Block A Evergreen Villa, 43 Stubbs Road, Hong Kong | HK$70,000,000 |
| 2. | Block 1 (No. 40 Belleview Drive) on 14/F, Car Parking Space No. 250 and Car Port Space No. G122 on the Ground Floor, Repulse Bay Garden, Nos. 18-40 Belleview Drive, Hong Kong | HK$65,000,000 |
| 3. | House No. 36, Manderly Garden, No. 48 Deep Water Bay Road, Hong Kong | HK$170,000,000 |
| 4. | Unit B on 8th Floor and Car Parking Space No. 39 on Lower Ground Floor, Celestial Garden, No. 5 Repulse Bay Road, Hong Kong | HK$80,000,000 |
| 5. | Apartment B33 (including the Roof) on 2/F of Block B3 and Garden appurtenant thereto and Car Parking Space No. 20, Woodgreen Estate, No. 5 Shouson Hill Road, Hong Kong | HK$60,000,000 |
| 6. | House No. 34, Manderly Garden, No. 48 Deep Water Bay Road, Hong Kong | HK$170,000,000 |
| | **GRAND TOTAL** | **HK$615,000,000** |

威格斯 國際物業顧問　　香港九龍官塘道388號創紀之城一期渣打中心27樓

# VIGERS

International Property Consultants

27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com



## PROPERTY VALUATION REPORT

| No. | Property | Description and Tenure | Occupancy Status | Market Value in Existing State as at the Date of Valuation |
|---|---|---|---|---|
| 1. | Flat A1 on 20th Floor & Roof & 1 Car Parking Space No. 108, Block A Evergreen Villa, 43 Stubbs Road, Hong Kong<br><br>All those 11/2,530th parts or shares of and in Inland Lot No. 7891 registered at the Land Registry | Completed in 1970, the property comprises a residential unit on 20/F of Block A and one carparking space on 1/F of the development.<br><br>As measured from the registered floor plan, the residential portion of the property has a saleable area of about 2,363 square feet (219.53 square metres) and a roof area of about 1,862 square feet (173.00 square metres).<br><br>Inland Lot No. 7891 is held under Conditions of Sale No. UB7271 for a lease term of 75 years from 23rd July 1962 renewable for 75 years. | According to a copy of tenancy agreement provided by the client, the property is leased out for a term from 1st January 2015 to 31st December 2029 at a monthly rent of HK$50,000 only, inclusive of Rates, Government Rent and management fee. | HK$70,000,000 (HONG KONG DOLLARS SEVENTY MILLION ONLY) |

Notes

1.  Pursuant to our recent Land Registration Record(s), the current registered owner is "RAWLEY TRADING LIMITED" vide Memorial No. UB9306990 dated 2nd August 2004.

2.  Pursuant to our recent Land Registration Record(s), the property is subject to the following salient encumbrances.

    (1)  Deed of Covenant vide Memorial No. UB840827 dated 12th October 1971;

    (2)  Occupation Permit (Permit No. H149/70) Re Block A vide Memorial No. UB859537 dated 12th November 1980;

    (3)  Notice No. WNZ/U09-09A/0001/08 by the Building Authority under Section 24C(1) of the Buildings Ordinance vide Memorial No. 12101600230131 dated 19th January 2010

    (4)  Mortgage for all monies in favour of DBS Bank (Hong Kong) Limited vide Memorial No. 14071002320134 dated 26th June 2014

    (5)  Tenancy Agreement for a least term of 15 years from 1st January 2015 to 31st December 2029 at a monthly rent of HK$50,000 in favour of Pacific Andes Enterprises (Hong Kong) Limited vide Memorial No. 17031602260319 dated 1st January 2015

3.  In the course of our valuation, we have assumed that the aforesaid notices have been complied with and to the satisfaction of the Building Authority; and no allowance has been made for remedial works, if any.

4   Our valuation is made on the basis that the property is not subject to mortgage or any other material encumbrances.

5.  According to the confirmation letter by DBS Bank (Hong Kong) Limited from the client, the mortgage has been fully settled and DBS Bank (Hong Kong) Limited has given her consent to discharge the mortgage.



# VIGERS
International Property Consultants
27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com

## PROPERTY VALUATION REPORT

| No. | Property | Description and Tenure | Occupancy Status | Market Value in Existing State as at the Date of Valuation |
|---|---|---|---|---|
| 2. | Block 1 (No. 40 Belleview Drive) on 14/F, Car Parking Space No. 250 and Car Port Space No. G122 on the Ground Floor, Repulse Bay Garden, Nos. 18-40 Belleview Drive, Hong Kong<br><br>All those 12/2,850th parts or shares of and in Rural Building Lot No. 792 registered at the Land Registry | Completed in 1970, the property comprises a residential unit on 14/F of Block 1 and two carparking spaces on G/F of the development.<br><br>As measured from the registered floor plan, the residential portion of the property has a saleable area of about 2,049 square feet (190.36 square metres).<br><br>Rural Building Lot No. 792 is held under Conditions of Sale No. 7320 for a lease term of 75 years from 17th September 1962 renewable for 75 years. | According to a copy of tenancy agreement provided by the client, the property is leased out for a term from 1st January 2015 to 31st December 2029 at a monthly rent of HK$50,000 only, inclusive of Rates, Government Rent and management fee. | HK$65,000,000 (HONG KONG DOLLARS SIXTY FIVE MILLION ONLY) |

Notes

1. Pursuant to our recent Land Registration Record(s), the current registered owner is "FASTACT GROUP LIMITED" vide Memorial No. UB7161418 dated 18th June 1997 (for Block 1 on 14/F & Car Port G122) and CHI KWOK COMPANY LIMITED (for Car Parking Space No. 250).

2. Pursuant to our recent Land Registration Record(s), the property is subject to the following salient encumbrances.

   (1) Deed of Mutual Covenant vide Memorial No. UB1043211 dated 15th December 1973;

   (2) Mortgage for all monies in favour of DBS Bank (Hong Kong) Limited vide Memorial No. 14071002320164 dated 26th June 2014. (Remarks: incl. borrower's rights & interest of Car Parking Space No. 250 on G/F);

   (3) Order No. DH0074/HK/15/C under Section 27A of the Buildings Ordinance vide Memorial No. 15050601240025 dated 17th April 2015. (Remarks: by the Building Authority re: for common part(s) only)

   (4) Tenancy Agreement for a least term of 15 years from 1st January 2015 to 31st December 2029 at a monthly rent of HK$50,000 in favour of Pacific Andes Enterprises (Hong Kong) Limited vide Memorial No. 1703160260344 dated 1st January 2015

   (5) Order No. "UBZ/U01-06/0028/06" by the Building Authority under Section 24(1) of the Buildings Ordinance vide Memorial No. 17092000660196 dated 15th March 2007. (Block 1 on 14/F only)

3. In the course of our valuations, we have assumed that the aforesaid orders have been complied with and to the satisfaction of the Building Authority; and no allowance has been made for remedial works, if any.

4. Our valuation is made on the basis that the property is not subject to mortgage or any other material encumbrances.

5. According to the confirmation letter by DBS Bank (Hong Kong) Limited from the client, the mortgage has been fully paid and DBS Bank (Hong Kong) Limited has given his consent to discharge the mortgage.

威格斯 國際物業顧問　香港九龍官塘道388號創紀之城一期渣打中心27樓



# VIGERS

International Property Consultants

27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com

## PROPERTY VALUATION REPORT

| No. | Property | Description and Tenure | Occupancy Status | Market Value in Existing State as at the Date of Valuation |
|---|---|---|---|---|
| 3. | House No. 36, Manderly Garden, No. 48 Deep Water Bay Road, Hong Kong<br><br>All those 125/7,266th parts or shares of and in Rural Building Lot No. 1052 and the extension thereto registered at the Land Registry | Completed in 1986, the property comprises a 3-storey of house of the development.<br><br>As measured from the registered floor plan, the property has a saleable area of about 3,200 square feet (297.29 square metres), including balcony of about 75 square feet (6.97 square metres) but excluding garden of about 222 square feet (20.62 square metres), courtyard of about 252 square feet (23.4 square metres) and roof of about 582 square feet (54.1 square metres)<br><br>Rural Building Lot No. 1052 and extension thereto is held under Conditions of Sale No. UB11594 for a lease term of 75 years from 20th January 1982 renewable for 75 years. | According to a copy of tenancy agreement provided by the client, the property is leased out for a term from 1st January 2015 to 31st December 2029 at a monthly rent of HK$100,000 only, inclusive of Rates, Government Rent and management fee. | HK$170,000,000 (HONG KONG DOLLARS ONE HUNDRED SEVENTY MILLION ONLY) |

Notes

1.  Pursuant to our recent Land Registration Record(s), the current registered owner is "CHASTERTON GROUP LIMITED" vide Memorial No. UB6683048 dated 27th June 1996.

2.  Pursuant to our recent Land Registration Record(s), the property is subject to the following salient encumbrances.

    (1)  Deed of Mutual Covenants and Management Agreement vide Memorial No. UB3177691 dated 11th September 1986;

    (2)  Occupation Permit No. H124/86 vide Memorial No. UB3250028 dated 5th November 1986;

    (3)  Certificate of Compliance vide Memorial No. UB3255034 dated 8th January 1987;

    (2)  Mortgage for all monies in favour of DBS Bank (Hong Kong) Limited vide Memorial No. 14071002320210 dated 26th June 2014;

    (3)  Tenancy Agreement for a least term of 15 years from 1st January 2015 to 31st December 2029 at a monthly rent of HK$100,000 in favour of Pacific Andes Enterprises (Hong Kong) Limited vide Memorial No. 17031602260307 dated 1st January 2015

3   Our valuation is made on the basis that the property is not subject to mortgage or any other material encumbrances.

4.  According to the confirmation letter by DBS Bank (Hong Kong) Limited from the client, the mortgage has been fully paid and DBS Bank (Hong Kong) Limited has given his consent to discharge the mortgage.

# VIGERS

International Property Consultants

27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com



## PROPERTY VALUATION REPORT

| No. | Property | Description and Tenure | Occupancy Status | Market Value in Existing State as at the Date of Valuation |
|---|---|---|---|---|
| 4. | Unit B on 8th Floor and Car Parking Space No. 39 on Lower Ground Floor, Celestial Garden, No. 5 Repulse Bay Road, Hong Kong<br><br>All those 204/12,254th parts or shares of and in Rural Building Lot No. 979 registered at the Land Registry | Completed in 1978, the property comprises a residential unit on 8/F and a carparking spaces on lower ground floor of a 22-sotrey residential building.<br><br>As measured from the registered floor plan, the residential portion of the property has a saleable area of about 1,962 square feet (182.28 square metres).<br><br>Rural Building Lot No. 979 is held under Conditions of Exchange No. UB10725 for a lease term of 75 years from 2nd November 1931 renewable for 75 years. | According to a copy of tenancy agreement provided by the client, the property is leased out for a term from 1st January 2015 to 31st December 2029 at a monthly rent of HK$55,000 only, inclusive of Rates, Government Rent and management fee. | HK$80,000,000 (HONG KONG DOLLARS EIGHTY MILLION ONLY) |

Notes

1. Pursuant to our recent Land Registration Record(s), the current registered owner is "BONAIRE DEVELOPMENTS LIMITED" vide Memorial No. UB6591736 dated 28th March 1996.

2. Pursuant to our recent Land Registration Record(s), the property is subject to the following salient encumbrances.

    (1) Deed of Mutual Covenants and Management Agreement vide Memorial No. UB5331935 dated 29th June 1992;

    (2) Mortgage for all monies in favour of DBS Bank (Hong Kong) Limited vide Memorial No. 14071002320175 dated 26th June 2014;

    (3) Tenancy Agreement for a least term of 15 years from 1st January 2015 to 31st December 2029 at a monthly rent of HK$55,000 in favour of Pacific Andes Enterprises (Hong Kong) Limited vide Memorial No. 1703160260331 dated 1st January 2015

3. Our valuation is made on the basis that the property is not subject to mortgage or any other material encumbrances.

4. According to the confirmation letter by DBS Bank (Hong Kong) Limited from the client, the mortgage has been fully paid and DBS Bank (Hong Kong) Limited has given his consent to discharge the mortgage.

# VIGERS

International Property Consultants

27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com



## PROPERTY VALUATION REPORT

| No. | Property | Description and Tenure | Occupancy Status | Market Value in Existing State as at the Date of Valuation |
|---|---|---|---|---|
| 5. | Apartment B33 (including the Roof) on 2/F of Block B3 and Garden appurtenant thereto and Car Parking Space No. 20, Woodgreen Estate, No. 5 Shouson Hill Road, Hong Kong<br><br>All those 82/1,881st parts or shares of and in Rural Building Lot No. 965 registered at the Land Registry | Completed in 1974, the property comprises a residential unit on 2/F of Block B3 and a carparking space of the development.<br><br>As measured from the registered floor plan, the residential portion of the property has a saleable area of about 2,215 square feet (205.78 square metres) excluding roof of about 1,758 square feet (163.32 square metres), garden of about 1,174 square feet (109.07 square metres).<br><br>Rural Building Lot No. 965 is held under Conditions of Exchange No. 10527 for a lease term of 75 years from 9th January 1924 renewable for 75 years. | According to a copy of tenancy agreement provided by the client, the property is leased out for a term from 1st April 2015 to 31st March 2030 at a monthly rent of HK\$50,000 only, inclusive of Rates, Government Rent and management fee. | HK\$60,000,000 (HONG KONG DOLLARS SIXTY MILLION ONLY) |

Notes

1. Pursuant to our recent Land Registration Record(s), the current registered owner is "GRANDLUCK ENTERPRISES LIMITED" vide Memorial No. 05050600730056 dated 31st March 2005.

2. Pursuant to our recent Land Registration Record(s), the property is subject to the following salient encumbrances.

   (1) Deed of Mutual Covenant vide Memorial No. UB1109072 dated 27th August 1974;

   (2) Notice No. WC/TA00905/06/HK-Q06 by the Building Authority under S.24C(1) of the Buildings Ordinance vide Memorial No. 06101000300058 dated 29th May 2006. (Apartment B33 only);

   (3) Mortgage for all monies in favour of DBS Bank (Hong Kong) Limited vide Memorial No. 14071002320120 dated 26th June 2014;

   (4) Tenancy Agreement for a least term of 15 years from 1st April 2015 to 31st March 2030 at a monthly rent of HK\$50,000 in favour of Pacific Andes Enterprises (Hong Kong) Limited vide Memorial No. 17031602260294 dated 1st April 2015

3. In the course of our valuations, we have assumed that the aforesaid orders have been complied with and to the satisfaction of the Building Authority; and no allowance has been made for remedial works, if any.

4. Our valuation is made on the basis that the property is not subject to mortgage or any other material encumbrances.

5. According to the confirmation letter by DBS Bank (Hong Kong) Limited from the client, the mortgage has been fully paid and DBS Bank (Hong Kong) Limited has given his consent to discharge the mortgage.

威格斯 國際物業顧問　香港九龍官塘道388號創紀之城一期滙打中心27樓



# VIGERS

International Property Consultants

27/F Standard Chartered Tower, Millennium City 1,
388 Kwun Tong Road, Kowloon, Hong Kong
www.Vigers.com

## PROPERTY VALUATION REPORT

| No. | Property | Description and Tenure | Occupancy Status | Market Value in Existing State as at the Date of Valuation |
|-----|----------|----------------------|------------------|----------------------------------------------------------|
| 6. | House No. 34, Manderly Garden, No. 48 Deep Water Bay Road, Hong Kong<br><br>All those 125/7,266th parts or shares of and in Rural Building Lot No. 1052 and the extension thereto registered at the Land Registry | Completed in 1986, the property comprises a 3-storey of house of the development.<br><br>As measured from the registered floor plan, the property has a saleable area of about 3,200 square feet (297.29 square metres), including balcony of about 75 square feet (6.97 square metres) but excluding garden of about 222 square feet (20.62 square metres), courtyard of about 252 square feet (23.4 square metres) and roof of about 582 square feet (54.1 square metres)<br><br>Rural Building Lot No. 1052 and extension thereto is held under Conditions of Sale No. UB11594 for a lease term of 75 years from 20th January 1982 renewable for 75 years. | According to a copy of tenancy agreement provided by the client, the property is leased out for a term from 1st April 2015 to 31st March 2030 at a monthly rent of HK$100,000 only, inclusive of Rates, Government Rent and management fee. | HK$170,000,000 (HONG KONG DOLLARS ONE HUNDRED SEVENTY MILLION ONLY) |

Notes

1. Pursuant to our recent Land Registration Record(s), the current registered owner is "PACIFIC ANDES ENTERPRISES (HONG KONG) LIMITED" vide Memorial No. 17042401860111 dated 27th June 1996.

2. Pursuant to our recent Land Registration Record(s), the property is subject to the following salient encumbrances.

   (1) Deed of Mutual Covenants and Management Agreement vide Memorial No. UB3177691 dated 11th September 1986;

   (2) Occupation Permit No. H124/86 vide Memorial No. UB3250028 dated 5th November 1986;

   (3) Certificate of Compliance vide Memorial No. UB3255034 dated 8th January 1987;

   (2) Mortgage for all monies in favour of DBS Bank (Hong Kong) Limited vide Memorial No. 14071002320192 dated 26th June 2014;

   (3) Tenancy Agreement for a least term of 15 years from 1st April 2015 to 31st March 2030 at a monthly rent of HK$100,000 in favour of Pacific Andes Enterprises (Hong Kong) Limited vide Memorial No. 17031602260327 dated 1st April 2015

3. Our valuation is made on the basis that the property is not subject to mortgage or any other material encumbrances.

4. According to the confirmation letter by DBS Bank (Hong Kong) Limited from the client, the mortgage has been fully paid and DBS Bank (Hong Kong) Limited has given his consent to discharge the mortgage.

威格斯 國際物業顧問　香港九龍官塘道388號創紀之城一期渣打中心27樓

ASIA UNION LIMITED

AND

PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED

AND

PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI) LIMITED

AND

RAWLEY TRADING LIMITED

AND

FASTACT GROUP LIMITED

AND

HENG HOLDINGS (BVI) LIMITED

AND

CHASTERTON GROUP LIMITED

AND

BONAIRE DEVELOPMENTS LIMITED

AND

GRANDLUCK ENTERPRISES LIMITED

AND

PACIFIC ANDES ENTERPRISES (HONG KONG) LIMITED

---

SETTLEMENT AND FRAMEWORK AGREEMENT

---

This settlement and framework agreement (the "**Agreement**") dated as of
_____ 2021, is made by and among **ASIA UNION LIMITED**, a company
incorporated in Hong Kong, with its registered office at 22/F South China Building, 1-3
Wyndham Street, Central, Hong Kong (the "**Investor**"), **PACIFIC ANDES
INTERNATIONAL HOLDINGS LIMITED**, a company incorporated in Bermuda, with its
registered office at Victoria Place, 5th Floor, 31 Victoria Street, Hamilton HM10, Bermuda
("**PAIH**"), **PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI) LIMITED**, a
company incorporated in the British Virgin Islands, with its registered office at 3rd Floor, J&C
Building, PO Box 362, Road Town, Tortola, British Virgin Islands VG1110 ("**PAIH BVI**"),
**RAWLEY TRADING LIMITED**, a company incorporated in the British Virgin Islands, with
its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town,
Tortola, VG 1110, British Virgin Islands   ("**RTL**"), **FASTACT GROUP LIMITED**, a
company incorporated in the British Virgin Islands, with its registered office at Portcullis
Chambers, 4th Floor, Ellen Skelton Building, 3076 Sir Francis Drake Highway, Road Town,
Tortola, VG 1110, British Virgin Islands ("**FGL**"), **HENG HOLDINGS (BVI) LIMITED**, a
company incorporated in the British Virgin Islands, with its registered office at 3rd Floor, J &
C Building, PO Box 362, Road Town, Tortola, British Virgin Islands VG1110 ("**Heng
Holdings**"), **CHASTERTON GROUP LIMITED**, a company incorporated in the British
Virgin Islands, with its registered office at Vistra Corporate Services Centre, Wickhams Cay
II, Road Town, Tortola, British Virgin Islands VG1110 ("**Chasterton**"), **BONAIRE
DEVELOPMENTS LIMITED**, a company incorporated in the British Virgin Islands, with
its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town,
Tortola, VG 1110, British Virgin Islands ("**BDL**"), **GRANDLUCK ENTERPRISES
LIMITED**, a company incorporated in the British Virgin Islands, with its registered office at
Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG 1110, British
Virgin Islands ("**Grandluck**") and **PACIFIC ANDES ENTERPRISES (HONG KONG)
LIMITED** ("**PAE HK**"), a company incorporated in Hong Kong, with its registered office at
Room 3312, Hong Kong Plaza, 186 Connaught Road West, Hong Kong, each a "**Party**" and
collectively, the "**Parties**" to this Agreement (which expressions shall include their permitted
assigns).

**Recitals**

WHEREAS, on June 30, 2016, PAIH commenced a voluntary case under Chapter 11
of Title 11 of the United States Code (the "**Bankruptcy Code**"). On April 17, 2017, PAIH BVI
commenced a voluntary case under Chapter 11 of the Bankruptcy Code (collectively, the
"**Bankruptcy Cases**").

WHEREAS, on the date of this Agreement, FGL and Heng Holdings' wholly owned
subsidiaries, namely Chasterton, BDL, Grandluck, RTL and PAE HK each of which are wholly
owned direct or indirect subsidiaries of PAIH and hold the title to certain properties in Hong
Kong, the details of which are set out in Appendix 1 (the "**Property Assets**").

WHEREAS, the Investor desires to acquire the Property Assets through the acquisition
of the shares of FGL and Heng Holdings.

WHEREAS, certain of the creditors of member(s) of the Group (including, without
limitation, the Debtors) desire to sell their rights to the Debt Claims to the Investor for a cash
payment.

WHEREAS, the Investor is willing to (a) purchase all of the Debt Claims from the holders of such Debt Claims for cash consideration, and (b) exchange such Debt Claims with the Debtors for the Property Assets and Target Group Debt as further described herein.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## Article I
## Definitions

### Section 1.01.   Definitions

"**Affiliate**" means, in relation to any person, any other person controlling, controlled by or under common control with that person or persons. For the purposes of this definition, "control" when used with respect to any person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "controlling" and "controlled" shall be construed accordingly. For the avoidance of doubt, an entity will control a second entity or entities if it: (a) owns or controls, directly or indirectly, at least 50% of the voting equity of the second entity or entities; or (b) it possesses, directly or indirectly, the power to direct or cause the direction of the affairs or management of the second entity or entities, whether through the ownership of voting securities, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of management or similar body governing the affairs of the second entity or entities.

"**Aggregate Debt Purchase Consideration**" means the aggregate amount to be paid by the Investor under the Debt Purchase Agreements (including for the avoidance of doubt, the Deferred Claim Purchase Price), which shall not be more than the Maximum Debt Purchase Consideration.

"**Assignment**" shall have the meaning given to such term in the Debt Purchase Agreement(s).

"**Business Days**" means a day (other than a Saturday or Sunday) on which banks are open for general business in the British Virgin Islands, Hong Kong and New York City.

"**Call Option Deed**" has the meaning given to the term in Section 2.02.

"**Call Option Completion**" means the completion of the sale and purchase of the Option Securities in accordance with clause 6.2 of the Call Option Deed, following the exercise of the option granted under the Call Option Deed.

"**Closing**" means the closing of the Transactions in accordance with Article IV.

"**Closing Date**" means the date falling three (3) Business Days after the Conditions have been fulfilled or waived by the Investor.

"**Conditions**" means the conditions set out in Article III.

"**Contractual Obligation**" of any Person means any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Debt Claims**" means the Priority Debt Claim, the Mandatory Unsecured Debt Claims, the Deferred Priority Debt Claims and the Optional Unsecured Debt Claims, and "**Debt Claim**" means any one of them.

"**Debt Purchase Agreement**" means each sale and purchase agreement entered into or to be entered into between the Investor and each PAIH Priority Creditor, Deferred Priority Creditor, Mandatory PAIH Unsecured Creditor and Optional PAIH Unsecured Creditor (as the case may be), and "**Debt Purchase Agreements**" refers to all such agreements.

"**Debtor Related Parties**" means RTL, FGL, Heng Holdings, Chasterton, BDL, Grandluck and PAE HK and "**Debtor Related Party**" means any one of them.

"**Debtors**" means PAIH and PAIH BVI, and "**Debtor**" means any of one of them.

"**Deferred Claim Purchase Price**" means, in respect of each Deferred Priority Debt Claim, the price set out next to each relevant Deferred Priority Debt Claim in Appendix 7.

"**Deferred Priority Creditors**" means Meridian Investment Group Pte. Ltd. and Ocean Incorporation Limited, in their capacity as creditors of the PAIH Affiliates with respect to the Deferred Priority Debt Claims against such PAIH Affiliates, the details of which are set out in Appendix 7, and "**Deferred Priority Creditor**" means any one of them as the context may require

"**Deferred Priority Debt Claims**" means the Deferred Priority Creditors' rights against the relevant PAIH Affiliates under the documents or in respect of the trade payables and/or intercompany loan balances detailed in Appendix 7, but excluding, for the avoidance of doubt, the Deferred Priority Creditors' rights under or in respect of any guarantees and/or security documents executed in connection therewith.

"**Disclosed**" has the meaning ascribed to it in the Warranty Deed.

"**Group**" means PAIH and its Subsidiaries for the time being and such other company(ies) as will from time to time become a Subsidiary of PAIH.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government.

"**Indebtedness**" means any obligation for the payment or repayment of money, whether as principal or as surety and whether present or future, actual or contingent (whether as principal, interest, fees, expenses, gross up obligation, under indemnity or otherwise) in respect of or in connection with (a) money borrowed or raised, (b) any bond, note, loan stock, debenture or similar instrument, (c) acceptance or documentary credit facilities, (d) foreign exchange

options, (e) rental and periodic payments, under leases and hire purchase agreements and instalments under conditional sale agreements (in all cases whether in respect of land, machinery, equipment or otherwise) entered into primarily as a method of raising finance or of financing the acquisition or use of the asset concerned, (f) payments in the nature of finance charges or repurchase amounts and debt indemnity under factoring and invoice discounting arrangements, (g) guarantees, indemnities, bonds, standby letters of credit or other instruments issued in connection with the performance of contracts and or in respect of the indebtedness of any other Person, (h) amounts payable (other than to another Target Company) in respect of any redemptions or other returns of capital or other entitlements on shares or securities or partnership interests of any Target Company and any associated Liability in respect of tax, (i) Liabilities in respect of financial grants received and (j) any accrued interest, success fees, prepayment premiums, break fees, make-whole premiums or penalties and fees or expenses (including legal fees) associated with the prepayment or redemption of any indebtedness including any such prepayment or redemption to be made as contemplated by the Transaction Documents.

"**Intellectual Property Rights**" means patents, trade marks, service marks, logos, get-up, trade names, brand names, internet domain names, rights in designs, copyright (including rights in computer software) and moral rights, database rights, rights in know-how and other intellectual property rights, in each case whether registered or unregistered, and all rights or forms of protection having equivalent or similar effect anywhere in the world and "**registered**" includes applications for registration.

"**Liabilities**" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, absolute, contingent, disputed, current, future or otherwise.

"**Lien**" means any mortgage, pledge, hypothecation, assignment (as security), deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including any conditional sale or other title retention agreement and any capital lease).

"**Long Stop Date**" means June 30, 2021, or such later date as may be agreed by the Parties in writing.

"**Mandatory PAIH Unsecured Creditors**" means the creditors of PAIH Affiliates who hold the relevant Mandatory Unsecured Debt Claims against such PAIH Affiliates, the details of whom are set out in Part A of Appendix 3, and "**Mandatory PAIH Unsecured Creditor**" means any one of them as the context may require.

"**Mandatory Unsecured Debt Claims**" means the Mandatory PAIH Unsecured Creditors' rights against the relevant PAIH Affiliates under the documents or in respect of the trade payables and/or intercompany loan balances detailed in Part A of Appendix 3 (including, without limitation, the Maybank Credit Support Interest), but excluding, for the avoidance of doubt, the Mandatory PAIH Unsecured Creditors' rights under or in respect of any guarantees and/or security documents executed in connection therewith (other than the Maybank Credit Support Interest), and "**Mandatory Unsecured Debt Claim**" means any one of them as the context may require.

"**Mandatory Debt Purchase Price**" means:

(a)     in respect of the Mandatory Unsecured Debt Claims by Maybank, the aggregate of (i) the price equal to 8.75% of the principal amount of each Mandatory Unsecured Debt Claim, and (ii) the Maybank Equity Premium; and

(b)     in respect of each Mandatory Unsecured Debt Claim not falling within paragraph (a) above, the price equal to 8.75% of the principal amount of such Mandatory Unsecured Debt Claim.

"**Material Adverse Effect**" means any event, circumstance, occurrence, fact, condition, change in or effect on the Debtors and/or the Target Group that, individually or in aggregate with all other such events, circumstances, occurrences, facts, conditions, changes or effects, has or could reasonably be expected to (a) have a material adverse effect on the business, operations, financial condition or prospects of the Target Group, taken as a whole; or (b) prevent, materially impair or materially delay the ability of the Parties to consummate the Transactions or transactions contemplated under the Transaction Documents or to perform their obligations hereunder or thereunder.

"**Maximum Debt Purchase Consideration**" means US$56,000,000.

"**Maybank**" means Malayan Banking Berhad, Hong Kong Branch.

"**Maybank Credit Support Interest**" means the rights, title, benefits, interests and remedies of Maybank under or in respect of (a) the share charge over the entire issued share capital of Pacific Andes Food (BVI) Limited dated as of 21 March 2014 (as amended, restated, modified or supplemented from time to time) by and among Pacific Andes International Holdings (BVI) Limited as chargor, and Maybank as security trustee, and (b) the equity pledge over the entire equity in Pacific Andes Food Limited dated as of 27 May 2014 (as amended, restated, modified or supplemented from time to time) by and among Pacific Andes Food (BVI) Limited as chargor, and Maybank as security trustee.

"**Maybank Equity Premium**" means US$4,000,000.

"**Maybank Receiving Account**" means the bank account for receipt of the Maybank Equity Premium as identified in the Debt Purchase Agreement to be entered into between Maybank and the Investor.

"**Net Liabilities Adjustment**" has the meaning ascribed to it in the Call Option Deed.

"**Novation Deed**" has the meaning given to the term in Section 2.02.

"**Option Consideration**" has the meaning ascribed to it in the Call Option Deed.

"**Option Granting Entity**" means PAIH BVI.

"**Option Securities**" means the entire issued and paid up share capital of FGL and Heng Holdings.

"**Optional PAIH Unsecured Creditors**" means the creditors of the PAIH Affiliates who hold the relevant Optional Unsecured Debt Claims against such PAIH Affiliates, the details of whom are set out in Part B of Appendix 3, and "**Optional PAIH Unsecured Creditor**" means any one of them as the context may require.

"**Optional Unsecured Debt Claims**" means the Optional PAIH Unsecured Creditors' rights against the relevant PAIH Affiliates under the documents or in respect of the trade payables and/or intercompany loan balances detailed in Part B of Appendix 3, but excluding, for the avoidance of doubt, the Optional PAIH Unsecured Creditors' rights under or in respect of any guarantees and/or security documents executed in connection therewith, and "**Optional Unsecured Debt Claim**" means any one of them as the context may require.

"**Optional Debt Purchase Price**" means, in respect of each Optional Unsecured Debt Claim, the price equal to 8.75% of the principal amount of such Optional Unsecured Debt Claim.

"**PAIH Affiliates**" means PAIH and all of its Affiliates (excluding Pacific Andes Resources Development Limited and entities owned directly or indirectly by Pacific Andes Resources Development Limited), as more specifically set out in Appendix 10.

"**PAIH Material Group**" means the Debtors and the Target Group.

"**PAIH Priority Creditor**" means the creditor of the PAIH Affiliate who holds the Priority Debt Claim against such PAIH Affiliate, the details of whom are set out in Appendix 2.

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority or other entity.

"**Pickenpack**" means Pickenpack Holding Germany GmbH, Pickenpack Europe GmbH, Pickenpack Production Lüneburg GmbH and TST The Seafood Traders GmbH.

"**Priority Debt Claim**" means the PAIH Priority Creditor's rights against the relevant PAIH Affiliate, the details of which are set out in Appendix 2, but excluding, for the avoidance of doubt, the PAIH Priority Creditor's rights under or in respect of any guarantees and/or security documents executed in connection therewith.

"**Priority Debt Purchase Price**" means the price set out next to the Priority Debt Claim in Appendix 2.

"**Property-Owning Companies**" means each of RTL, FGL, Chasterton, BDL, Grandluck and PAE HK and "**Property-Owning Company**" means any one of them, as the context may require.

"**Purchased Debt Claims**" means the Mandatory Unsecured Debt Claims, the Deferred Priority Debt Claim, the Optional Unsecured Debt Claims (if any) and the Priority Debt Claim (if any) purchased by the Investor pursuant to this Agreement and the Debt Purchase Agreements, which for the purposes of Section 6.02 only shall not include the Maybank Equity Premium.

"**Related Party Lease Agreements**" means the lease agreements as set out in Appendix 8.

"**Relevant Professionals**" means professionals who have outstanding balances due and payable by PAIH and its affiliates at Closing.

"**Remaining Cash Amount**" means the Maximum Debt Purchase Consideration minus the Aggregate Debt Purchase Consideration which, for the avoidance of doubt, may be zero (but not less than zero).

"**Requirement of Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Restructuring**" has the meaning ascribed to it in the Warranty Deed.

"**Subsidiary**" means an entity of a Person which has direct or indirect control or owns directly or indirectly more than 50% of the voting capital or similar right of ownership and control for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise.

"**Target Group**" means Heng Holdings and the Property-Owning Companies, "**Target Company**" means any of them and the expression "**relevant Target Company**" shall be construed accordingly.

"**Target Group Debt**" has the meaning ascribed to it in the Call Option Deed.

"**Target Group Intercompany Debt**" has the meaning ascribed to it in the Warranty Deed.

"**Transaction Documents**" means the documents to be entered into to consummate the Transactions, including but not limited to this Agreement, the Call Option Deed, the Debt Purchase Agreements, the Warranty Deed and the Novation Deed.

"**Transactions**" means the transactions contemplated under this Agreement.

"**Warranties**" means the representations and warranties set out in the Warranty Deed.

"**Warranty Deed**" means the warranty deed entered into among others, the Debtors, the Option Granting Entity and the Investor on the date of this Agreement.

**Section 1.02.  Rules of Construction.**  The headings within this Agreement are purely for convenience and are not to be used as an aid in interpretation. This Agreement shall not be construed against either Party as the author or drafter of the Agreement.  For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or

neuter gender shall include the masculine, feminine, and the neuter gender; and (ii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply. References to "principal amount" as used herein shall refer to the principal amount set forth in the appendices hereto.

## Article II
## Transactions

**Section 2.01.  Purchase of Purchased Debt Claims.** Subject to the satisfaction (or waiver by the Investor) of the Conditions and the terms and conditions of the Debt Purchase Agreements, on the Closing Date the Investor shall purchase:

(a)    each Mandatory Unsecured Debt Claim from each relevant Mandatory PAIH Unsecured Creditor for the Mandatory Debt Purchase Price in respect of each Mandatory Unsecured Debt Claim in accordance with the terms of the relevant Debt Purchase Agreement;

(b)    each Optional Unsecured Debt Claim from each relevant Optional PAIH Unsecured Creditor that has entered into a Debt Purchase Agreement, if any, for the Optional Debt Purchase Price in respect of such Optional Unsecured Debt Claim in accordance with the terms of the relevant Debt Purchase Agreement;

(c)    the Priority Debt Claim from the PAIH Priority Creditor that has entered into a Debt Purchase Agreement, if any, for the Priority Debt Purchase Price in respect of the Priority Debt Claim in accordance with the terms of the relevant Debt Purchase Agreement; and

(d)    each Deferred Priority Debt Claim from each relevant Deferred Priority Creditor for the Deferred Claim Purchase Price in accordance with the terms of the relevant Debt Purchase Agreement, it being agreed that each Debt Purchase Agreement in respect of each Deferred Priority Debt Claim shall provide for payment thereunder to be made on the date falling two years from the Closing Date (which may be extended by the Investor for up to an additional three year period, in its sole discretion).

For the avoidance of doubt, Closing under this Agreement is not conditioned on (a) the entry into one or more Debt Purchase Agreements with any Optional PAIH Unsecured Creditor or PAIH Priority Creditor, or (b) the agreement by any Optional PAIH Unsecured Creditor or PAIH Priority Creditor to sell Optional Unsecured Debt Claims or Priority Debt Claim, respectively, to the Investor.  Notwithstanding the foregoing, for the avoidance of doubt, the Investor's obligation to purchase an Optional Unsecured Debt Claim or the Priority Debt Claim pursuant to Section 2.01(b) or (c), respectively, shall be conditioned on the entry into the relevant Debt Purchase Agreement between the Optional PAIH Unsecured Creditor or PAIH Priority Creditor, as applicable, and the Investor, prior to Closing, which Debt Purchase Agreement shall be in form and substance satisfactory to the Investor.

**Section 2.02.  Call Option and Novation Deed.** Subject to the satisfaction (or waiver by the Investor) of the Conditions, on the Closing Date, the Option Granting Entity shall (a) grant the Investor a call option to acquire the Option Securities on the terms set out in Appendix 5 (the "**Call Option Deed**"); and (b) novate the Target Group Debt to the Investor on the terms set out in Appendix 11 (the "**Novation Deed**"), in accordance with the provisions set out in Section 4.02, the consideration for the call option and novation of the Target Group Debt will be US$56,000,000, subject to the Net Liabilities Adjustment.

## Article III
## Conditions

**Section 3.01.  Conditions to Closing.** The Parties agree that Closing is conditional on the following Conditions being satisfied (or waived by the Investor) in accordance with this Agreement:

(a)   PAIH and its Subsidiaries having filed or submitted all documentation relating to the Transactions with the United States Bankruptcy Court for the Southern District of New York by the date falling seven days prior to the date of the hearing before the United States Bankruptcy Court for the Southern District of New York for the approval of the Transactions and the Transaction Documents;

(b)   the United States Bankruptcy Court for the Southern District of New York entering a final non-appealable order, in form and substance satisfactory to the Investor (acting reasonably), approving the Transactions and the Transaction Documents, including, for the avoidance of doubt, this Agreement, the Debt Purchase Agreements, the Warranty Deed, the Call Option Deed and the Novation Deed (the "**Bankruptcy Court Approval**"), a form of which is set out in Appendix 9;

(c)   each Mandatory PAIH Unsecured Creditor and each Deferred Priority Creditor having executed a Debt Purchase Agreement with the Investor, in the form substantially set out in Appendix 6, with respect to the sale by such Mandatory PAIH Unsecured Creditor or Deferred Priority Creditor of its Mandatory Unsecured Debt Claim or its Deferred Priority Debt Claim (as applicable);

(d)   execution and delivery of the Call Option Deed;

(e)   execution and delivery of the Novation Deed;

(f)   satisfaction (or waiver by the Investor) of the conditions in each Debt Purchase Agreement with each Mandatory PAIH Unsecured Creditor or each Deferred Priority Creditor (as applicable);

(g)   receipt of all required approvals, consents, licenses, permits, waivers and exemptions in respect of (i) the Transaction Documents, and (ii) the performance of the transactions contemplated by the Transaction Documents by the parties thereto (collectively, the "**Approvals**" and each, an "**Approval**"), and where any such Approval is subject to conditions, such conditions being acceptable to the Investor, and if such conditions are required to be fulfilled before the Closing Date, such conditions being fulfilled before the Closing Date, and such Approvals remaining in full force and effect;

(h)   each of the representations and warranties provided by the Debtors and the Debtor Related Parties in this Agreement being true, accurate and not misleading in all respects as of the date of this Agreement and as of the Closing Date, as though made on and as of that date;

(i)   the representations and warranties in the Warranty Deed provided by the Debtors and the Option Granting Entity being true, accurate and not misleading in all respects as of the date of this Agreement and as of the Closing Date as though made on and as of that date;

(j)      no applicable laws or regulations having been enacted, amended or proposed, and no judgment having been issued by any court, which would prohibit, materially restrict or materially delay the implementation of the Transactions;

(k)      a valid resolution of the board of directors of PAIH having been passed to approve the Transactions and the Transaction Documents, including, for the avoidance of doubt, this Agreement, the Debt Purchase Agreements and Warranty Deed and a legal opinion from a Bermuda lawyer (in form and substance satisfactory to the Investor) that all required governance actions have been taken to approve the Transactions and the Transaction Documents, in compliance with the constitutional documents of PAIH and Bermuda law. For the avoidance of doubt, all such approvals, resolutions and other required governance actions for the Transactions and the Transaction Documents shall be in compliance with the applicable rules and regulations as may be applicable to PAIH, including any requirements under local laws and the constitutional documents of PAIH, and there being no objection from any regulatory authorities in respect of the Transactions and the Transaction Documents;

(l)      a valid resolution of the board of directors of PAIH BVI having been passed to approve the Transactions and the Transaction Documents, including, for the avoidance of doubt, this Agreement, the Warranty Deed, Call Option Deed and the Novation Deed;

(m)      the Investor having satisfactorily completed its bring-down due diligence review of the Target Group, in its sole discretion;

(n)      other than the Target Group Debt which will be novated to the Investor at Call Option Completion pursuant to the terms and conditions of the Novation Deed and the Target Group Intercompany Debt which will remain outstanding at Call Option Completion, repayment or settlement in full of all Indebtedness (including the release of all corporate guarantees) owed by any member of the Target Group to any member of the Group;

(o)      no Material Adverse Effect having occurred;

(p)      receipt of legal advice from a law firm, appointed by the Investor, satisfactory to the Investor; covering the implications of the Chapter 11 Bankruptcy Order;

(q)      each of the Parties having, as of the Closing Date, performed and complied in all respects with all covenants and agreements contained in this Agreement and the Transaction Documents (as applicable) which are required to be performed or complied by it, on or prior to the Closing Date;

(r)      termination of the Related Party Lease Agreements and the execution of new lease agreements in respect of the Property Assets leased to the related companies of PAIH (in form and substance (including the identity of the tenant) satisfactory to the Investor, acting reasonably);

(s)      update of the Register of Mortgages and Charges of each Target Company in a form satisfactory to the Investor;

(t)      execution and delivery of the Warranty Deed;

(u)      [completion of the Restructuring in a manner satisfactory to the Investor;] and

(v)      [*To be supplemented as necessary with bring-down due diligence findings.*]

**Section 3.02.   Waiver of Certain Conditions**. Each of the Conditions is for the benefit of the Investor and the Investor shall be entitled in its sole discretion at any time prior to the Long Stop Date by notice in writing to the other Parties to waive in whole or in part satisfaction of all or any of the Conditions, with the exception of Conditions (b) and (k) and, upon doing so, may elect to proceed to Closing.

**Section 3.03.   Non-satisfaction of Conditions**. If the Conditions (excluding conditions that, by their nature, cannot be satisfied until the Closing) shall not have been satisfied, or waived in accordance with Section 3.02, on or before the Long Stop Date, this Agreement shall terminate and the provisions of Section 7.01 shall apply.

**Article IV**
**Closing**

**Section 4.01.   Closing Date.** The Parties agree that Closing will take place on the Closing Date.

**Section 4.02.   Actions to be taken at Closing.** In the event that all Conditions (excluding Conditions that, by their nature, cannot be satisfied until the Closing) have been satisfied or waived, then the Parties agree to consummate the Closing and the following steps shall occur:

(a)     Closing under each executed Debt Purchase Agreement will occur in its entirety in accordance with the terms thereof, including, for the avoidance of doubt:

(i)     the payment of the Aggregate Debt Purchase Consideration by the Investor to the Mandatory PAIH Unsecured Creditors, the Optional PAIH Unsecured Creditors (if any) and the PAIH Priority Creditors (if any) (including, for the avoidance of doubt, the transfer of the full amount of the Maybank Equity Premium in immediately available funds to the Maybank Receiving Account); and

(ii)     the assignment of all Purchased Debt Claims to the Investor including the Purchased Debt Claims of the Deferred Priority Creditors;

(b)     the Investor and the Option Granting Entity will execute the Call Option Deed in respect of the Option Securities and the Investor, PAIH BVI and the Target Group will execute the Novation Deed in respect of the Target Group Debt; and

(c)     the Investor will transfer the Remaining Cash Amount to PAIH and all such funds will be used for the benefit of the Bankruptcy Cases, including but not limited to, discharging further fees incurred by the Relevant Professionals.

**Section 4.03.   Interdependence of Closing Obligations.** The obligations of the Parties under Section 4.02 are interdependent and will be deemed as having been performed simultaneously. If any step or action set out in Section 4.02 is not performed at or before Closing then, without limiting any other rights of the Parties, Closing will not have occurred and any step taken, document delivered and/or payment made pursuant to Section 4.02 must be refunded and/or returned in full to the Party that delivered it or paid it.

**Article V**
**Representations and Warranties**

11

**Section 5.01.  Existence; Compliance with Laws.** Each Party represents and warrants to each other Party that it (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (b) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification.

**Section 5.02.  Power; Authorization; Enforceability.**

(a)      Each Party represents and warrants to each other Party that it has the power, authority and legal right, to carry on its business as now conducted and as proposed to be conducted, and to execute, deliver and perform the Transactions contemplated hereunder.

(b)      Each Property-Owning Company represents and warrants to the Investor that it has the power, authority and legal right to own or lease and operate its property, and to carry on its business as now conducted and as proposed to be conducted.

(c)      Each Party represents and warrants to each other Party that it has taken all necessary organizational action to authorize the execution, delivery and performance of the Transaction Documents to which it is a party.

(d)      Each Party represents and warrants to each other Party that this Agreement constitutes, and each other Transaction Document when delivered hereunder will constitute, a legal, valid and binding obligation of each Party thereto, enforceable against each such Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

**Section 5.03.  Non-Contravention.** Each Party represents and warrants to each other Party that the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the Transactions will not violate any Requirement of Law or any Contractual Obligation of any Party and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or assets pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Transaction Documents).

**Section 5.04.  Structure.** [Each Debtor and Debtor Related Party represents and warrants to the Investor that as of the date of this Agreement and at Closing, the structure of the companies insofar as they relate to the ownership of the Property Assets, the Target Group and the Option Granting Entity is and will be as set out at Appendix 4 (*Structure Chart*).] [

**Section 5.05.  Good Title.**

(a)      Each Property-Owning Company represents and warrants to the Investor that it has legal, beneficial and marketable title to the Property Assets.

(b)      The Option Granting Entity represents and warrants to the Investor that it is the sole and exclusive legal and beneficial owner of the entire issued and paid up share capital of FGL and Heng Holdings as set out in Appendix 4 (*Structure Chart*).

**Section 5.06.  Sufficiency of Funding.** The Investor represents and warrants to each other Party that it has sufficient cash resources (in immediately available funds) to consummate

the transactions contemplated hereunder, including but not limited to the purchase of all Debt Claims.

## Article VI
## Undertakings and Covenants

**Section 6.01.   Property Assets.** Each Property-Owning Company undertakes with the Investor that it shall procure that (a) the Related Party Lease Agreements shall be terminated on or before the Closing Date; and (b) new lease agreements in respect of the Property Assets leased to the related companies of PAIH (in form and substance (including the identity of the tenant) satisfactory to the Investor, acting reasonably) are entered into on the Closing Date.

**Section 6.02.   Compromise and Settlement of Purchased Debt Claims.**

(a)      At Closing, and in consideration for the grant of the exercisable option under the Call Option Deed and the novation of the Target Group Debt under the Novation Deed which consideration is deemed good and sufficient, (i) the Mandatory Unsecured Debt Claims and the Optional Unsecured Debt Claims (if any) that are Purchased Debt Claims shall be compromised and reduced by the Investor to an amount equal to approximately 8.75% of the aggregate principal amount of such Purchased Debt Claims; (ii) the Priority Debt Claim, if it is a Purchased Debt Claim, shall be compromised and reduced by the Investor to an amount equal to approximately 60% of the aggregate principal amount of such Purchased Debt Claim; and (iii) the Deferred Priority Debt Claims that are Purchased Debt Claims shall be compromised by the Investor by fixing the allowed claim at the principal amount. Notwithstanding the foregoing, if at any time following Closing but prior to the Call Option Completion, PAIH and/or the Option Granting Entity are not in compliance with their obligations under the Transaction Documents, then any such Purchased Debt Claims compromised in accordance with this Section 6.02(a) shall no longer be deemed to be compromised and reduced and the full principal amount of any such Purchased Debt Claims shall be restored.

(b)      If the Investor exercises the option under the Call Option Deed (the consideration therefor which shall be deemed good and sufficient), (i) all Purchased Debt Claims shall be assigned in accordance with the Call Option Deed, (ii) the Target Group Debt shall be novated in accordance with the Novation Deed, and (iii) upon such assignment, such Purchased Debt Claims be deemed settled, satisfied and expunged in full as against all Debtors. Additionally, the Parties agree that the proposed form of the Bankruptcy Court Approval which is set out in Appendix 9 shall provide that the Mandatory Unsecured Debt Claims, the Optional Unsecured Debt Claims (if any), the Priority Debt Claim and the Deferred Priority Debt Claims that are Purchased Debt Claims shall only be compromised as against the Debtors and the full amount of each Purchased Debt Claim will continue to exist and subsist in its entirety against each affiliate of the Debtors unless otherwise agreed by the Parties. Without limitation to Section 13.04 of this Agreement or otherwise, the Debtors undertake to bear all fees, costs and expenses incurred in connection with such compromise and settlement of the Purchased Debt Claims.

**Section 6.03.**   Until the earlier of Closing and the termination of this Agreement, the Option Granting Entity shall:

(a)     ensure that each Target Company shall in reasonable consultation with the Investor carry on business in the ordinary course and with a view to profit and not do anything outside the ordinary course of business;

(b)     procure that each Target Company uses its best efforts to preserve and protect its business and assets;

(c)     not, and shall procure that no Target Company shall, take or permit to be taken any action which (except in the ordinary course of business) results or is likely to result in the net assets of the Target Group being reduced and/or which could have an adverse effect on the financial or trading position or prospects of the Target Group;

(d)     to the extent permitted by applicable laws, promptly give, or procure to be given, to the Investor and its advisers copies of all management reports and financial reports following their preparation within 15 days after each month end closing and such further information regarding the businesses, assets, liabilities, contracts and affairs of the Target Group as the Investor may reasonably require, together with access on reasonable notice and during normal working hours to premises from which any Target Company operates; and

(e)     procure that neither the Target Group nor any Target Company shall, except with the prior written consent of the Investor,

(i)     dispose of or transfer or acquire any business or part of any business or any shares or securities or ownership interest in any entity;

(ii)     except in the case of current assets acquired or disposed of in the ordinary course of business, acquire or dispose of any assets at a cost or with a value individually or in the aggregate in excess of US$250,000;

(iii)     enter into any contract or materially modify or terminate or waive any material rights under or breach in any material respect any contract;

(iv)     create or permit to be created any Lien over any of the Option Securities, any of the shares in any Target Company or any of the other assets of the Target Group;

(v)     engage or employ any person;

(vi)     terminate or give notice to terminate the employment of any employee;

(vii)     in relation to the employees, enter into any collective bargaining agreement, or materially modify or terminate their employment terms and/or any material rights under any collective bargaining agreement subsisting at the date of this Agreement;

(viii)     enter into any agreement, arrangement or understanding pursuant to which any Person is or may become entitled to any commission or bonus in respect of any of the transactions contemplated by this agreement;

(ix)     enter into any joint venture, co-operation, consortium, partnership or similar agreement;

(x)     dispose of or licence or enter into or vary in any material respect any agreement relating to any Intellectual Property Rights;

(xi)    acquire or dispose of any interest in land or premises or enter into any new (or amend in any material respect, renew or give notice to terminate any existing) lease or licence for or in respect of any of the Property Assets;

(xii)   initiate or settle any litigation, arbitration, prosecution or other legal proceedings (other than normal debt collection);

(xiii)  make or commit to make any expenditure on capital items other than in amounts and for items and in accordance with the timing arrangements which have been Disclosed for this purpose;

(xiv)   incur any Indebtedness or cancel, release or assign or prepay or vary in any material respect the terms of any Indebtedness, except as otherwise provided in this Agreement;

(xv)    fail to take any action required to maintain or comply with the conditions of cover under any material insurance policies in force at the date of this Agreement in respect of any Target Company;

(xvi)   resolve to change its name or to alter its memorandum or articles of association or bylaws or any similar constitutional document;

(xvii)  allot or issue, or agree to allot or issue, any shares or any other securities or grant or agree to grant rights which confer on the holder any rights to acquire any shares or other securities;

(xviii) declare, pay or make any dividend or other distribution;

(xix)   repay or redeem or reduce any of its share capital;

(xx)    pass any ordinary or special resolution or enter into any agreement of equivalent effect;

(xxi)   resolve to be convened, or convene, any general meeting at which a resolution is to be proposed that it shall be voluntarily wound-up;

(xxii)  not do or omit to do, any act or thing which would give rise to a breach of the Warranties when the Warranties are repeated at Closing; and

(xxiii) shall not enter into any agreement or commitment to do anything which if done or omitted to be done would be in breach of any of the provisions of the foregoing paragraphs.

### Article VII
### Termination

**Section 7.01. Automatic Termination of Agreement.** This Agreement shall automatically terminate if the Conditions are not fulfilled or waived (to the extent permissible under applicable laws) by the Long Stop Date. If this Agreement is terminated in accordance

with this Section 7.01, then the obligations of the Parties shall automatically terminate save that the rights and liabilities of the Parties which have accrued prior to termination shall continue to survive such termination.

### Section 7.02. Voluntary Termination.

(a)     In the event any of the Debtors or Debtor Related Parties breaches any provision of this Agreement or fails to comply with any of their respective obligations hereunder, the Investor shall be entitled to terminate this Agreement (and all Transactions contemplated hereunder) by written notice to the Debtors and Debtor Related Parties. If the Investor terminates this Agreement pursuant to this Section 7.02, then (in addition and without prejudice to any other rights or remedies the Investor may have against the Debtors and the Debtor Related Parties (or any one of them)) the Debtors and Debtor Related Parties shall indemnify the Investor against all costs, charges and expenses incurred by it in connection with the Transactions contemplated hereunder.

(b)     In the event the Investor breaches any provision of this Agreement or fails to comply with any of its obligations hereunder, the Debtors and Debtor Related Parties (or any one of them) shall be entitled to terminate this Agreement (and all Transactions contemplated hereunder) by written notice to the Investor. If the Debtors and Debtor Related Parties terminate this Agreement pursuant to this Section 7.02, then (in addition and without prejudice to any other rights or remedies the Debtors and Debtor Related Parties (or any one of them) may have against the Investor, the Investor shall indemnify the Debtors and Debtor Related Parties against all costs, charges and expenses incurred by it in connection with the Transactions contemplated hereunder.

### Article VIII
### Entire Agreement

This Agreement, together with all agreements referred to herein, constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof. Furthermore, no modification of this Agreement shall be binding unless it is in writing and signed by each of the Parties hereto.

### Article IX
### Assignments

Save for assignments, transfers, encumbrances or disposition of any of the Investor's rights and/or obligations under this Agreement to other members in the Investor's group, the Parties agree that each Party may not assign, transfer, encumber or dispose of any of its rights and/or obligations under this Agreement without the prior written consent of each other Party.

### Article X
### Agreement is Legally Binding

The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each of them and their respective successors, assigns, executors, administrators, heirs, and estates. The Parties further agree that there are no third-party beneficiaries of this Agreement.

## Article XI
## Severability

Should any provision of this Agreement be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not to be a part of this Agreement.

## Article XII
## Consequences of Breach

The Parties acknowledge that any actual or threatened breach of this Agreement would cause irreparable harm for which monetary damages would be an inadequate remedy. Accordingly, each Party agrees that each other Party may seek equitable relief in the event of any breach or threatened breach of this Agreement, including injunctive relief against any breach thereof and specific performance of any provision hereof, in addition to any other remedy to which each such Party may be entitled. For the avoidance of doubt, this Article XII is without prejudice to each Party's rights set out in Article VII.

## Article XIII
## Miscellaneous

**Section 13.01. Counterparts.** This Agreement may be executed by the Parties in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 13.02. Reliance on own counsel.** In entering into this Agreement, the Parties acknowledge that they have relied upon the legal advice of their respective attorneys, who are the attorneys of their own choosing, that such terms are fully understood and voluntarily accepted by them, and that, other than the consideration set forth herein, no promises or representations of any kind have been made to them by the other Party. The Parties represent and acknowledge that in executing this Agreement they did not rely, and have not relied, upon any representation or statement, whether oral or written, made by the other Party or by that other Party's agents, representatives, or attorneys with regard to the subject matter, basis, or effect of this Agreement or otherwise.

**Section 13.03. Authority to Execute Agreement.** By signing below, each Party warrants and represents that the person signing this Agreement on its behalf has authority to bind that Party and that the Party's execution of this Agreement is not in violation of any bylaws, covenants, and/or other restrictions placed upon them by their respective entities.

**Section 13.04. Indemnities, Costs and Expenses.** Notwithstanding termination of this Agreement under Article VII and the other provisions of the Transaction Documents, the Debtors and/or the Debtor Related Parties shall be jointly and severally liable to:

(a) bear all fees, costs, expenses and disbursements (howsoever described) relating to the preparation, negotiation and execution of the Transaction Documents including, for the avoidance of doubt, this Agreement, the Call Option Deed, the Debt Purchase Agreements, the Warranty Deed, the Novation Deed and all ancillary documents entered in connection herewith; and

17

(b)     [immediately on demand, indemnify the Investor against all bank charges, fees or commissions for converting one currency to another, custodian fees and expenses incurred by any Investor in connection with the sale and purchase of the Debt Claim(s) under Debt Purchase Agreement(s). ]

**Section 13.05. Notices.**

(a)     Any notice, demand or other communication given or made under or in connection with the matters contemplated by this Agreement shall be in writing and shall be delivered by hand or by courier or sent by electronic mail or air mail to:

| Debtors and Debtor Related Parties | - | Attention: Ng Puay Yee Annie |
| | | Address: Room 3312 Hong Kong Plaza, 188 Connaught Road West, Hong Kong |
| | | Email: Jessie.ng@pacificandes.com |
| Investor | - | Attention: Ivan Wong/ May Chan/ Amy Yuen |
| | | Address: 22/F South China Building, 1-3 Wyndham Street, Central, Hong Kong |
| | | Email:     ivan_wong@petersonhk.com/ mayc@petersonhk.com/ amy_yuen@petersonhk.com |

 and shall be deemed to have been duly given or made as follows:

(i)     if delivered by hand or by courier, upon delivery at the address of the relevant Party;

(ii)     if sent by first class post, two (2) Business Days after the date of posting;

(iii)     if sent by air mail, three (3) Business Days after the date of posting; and

(iv)     if sent by electronic mail when actually received by the intended recipient in readable form;

provided that if, in accordance with the above provision, any such notice, demand or other communication would otherwise be deemed to be given or made after 5.00 p.m. such notice, demand or other communication shall be deemed to be given or made at 9.00 a.m. on the next Business Day.

(b)     A Party may notify the other Parties to this Agreement of a change to its name, relevant addressee, address (including e-mail address) for the purposes of Section 13.05 provided that such notification shall only be effective (i) on the date specified in the notification as the date on which the change is to take place; or (ii) if no date is specified or the date specified is less than five (5) Business Days after the date on which notice is given, the date falling five (5) Business Days after notice of any such change has been given.

(c)     Any service of process in relation to any claims, disputes or proceedings or other matters arising out of or in connection with this Agreement shall be given or made in accordance with Section 13.05.

**Article XIV**
**Dispute Resolution; Waiver of Jury Trial**

**Section 14.01. Governing Law.**  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to this Agreement provides otherwise, the rights, duties, and obligations arising under this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

**Section 14.02. Jurisdiction.**  Should any disagreement arise under or in connection with this Agreement, including any disagreement arising out of the interpretation or enforcement of this Agreement, the Bankruptcy Court shall maintain exclusive jurisdiction over any disputes which arise between the Parties.  Each Party (a) agrees to submit to such jurisdiction, (b) to waive any defense based on the location or jurisdiction of such court, and (c) to consent to the Bankruptcy Court hearing and finally determining any action or proceeding with respect to this Agreement.  To the extent the Bankruptcy Court declines to exercise jurisdiction for any reason, each Party consents that jurisdiction is appropriate before the New York state and federal courts sitting in the Borough of Manhattan.

**Section 14.03. Waiver of Jury Trial.**  Each Party to this Agreement hereby expressly waives any right to trial by jury in any action or proceeding arising out of or in connection with this Agreement or any other agreement(s) executed or delivered in connection herewith.

[*Remainder of this page intentionally left blank*]

Subject to FRE 408 and all applicable privileges
Confidential

# APPENDIX 1
## PROPERTY ASSETS

| | Property Owner | Property Address |
|---|---|---|
| 1. | Rawley Trading Limited | Flat A1, 20/F & Roof, Blk A, Evergreen Villa, 43 Stubbs Road and Car Parking Space No. 108, Hong Kong |
| 2. | Fastact Group Limited | Block 1, 14/ F and Car Port Space No. G122 and Car Parking Space No. 250, Repulse Bay Garden, Nos. 18-40 Belleview Drive, Hong Kong |
| 3. | Chasterton Group Limited | House No. 36, Manderly Garden, 48 Deep Water Bay Road, Hong Kong |
| 4. | Pacific Andes Enterprises (Hong Kong) Limited | House No. 34, Manderly Garden, 48 Deep Water Bay Road, Hong Kong |
| 5. | Bonaire Development Limited | Unit 8B and Car Parking Space No. L39 on Lower Ground Floor, Celestial Garden, 5 Repulse Bay Road, Hong Kong |
| 6. | Grandluck Enterprises Limited | Apartment B33, 2/F, Block B3, Woodgreen Estate, 5 Shouson Hill Road, Hong Kong & Car parking Space No.10 & 20 |

Subject to FRE 408 and all applicable privileges
Confidential

**APPENDIX 2**
**PRIORITY DEBT CLAIM**

| PAIH Priority Creditor | Description of Priority Debt Claim | Principal Amount | Purchase Price |
|---|---|---|---|
| Valery Fedorovich Kolomin | Loan Agreement No 12/2014 dated 15 December 2014 between Pacific Andes Enterprises (Hong Kong) Limited as borrower and the Lenders thereto. | US$ 1,479,927.85 | US$ 887,956.71 |
| **Total** | | **US$ 1,479,927.85** | **US$ 887,956.71** |

Confidential

**APPENDIX 3**

**Part A**
**Mandatory Unsecured Debt Claims**

| Mandatory PAIH Unsecured Creditor | Description of Mandatory Unsecured Debt Claim | Principal Amount | Purchase Price (8.75% of Principal Amount) |
|---|---|---|---|
| Maybank | Facility Agreement dated as of 21 March 2014 (as amended by an Amendment Letter dated as of 30 May 2014, and as further amended, restated, modified, or supplemented from time to time) by and among, inter alia, Pacific Andes Treasury Management Limited, as borrower, Pacific Andes International Holdings Limited, Europaco Limited, and Pacos Processing Limited, as guarantors, and the lenders party thereto | US$ 95,000,000.00 | US$ 8,312,500.00 |
| | Share Charge over the entire issued share capital of Pacific Andes Food (BVI) Limited dated as of 21 March 2014 (as amended, restated, modified or supplemented from time to time) by and among Pacific Andes International Holdings (BVI) Limited as chargor, and Malayan Banking Berhad, Hong Kong Branch as security trustee | | |
| | Equity Pledge over the entire equity in Pacific Andes Food Limited dated as of 27 May 2014 (as amended, restated, modified or supplemented from time to time) by and among Pacific Andes Food (BVI) Limited as chargor, and Malayan Banking Berhad, Hong Kong Branch as security trustee | | |

| Mandatory PAIH Unsecured Creditor | Description of Mandatory Unsecured Debt Claim | Principal Amount | Purchase Price (8.75% of Principal Amount) |
|---|---|---|---|
| Maybank | Facility Letter dated as of September 30, 2014 (as amended, restated, modified or supplemented from time to time) by and among Europaco Limited, as borrower, Pacific Andes International Holdings Limited, as guarantor, and Malayan Banking Berhad, Hong Kong Branch as lender | US$ 40,000,000.00 | US$ 3,500,000.00 |
| Coöperatieve Rabobank U.A., Hong Kong Branch | Facility Letter dated as of August 10, 2012 (as supplemented by Supplemental Facility Letters dated as of June 6, 2014 and July 9, 2015, and as further amended, restated, modified, or supplemented from time to time) by and among Europaco Limited, Pacos Processing Limited, Europaco (EP) Limited, Europaco (GP) Limited, and Europaco (HP) Limited as borrowers, Pacific Andes International Holdings Limited, as guarantor, and Coöperatieve Rabobank U.A., Hong Kong Branch as lender | US$ 12,388,832.98 | US$ 1,084,022.89 |
| Coöperatieve Rabobank U.A., Hong Kong Branch | Facility Letter dated as of August 10, 2012 (as supplemented by Supplemental Facility Letters dated as of June 6, 2014 and July 9, 2015, and as further amended, restated, modified or supplemented from time to time) by and among Europaco Limited, Pacos Processing Limited, Europaco (EP) Limited, Europaco (GP) Limited, and Europaco (HP) Limited as borrowers, Pacific Andes International Holdings Limited, as guarantor, and Coöperatieve Rabobank U.A., Hong Kong Branch as lender | € 2,764,811.39 *Approximately US$3,344,315.86* | € 241,921.00 *Approximately US$292,627.64* |

| Mandatory PAIH Unsecured Creditor | Description of Mandatory Unsecured Debt Claim | Principal Amount | Purchase Price (8.75% of Principal Amount) |
|---|---|---|---|
| Coöperatieve Rabobank U.A., Hong Kong Branch | Facility Letter dated as of October 8, 2015 (as amended, restated, modified, or supplemented from time to time) by National Fish & Seafood Limited as borrowers, Pacific Andes International Holdings Limited, National Fish & Seafood, Inc and Mr Arthur Jack Ventola, as guarantors, and Coöperatieve Rabobank U.A., Hong Kong Branch as lender | US$ 51,000,000.00 | US$ 4,462,500.00 |
| Coöperatieve Rabobank U.A., Hong Kong Branch | Intercompany loan balance (originally owed to National Fish & Seafood, Inc. and subsequently assigned by National Fish & Seafood, Inc. to Coöperatieve Rabobank U.A., Hong Kong Branch) in respect of which Proofs of Claim No. 1853, 1854, 1855 and 1856 were filed against Pacific Andes International Holdings Limited and Pacific Andes International Holdings (BVI) Limited | US$ 30,812,495.76 | US$ 2,696,093.38 |
| Pickenpack | Claims against the following letters of comfort executed by Pacific Andes International Holdings Limited in favour of Pickenpack:<br><br>(a) Letter of Comfort dated as of December 14, 2012 (as amended, restated, modified, or supplemented from time to time) by and among Pickenpack Holding Germany GmbH and Pacific Andes International Holdings Limited.<br><br>(b) Letter of Comfort dated as of December 14, 2012 (as amended, restated, modified, or supplemented from | US$ 27,428,571.43[1] | US$ 2,400,000.00 |

---

[1] Pickenpack entities have filed more than 100 claims against PAIH entities for a total of more than one billion US dollars. PAIH disputes these claims. For purposes of this settlement only, Pickenpack agrees to a compromised claim amount of US$27,428,571.43.

| Mandatory PAIH Unsecured Creditor | Description of Mandatory Unsecured Debt Claim | Principal Amount | Purchase Price (8.75% of Principal Amount) |
|---|---|---|---|
| | time to time) by and among Pickenpack Production Lüneburg GmbH and Pacific Andes International Holdings Limited.<br><br>(c) Letter of Comfort dated as of June 12, 2015 (as amended, restated, modified, or supplemented from time to time) by and among TST The Seafood Traders GmbH and Pacific Andes International Holdings Limited.<br><br>(d) Letter of Comfort dated as of June 12, 2015 (as amended, restated, modified, or supplemented from time to time) by and among Pickenpack Europe GmbH and Pacific Andes International Holdings Limited | | |
| **TOTAL (approx.)** | | **US$259,974,216.03** | **US$ 22,747,743.90** |

The Principal Amount and Purchase Price for those claims in Euro and HK$ are based on the exchange rate of Euro1=US$1.2096 and US$1=HK$7.8 respectively as of January 14,2021

## Part B
## Optional Unsecured Debt Claims

| Optional PAIH Unsecured Creditor | Description of Optional Unsecured Debt Claim | Principal Amount | Purchase Price (8.75% of Principal Amount) |
|---|---|---|---|
| Standard Chartered Bank (Hong Kong) Limited | Facility Letter dated as of 10 April, 2014 (as amended, restated, modified, or supplemented from time to time) by and among Europaco Limited, as borrower, Pacific Andes International Holdings Limited, as guarantor, and Standard Chartered Bank (Hong Kong) Limited as lender | US$ 8,357,318.52 | US$ 731,265.37 |
| China CITIC Bank International Limited | Facility Letter dated as of January 13, 2016 (as amended, restated, modified, supplemented, or replaced from time to time) by and among, inter alia, Pacos Processing Limited, Europaco Limited as borrowers and guarantors, Pacific Andes International Holdings Limited, as guarantor with respect to the borrowings thereunder by Pacos Processing Limited and Europaco Limited, and China CITIC Bank International Limited as lender, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, restated, modified, supplemented, or replaced from time to time) | US$ 19,032,672.22 (For the avoidance of doubt, the principal amount listed herein refers to the principal amount of Indebtedness owed by Pacos Processing Limited and Europaco Limited under the Facility Letter dated as of 13 January, 2016 (as amended, restated, modified, supplemented or replaced from time to time) | US$ 1,665,358.82 |

| Optional PAIH Unsecured Creditor | Description of Optional Unsecured Debt Claim | Principal Amount | Purchase Price (8.75% of Principal Amount) |
|---|---|---|---|
| China CITIC Bank International Limited | Above | € 2,851,151.30<br><br>*Approximately US$ 3,448,752.61*<br><br>(For the avoidance of doubt, the principal amount listed herein refers to the principal amount of Indebtedness owed by Europaco Limited under the Facility Letter dated as of 13 January, 2016 (as amended, restated, modified, supplemented or replaced from time to time) | € 249,475.74<br><br>*Approximately US$ 301,765.85* |
| KBC Bank N.V., Hong Kong Branch | Facility Letter dated as of May 31, 2013 (as amended, restated, modified or supplemented from time to time) by and among Europaco Limited and Nouvelle Foods International Limited as borrowers, Pacific Andes International Holdings Limited as guarantor, and KBC Bank N.V., Hong Kong Branch as lender | US$ 10,646,683.06 | US$ 931,584.77 |

| Optional PAIH Unsecured Creditor | Description of Optional Unsecured Debt Claim | Principal Amount | Purchase Price (8.75% of Principal Amount) |
|---|---|---|---|
| United Overseas Bank Limited, Hong Kong office | Facility Letter dated as of 18 September, 2015 by and among Pacific Andes Enterprises (BVI) Limited and Europaco Limited (BVI) as borrowers, Pacific Andes Resources Development Limited, as guarantor with respect to the borrowings thereunder by Pacific Andes Enterprises (BVI) Limited, Pacific Andes International Holdings Limited, as guarantor with respect to the borrowings thereunder Europaco Limited, and the lenders party thereto from time to time, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, restated, modified, or supplemented from time to time) | US$ 4,883,328.91 | US$ 427,291.28 |
| United Overseas Bank Limited, Hong Kong office | Above | € 1,908,012.99<br><br>*Approximately US$ 2,307,932.51* | € 166,951.14<br><br>*Approximately US$ 201,944.09* |
| Fubon Bank (Hong Kong) Limited | Facility Letter dated as of May 14, 2015 (as amended, restated, modified, or supplemented from time to time) by and among Europaco Limited, Pacific Andes Enterprises (BVI) Limited, Europaco (EP) Limited, Europaco (HP) Limited, and Europaco (AP) Limited as borrowers, Pacific Andes Resources Development Limited, as guarantor with respect to the borrowings thereunder by Pacific Andes Enterprises (BVI) Limited, Pacific Andes International Holdings Limited, as guarantor with respect to the borrowings thereunder Europaco Limited, Europaco (EP) | US$ 15,244,279.96 | US$ 1,333,874.50 |

Confidential

| Optional PAIH Unsecured Creditor | Description of Optional Unsecured Debt Claim | Principal Amount | Purchase Price (8.75% of Principal Amount) |
|---|---|---|---|
| | Limited, Europaco (HP) Limited, and Europaco (AP) Limited, and Fubon Bank (Hong Kong) Limited as lender | | |
| Trans-Europe Seafood Sales B.V. | Trade Payable. | US$ 933,554.16 | US$ 81,685.90 |
| Glacier Fish Company, LLC | Trade Payable. | US$ 3,519,486.49 | US$ 307,955.07 |
| Deloitte Touche Tohmatsu | Trade Payable. | HK$ 6,775,525  *Approximately US$ 868,657.05* | HK$592,858.44  *Approximately US$ 76,007.49* |
| PricewaterhouseCoopers Limited | Trade Payable. | US$ 838,656.00 | US$ 73,382.40 |
| Baker & McKenzie | Trade Payable. | US$ 450,012.00 | US$ 39,376.05 |
| Qingdao Fusheng Foodstuffs Co., Ltd. | Trade Payable. | US$ 3,166,015.00 | US$ 277,026.31 |
| Shandong Tong Xing Foodstuff Co., Ltd | Trade Payable. | US$ 10,148,319.00 | US$ 887,977.91 |
| Richtown Development Ltd (BVI) (in liquidation) | Intercompany loan balance. | US$ 37,623,202.00 | US$ 3,292,030.18 |

16-11895-shl Doc 2341-5 Filed 09/23/21 Entered 09/23/21 14:29:01 Exhibit Ng Declaration (Settlement Declaration w/o Reference) subject to FRE 408 Pg 91 of 49

Confidential

| Optional PAIH Unsecured Creditor | Description of Optional Unsecured Debt Claim | Principal Amount | Purchase Price (8.75% of Principal Amount) |
|---|---|---|---|
| Pacos Trading Ltd (Cayman) (in liquidation) | Intercompany loan balance. | US$ 178,003.00 | US$ 15,575.26 |
| Pacific Andes Enterprises (BVI) Limited (in liquidation) | Intercompany loan balance. | US$ 6,249,000.00[2] | US$ 546,787.50 |
| **TOTAL** | | **US$ 127,895,872.50** | **US$11,190,888.84** |

---

[2] Pacific Andes Enterprises (BVI) Limited alleges a claim against Nouvelle Foods International Ltd. for more than a billion US dollars. Nouvelle's only material asset is a claim of US$6,249,000 against PAIH BVI. PAIH disputes PAE BVI's claim against Nouvelle. For purposes of this settlement only, PAE BVI and Nouvelle agree to a compromised claim amount of US$6,249,000.

# APPENDIX 4
## STRUCTURE CHART



# APPENDIX 5
# FORM OF CALL OPTION DEED

16-11895-jlg Doc 2341-5 Filed 09/23/21 Entered 09/23/21 14:29:33 Exhibit G
Declaration (Settlement and Framework Agreement) Pg 34 of 43
Deutsch Declaration - Work Product and applicable privileges
Confidential

**APPENDIX 6**
**DEBT PURCHASE AGREEMENT**

Subject to RPC 408 and applicable privileges
Confidential

# APPENDIX 7
# DEFERRED PRIORITY DEBT CLAIM

| Deferred Priority Creditor | Description of Deferred Priority Debt Claim | Principal Amount | Purchase Price | Timing of Payment |
|---|---|---|---|---|
| Meridian Investment Group Pte. Ltd. | Trade Payable. | US$ 11,500,000 | US$ 11,500,000 | 2 years from the Closing Date (which may be extended by the Investor for an additional 3 year period, in its sole discretion) |
| Ocean Incorporation Limited | Post-Petition Trade Creditor. | US$ 6,840,087 | US$ 6,840,087 | 2 years from the Closing Date (which may be extended by the Investor for an additional 3 year period, in its sole discretion) |
| **TOTAL** | | **US$ 18,340,087** | **US$ 18,340,087** | |

## APPENDIX 8
## RELATED PARTY LEASE AGREEMENTS

| Relevant Target Company | Description of Lease Agreement |
|---|---|
| Rawley Trading Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 January 2015 on the lease of property Flat A1, 20/F & Roof, Block A, Evergreen Villa, 43 Stubbs Road and Car Parking Space No. 108, Hong Kong |
| Fastact Group Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 January 2015 on the lease of property 14/F of No. 40 Belleview Drive and Car Port Space No. G122 and Car Parking Space No. 250, Repulse Bay Garden, Nos. 18-40 Belleview Drive, Hong Kong |
| Chasterton Group Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 January 2015 on the lease of property House No. 36, Manderly Garden, No. 48 Deep Water Bay Road, Hong Kong |
| Bonaire Developments Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 January 2015 on the lease of property Unit 8B and Car Parking Space No. 39 on Lower Ground Floor, Celestial Garden, 5 Repulse Bay Road, Hong Kong |
| Grandluck Enterprises Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 April 2015 on the lease of property Apartment B33, 2/F Block B3 and Car Parking Space No. 10 & 20, Woodgreen Estate, No. 5 Shouson Hill Road, Hong Kong |
| Pacific Andes Enterprises (Hong Kong) Limited | Lease agreement with Pelican Food Limited dated 1 April 2015 on the lease of property House No. 34, Manderly Garden, No. 48 Deep Water Bay Road, Hong Kong |

**APPENDIX 9**
**FORM OF BANKRUPTCY COURT APPROVAL**

# APPENDIX 10

# PAIH AFFILIATES

| No. | Name | Jurisdiction of Incorporation |
|-----|------|-------------------------------|
| 1. | Pacific Andes International Holdings (BVI) Limited | British Virgin Islands |
| 2. | ACE Field Limited | British Virgin Islands |
| 3. | Aqua Foods (Qingdao) Co., Ltd. | People's Republic of China |
| 4. | Bestmate Investments Limited | Independent State of Samoa |
| 5. | Bonaire Developments Limited | British Virgin Islands |
| 6. | Chasterton Group Limited | British Virgin Islands |
| 7. | Clamford Holding Limited | British Virgin Islands |
| 8. | Dynamic Choice Limited | Hong Kong S.A.R. |
| 9. | Europaco Limited | British Virgin Islands |
| 10. | Europaco (AP) Limited | British Virgin Islands |
| 11. | Europaco (BP) Limited | British Virgin Islands |
| 12. | Europaco (EP) Limited | British Virgin Islands |
| 13. | Europaco (GP) Limited | British Virgin Islands |
| 14. | Europaco (HP) Limited | Hong Kong S.A.R. |
| 15. | Fastact Group Limited | British Virgin Islands |
| 16. | Fortune Midas Limited | British Virgin Islands |
| 17. | Full Enrich Limited | Hong Kong S.A.R. |
| 18. | Global Research Group Inc. | British Virgin Islands |
| 19. | Global Research Services Inc. | British Virgin Islands |
| 20. | Glorious Ocean Limited | Hong Kong S.A.R. |
| 21. | Grandluck Enterprises Limited | British Virgin Islands |
| 22. | Heng Holdings (BVI) Limited | British Virgin Islands |

| No. | Name | Jurisdiction of Incorporation |
|---|---|---|
| 23. | Join Power Assets Limited | British Virgin Islands |
| 24. | Kyoshoku Company Limited | Japan |
| 25. | Kyoshoku Marketing Company Limited | Japan |
| 26. | Modern Energy Holdings Limited | British Virgin Islands |
| 27. | National Fish & Seafood, Inc. | United States |
| 28. | National Fish & Seafood Limited | Hong Kong S.A.R. |
| 29. | National Fish & Seafood Management Limited | Hong Kong S.A.R. |
| 30. | Nouvelle Foods International Ltd. | British Virgin Islands |
| 31. | Ocean Kingdom Enterprises Limited | Hong Kong S.A.R. |
| 32. | Onn Profits Limited | British Virgin Islands |
| 33. | Orient Ocean Limited | British Virgin Islands |
| 34. | Pacific Andes (Shanghai) Food Trading Company Limited | People's Republic of China |
| 35. | Pacific Andes Development Limited | British Virgin Islands |
| 36. | Pacific Andes Development Sdn. Bhd. | Malaysia |
| 37. | Pacific Andes Enterprises (Hong Kong) Limited | Hong Kong S.A.R. |
| 38. | Pacific Andes Food (BVI) Limited | British Virgin Islands |
| 39. | Pacific Andes Food Limited | People's Republic of China |
| 40. | Pacific Andes Treasury Management Limited | Hong Kong S.A.R. |
| 41. | Pacific Fruit Trading Limited | Hong Kong S.A.R. |
| 42. | Paco-EP Limited | Cyprus |
| 43. | Paco-GP Limited | Cyprus |
| 44. | Paco-HP Limited | Cyprus |
| 45. | Pacos (QP) Limited | Cyprus |
| 46. | Pacos Processing Limited | Cayman Islands |

| No. | Name | Jurisdiction of Incorporation |
|---|---|---|
| 47. | Pacos Processing Limited | Cyprus |
| 48. | PAE Limited | Hong Kong S.A.R. |
| 49. | Paramount Holdings Limited | Hong Kong S.A.R. |
| 50. | Peaksville Limited | United Kingdom |
| 51. | Pelican Food Limited | British Virgin Islands |
| 52. | Poweroute Limited | British Virgin Islands |
| 53. | Qingdao Canning and Foodstuff Company Limited | People's Republic of China |
| 54. | Qingdao Pacific Andes International Trading Company Limited | British Virgin Islands |
| 55. | Qingdao Pacific Andes International Trade Limited | People's Republic of China |
| 56. | Rawley Trading Limited | British Virgin Islands |
| 57. | Rich Reward Assets Limited | British Virgin Islands |
| 58. | Rich System Limited | Hong Kong S.A.R. |
| 59. | Silliker Hong Kong Limited | Hong Kong S.A.R. |
| 60. | Value Food Supply Limited | Hong Kong S.A.R. |
| 61. | Vision Invest Limited | British Virgin Islands |
| 62. | Waton Enterprises Limited | Hong Kong S.A.R. |
| 63. | Wealthy Nation Holdings Limited | British Virgin Islands |
| 64. | Xinxing Foodstuffs (Qingdao) Company Limited | People's Republic of China |

# APPENDIX 11

# FORM OF NOVATION DEED

**IN WITNESS WHEREOF,** and intending to be legally bound, each of the Parties hereto has caused this Agreement to be executed as of the date(s) set forth below.

ASIA UNION LIMITED

By_____

Name:

Title:

PACIFIC     ANDES     INTERNATIONAL HOLDINGS LIMITED

By_____

Name:

Title:

PACIFIC     ANDES     INTERNATIONAL HOLDINGS (BVI) LIMITED

By_____

Name:

Title:

RAWLEY TRADING LIMITED

By_____

Name:

Title:

FASTACT GROUP LIMITED

By_____

Name:

Title:

HENG HOLDINGS (BVI) LIMITED

By_____

Name:

Title:

CHASTERTON GROUP LIMITED

By_____

Name:

Title:

BONAIRE DEVELOPMENTS LIMITED

By_____

Name:

Title:

GRANDLUCK ENTERPRISES LIMITED

By_____

Name:

Title:

PACIFIC ANDES ENTERPRISES (HONG KONG) LIMITED

By_____

Name:

Title:

**WARRANTY DEED**


**DATED _____**


**BETWEEN**


**PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED AND PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI) LIMITED**

**as Warrantors**


**AND**


**ASIA UNION LIMITED**

**as Grantee**


**AND**


**MERIDIAN INVESTMENT GROUP PTE. LTD. AND THE PERSONS WHOSE NAMES AND PARTICULARS ARE SET OUT IN SCHEDULE 1**

**as Guarantors**

Table of Contents

1.  INTERPRETATION ............................................................................................................ 1
2.  WARRANTIES ................................................................................................................... 9
3.  GUARANTEE ................................................................................................................... 10
4.  INDEMNITIES ................................................................................................................. 10
5.  LIMITATIONS ................................................................................................................. 13
6.  ASSIGNMENT AND SUCCESSION ............................................................................. 14
7.  ANNOUNCEMENTS ....................................................................................................... 14
8.  RIGHTS AND REMEDIES OF THE GRANTEES ....................................................... 14
9.  WITHHOLDING TAX AND GROSSING-UP .............................................................. 15
10.  CLAIMS PROCEDURE ................................................................................................. 15
11.  DUE DATE OF PAYMENT ........................................................................................... 15
12.  INTEREST ....................................................................................................................... 16
13.  SATISFACTION OF CLAIMS ....................................................................................... 16
14.  COSTS .............................................................................................................................. 16
15.  DESIGNATED REPRESENTATIVE ............................................................................. 17
16.  ENTIRE AGREEMENT .................................................................................................. 17
17.  WAIVER/AMENDMENT ............................................................................................... 18
18.  FURTHER ASSURANCE ............................................................................................... 18
19.  NOTICES .......................................................................................................................... 18
20.  COUNTERPARTS ........................................................................................................... 19
21.  THIRD PARTY RIGHTS ................................................................................................ 19
22.  JOINT AND SEVERAL LIABILITY ............................................................................ 20
23.  GOVERNING LAW AND JURISDICTION .................................................................. 20
SCHEDULE 1 ............................................................................................................................. 21
SCHEDULE 2 ............................................................................................................................. 22
SCHEDULE 3 ............................................................................................................................. 27
SCHEDULE 4 ............................................................................................................................. 46
SCHEDULE 5 ............................................................................................................................. 50
SCHEDULE 6 ............................................................................................................................. 50
SCHEDULE 7 ............................................................................................................................. 51

**THIS WARRANTY DEED** (this "**Deed**") is made on _____.

**PARTIES:**

(1) **PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED**, a company incorporated in Bermuda, with its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda ("**PAIH**");

(2) **PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI) LIMITED**, a company incorporated in the British Virgin Islands, with its registered office at 3rd Floor, J&C Building, PO Box 362, Road Town, Tortola, British Virgin Islands VG1110 ("**PAIH BVI**");

(PAIH and PAIH BVI, each a "**Warrantor**" and together the "**Warrantors**");

(3) **ASIA UNION LIMITED**, a company incorporated in Hong Kong, with its registered office at 22/F South China Building, 1-3 Wyndham Street, Central, Hong Kong (the "**Grantee**"); and

(4) **MERIDIAN INVESTMENT GROUP PTE. LTD.**, a company incorporated in the Republic of Singapore, with its registered office at 138 Cecil Street, #12-01A Cecil Court, Singapore 069538 ("**Meridian**");

(5) The persons whose names and particulars are set out in Schedule 1 (each, an "**Individual Guarantor**" and collectively, the "**Individual Guarantors**");

(Meridian and the Individual Guarantors each a "**Guarantor**" and together the "**Guarantors**", the Guarantors and the Warrantors together the "**Obligors**"),

(the Warrantors, the Grantee and the Guarantors, each a "**Party**" and, together, the "**Parties**").

**RECITALS**

(A) PAIH BVI is the sole legal and beneficial owner of the Option Securities (as defined below).

(B) PAIH BVI has agreed to grant to the Grantee a call option in respect of the Option Securities on the terms and subject to the conditions of the Call Option Deed.

(C) PAIH BVI has agreed to novate the Target Group Debt on the terms and subject to the conditions of the Novation Deed.

(D) In consideration of the entry by the Grantee into the Settlement and Framework Agreement, each of the Warrantors provided warranties to the Grantee on the terms set out in this Deed.

**NOW THIS DEED WITNESSES AS FOLLOWS:**

1. **INTERPRETATION**

1.1 In this Deed, the following words and expressions have the following meanings unless the context otherwise requires:

"**Accounts**" means:

(a) the individual audited balance sheet of each of the Target Companies incorporated in Hong Kong as at the Accounts Date and the individual unaudited balance sheet of each

1

of the Target Companies incorporated in the British Virgin Islands as at [28 March 2021]; and

(b)     the individual audited profit and loss account of each of the Target Companies incorporated in Hong Kong for the financial year ended on the Accounts Date and the individual unaudited profit and loss account of each of the Target Companies incorporated in British Virgin Islands for the financial year ended on [28 March 2021];

including, in each case, the relative notes and directors' and auditors reports, if applicable;

"**Accounts Date**" means [28 March 2021];

"**Affiliate**" means, in relation to any person, any other person controlling, controlled by or under common control with that person or persons. For the purposes of this definition, "**control**" when used with respect to any person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "**controlling**" and "**controlled**" shall be construed accordingly. For the avoidance of doubt, an entity will control a second entity or entities if it: (a) owns or controls, directly or indirectly, at least 50% of the voting equity of the second entity or entities; or (b) it possesses, directly or indirectly, the power to direct or cause the direction of the affairs or management of the second entity or entities, whether through the ownership of voting securities, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of management or similar body governing the affairs of the second entity or entities;

"**Agreed Form**" means, in relation to a document, the form of that document which has been agreed between the Parties and initially by or on behalf of each of them as evidence of that agreement;

"**Anti-Corruption Law**" means any Applicable Law which:

(a)     prohibits the conferring of any gift, payment or other benefit on any person or any officer, employee, agent or adviser of such person; and/or

(b)     prohibits the receiving of any gift, payment or other benefit from any person or any officer, employee, agent or adviser of such person;

"**Applicable Law**" means all applicable international, national, state, federal, regional or local laws (including common law, statute law, regulations, secondary legislation, by-laws, civil and criminal law, judgments and decisions of any court or tribunal), codes of practice or guidance notes;

"**Business Intermediary**" has the meaning ascribed to it in paragraph 19.2 of Schedule 3 (*Warranties*);

"**Call Option Deed**" means the deed made between PAIH BVI and the Grantee *inter alia* in relation to the grant of the call option over the Option Securities;

"**CITIC**" means China CITIC Bank International Limited;

"**CITIC Sale and Purchase Agreement**" has the meaning ascribed to it in clause 4(f);

2

"**Claim**" means any claim by the Grantee under this Deed;

"**Completion**" means completion of the sale and purchase of the Option Securities in accordance with the Call Option Deed;

"**Connected Person**" means, in relation to a person (the "**first person**"):

(a)     any relative or partner of the first person;

(b)     any (other) trustees of and any (other) settlor or beneficiary of any trust or settlement in relation to which the first person or any relative or partner of the first person (living or dead) is or was a trustee, settlor or beneficiary;

(c)     if the first person has an interest in any assets which form part of the estate of a deceased person, the personal representatives of the deceased and each other person that has an interest in those assets; and

(d)     any Affiliate of the first person and any person mentioned in paragraphs (a), (b) or (c) (or which would be an Affiliate of any two (2) or more such persons if they acted together) and any director, officer, shareholder, manager, or partner (of whatever nature) of the first person and any such Affiliate;

where "**relative**" means, in respect of a person: (i) a spouse or civil partner of that person or any other person falling within this definition of relative, (ii) a parent or remoter forebear of that person or any other person falling within this definition of relative, (iii) a child or remoter issue of that person or any other person falling within this definition of relative, or (iv) a brother or sister of that person or any other person falling within this definition of relative;

"**Data Protection Laws**" means all Applicable Law relating to data protection and the processing of personal data;

"**Debt Claims**" has the meaning ascribed to it in the Settlement and Framework Agreement;

"**Debt Completion**" means completion of the Assignment (as defined in each Sale and Purchase Agreement) under each Sale and Purchase Agreement;

"**Debt Documents**" means all agreements and other documents identified as "PAIH Debt Documents" in each Sale and Purchase Agreement, and all other agreements and documents entered into thereunder or in connection therewith;

"**Deferred Payment**" means the aggregate of the Purchase Price as defined in each of (a) the Sale and Purchase Agreement among Meridian and the Grantee; and (b) the Sale and Purchase Agreement among Ocean Incorporation Limited and the Grantee;

"**Designated Representative**" has the meaning ascribed to it in clause 15.1;

"**Disclosed**" means fairly disclosed to the Grantee in writing and in sufficient detail to allow the Grantee to make an informed assessment of the nature and scope of the matters, facts or circumstances disclosed and the extent and impact of their consequences acknowledged and accepted by the Grantee and delivered to the Grantee on the date of this Deed;

"**Disposed Subsidiaries**" has the meaning ascribed to it in Schedule 7 (*Restructuring*);

"**Dollars**" means the lawful currency for the time being of the United States of America;

"**Due Date**" has the meaning ascribed to it in clause 11.1;

"**Encumbrance**" means any interest or equity of any person (including any right to acquire, option or right of first refusal, right of pre-emption or conversion) or any mortgage, charge, pledge, lien, assignment, hypothecation, security interest, title retention or any other security agreement or preferential arrangement or any agreement to create any of the above;

"**Environment**" means the natural and man-made environment, including all or any of the following media, namely air (including the air within buildings or other natural or man-made structures above or below ground), water (including water under or within land or drains or sewers) and land and any living organisms (including man) or systems supported by those media;

"**Environmental Consents**" means any Permit required under Environmental Laws for the carrying on of the business of the Target Group or the use of, or any activities or operations carried out at, any of the Properties;

"**Environmental Laws**" means all Applicable Laws which relate to Environmental Matters;

"**Environmental Matters**" means all matters relating to the control of Hazardous Substances or waste, pollution or protection of the Environment and/or the health and well being of human beings and other living things;

"**Europaco**" means Europaco Limited (in liquidation), a company incorporated and registered in the British Virgin Islands with company number 539805;

"**Euros**" means the single currency for the time being of the participating member states of the European Union that have the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union;

"**Fundamental Warranties**" means those Warranties set out in paragraphs 1, 2, 4 and 11.1 of Schedule 3 (*Warranties*);

"**Fundamental Warranty Claim**" means a Claim for breach of any of the Fundamental Warranties;

"**Governmental Entity**" means any supranational, national, state, municipal or local government (including any subdivision, court, administrative agency or commission or other authority of the same) or any quasi governmental, industry or trade or private body exercising any regulatory or quasi regulatory, taxing, fiscal, judicial, authority, including securities exchanges, competition authorities and the relevant institutions of any relevant country;

"**Group**" means PAIH and its Subsidiaries for the time being and such other company(ies) as will from time to time become a Subsidiary of PAIH;

"**Guaranteed Obligations**" has the meaning ascribed to it in clause 3.1(a);

"**Harm**" means harm to the Environment, and in the case of man includes offence caused to any of his senses or harm to his property;

"**Hazardous Substances**" means any material, substance or organism which, alone or in combination with others, is capable of causing Harm;

4

"**Health and Safety Laws**" means all Applicable Laws that relate to Health and Safety Matters;

"**Health and Safety Matters**" means all matters relating to the health and safety of any person, including any accidents, injuries, illnesses, diseases and dangerous occurrences or practices;

"**Indebtedness**" means any obligation for the payment or repayment of money, whether as principal or as surety and whether present or future, actual or contingent (whether as principal, interest, fees, expenses, gross up obligation, under indemnity or otherwise) in respect of or in connection with (a) money borrowed or raised, (b) any bond, note, loan stock, debenture or similar instrument, (c) acceptance or documentary credit facilities, (d) foreign exchange options, (e) rental and periodic payments, under leases and hire purchase agreements and instalments under conditional sale agreements (in all cases whether in respect of land, machinery, equipment or otherwise) entered into primarily as a method of raising finance or of financing the acquisition or use of the asset concerned, (f) payments in the nature of finance charges or repurchase amounts and debt indemnity under factoring and invoice discounting arrangements, (g) guarantees, indemnities, bonds, standby letters of credit or other instruments issued in connection with the performance of contracts and or in respect of the indebtedness of any other person, (h) amounts payable (other than to another Target Company) in respect of any redemptions or other returns of capital or other entitlements on shares or securities or partnership interests of any Target Company and any associated Liability in respect of tax, (i) Liabilities in respect of financial grants received and (j) any accrued interest, success fees, prepayment premiums, break fees, make-whole premiums or penalties and fees or expenses (including legal fees) associated with the prepayment or redemption of any Indebtedness including any such prepayment or redemption to be made as contemplated by this Deed;

"**Indemnities**" means the indemnities set out at clause 4;

"**Intellectual Property Rights**" means patents, trademarks, service marks, logos, get-up, trade names, brand names, internet domain names, rights in designs, copyright (including rights in computer software) and moral rights, database rights, rights in know-how and other intellectual property rights, in each case whether registered or unregistered, and all rights or forms of protection having equivalent or similar effect anywhere in the world and "**registered**" includes applications for registration;

"**IP Contracts**" means agreements, arrangements or licences relating to Intellectual Property Rights owned or used by the Target Company but does not include the IT Contracts;

"**IT Contracts**" means agreements (including hire purchase contracts or leases), arrangements or licences relating to IT Systems, including maintenance arrangements;

"**Leases**" means the leases referred to in Schedule 6 (*Leases*) and "**Lease**" means any of them;

"**Liabilities**" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, absolute, contingent, disputed, current, future or otherwise;

"**Losses**" means any loss, action, governmental order, remediation costs, damage, fine, penalty, expense (including court costs and reasonable attorneys' or other professional fees and expenses incurred in disputing the claim and/or penalties imposed by a Governmental Entity), liability or tax, whether or not involving the claim of another person;

"**Management Accounts**" means the unaudited accounts in the Agreed Form of the Target Group for the period from the Accounts Date to [28 March 2021];

"**Material Contracts**" has the meaning ascribed to it in paragraph Schedule 310.1 of Schedule 3 (*Warranties*);

"**Novation Deed**" means the deed made among PAIH BVI, the Grantee and the Target Group in relation to the novation of the Target Group Debt from PAIH BVI to the Grantee;

"**Option Consideration**" has the meaning given to it in the Call Option Deed;

"**Option Securities**" has the meaning given to it in the Settlement and Framework Agreement;

"**PAIH Affiliates**" has the meaning given to it in the Settlement and Framework Agreement;

"**PAIH Material Group**" means PAIH, PAIH BVI, Heng Holdings (BVI) Limited and the Property Holding Entities;

"**Past Accounts**" has the meaning ascribed to it in paragraph Schedule 36.1 of Schedule 3 (*Warranties*);

"**Permit**" means an authorisation, certificate, approval, permit, licence, registration or consent;

"**Pickenpack Entities**" means, collectively, (a) Pickenpack Holding Germany GmbH, a company organised under the laws of Germany and having its registered address at Lüner Rennbahn 9, 21339 Lüneburg, Germany, (b) Pickenpack Europe GmbH, a company organised under the laws of Germany, (c) Pickenpack Production Lüneburg GmbH, a company organised under the laws of Germany and having its registered address at Lüner Rennbahn 9, 21339 Lüneburg, Germany, and (d) TST The Seafood Traders GmbH, a company organised under the laws of Germany and having its registered address at Lüner Rennbahn 9, 21339 Lüneburg, Germany, in each case acting through Friedrich von Kaltenborn-Stachua, in his sole capacity as insolvency administrator in its insolvency proceeding;

"**Properties**" means the properties referred to in Schedule 5 (*Properties*) and "**Property**" means any of them;

"**Property Holding Entities**" means the entities of which brief particulars are set out in Schedule 2 (*Details on the Target Group*) and "**Property Holding Entity**" means any of them;

"**Relevant Facilities**" means:

(a)     US$100,000,000 facility agreement dated 21 March 2014 executed between, *inter alia*, Pacific Andes Treasury Management Limited as borrower, Pacific Andes International Holdings Limited, Europaco and Pacos Processing Limited as guarantor, and Malayan Banking Berhad, Hong Kong Branch as lender;

(b)     US$70,000,000 facility letter dated 30 September 2014 executed between, *inter alia*, Europaco as borrower, and Malayan Banking Berhad, Hong Kong Branch as lender;

(c)     US$20,000,000 amended and restated facility letter dated 10 April 2014 executed between, *inter alia*, Europaco as borrower, and Standard Chartered Bank (Hong Kong) Limited as lender;

16-11893-jlg   Doc 2342-6   Filed 09/28/21   Entered 09/28/21 14:29:01   Exhibit 3B
to Ng Declaration (Warranty Deed) Page 99 of 236
21-1895-jlg   Doc 23-2   Filed 09/28/21   Entered 09/28/21 14:23:11   Exhibit B
to Declaration   Page 99 of 59

(d)      US$73,000,000 facility letter dated 13 January 2016 executed between, *inter alia*, Pacific Andes Enterprises (BVI) Limited, Pacos Processing Limited, Europaco, Premium Choice Group Limited and Protein Trading Limited as borrowers, and CITIC as lender;

(e)      US$95,000,000 facility letter dated 8 October 2015 executed by National Fish & Seafood Limited as borrower, and Cooperatieve Centrale Raiffeisen- Boerenleenbank B.A., Hong Kong Branch as lender; and

(f)      US$30,000,000 facility letter dated 18 September 2015 executed between, inter alia, Pacific Andes Enterprises (BVI) Limited and Europaco as borrowers, and   United Overseas Bank Limited as lender;

"**Relevant PAIH Party**" has the meaning ascribed to it in clause 3.1(a).

"**Restructuring**" means the restructuring of the Group details of which are set out in Schedule 7 (*Restructuring*);

"**Sale and Purchase Agreements**" means the sale and purchase agreements made between such Grantee and holders of the Debt Claims, each a "**Sale and Purchase Agreement**";

"**Sanctions**" means economic or financial sanctions, trade embargoes and other prohibitions or restrictions implemented, administered or enforced from time to time by the U.S. (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. State Department or the U.S. Commerce Department), the United Kingdom, the European Union and/or the United Nations Security Council;

"**Settlement and Framework Agreement**" means that certain Settlement and Framework Agreement dated _____ among the Warrantors, the Grantee and the Target Group;

"**Specific Indemnities**" means the Indemnities and Tax Indemnities, a "**Specific Indemnity**" means each of them;

"**Subsidiar**y" means an entity of which a person has direct or indirect control or owns directly or indirectly more than 50% of the voting capital or similar right of ownership and control for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise;

"**Target Companies**" or "**Target Group**" means Heng Holdings (BVI) Limited  and the Property Holding Entities, "**Target Company**" means any of them and the expression "**relevant Target Company**" shall be construed accordingly;

"**Target Group Debt**" has the meaning ascribed to it in the Call Option Deed;

"**Target Group Intercompany Debt**" has the meaning ascribed to it in paragraph 9.1 of Schedule 3 (*Warranties*);


"**tax**" or "**taxation**" means all forms of taxation, dues, duties, imposts, levies and rates of Hong Kong or any other jurisdiction whenever and wheresoever charged, imposed or deducted, or otherwise payable as a consequence of any direction or order of any Tax Authority, together

with all costs, charges, interest, penalties, fines and expenses incidental or relating to or arising in connection with any and all such taxes, dues, duties, imposts, levies and rates or the negotiation of any settlement of any dispute as to the liability of any person therefor or any actual claim in respect of the same, including income tax, national insurance contributions, corporation tax, advance corporation tax, capital gains tax, value added tax, customs and other import duties, stamp duty, stamp duty reserve tax, stamp duty land tax, withholding tax, diverted profits tax, capital transfer tax and inheritance tax;

"**Tax Authority**" means any taxing or other authority (whether within or outside Hong Kong) competent to impose any tax liability;

"**Tax Indemnities**" means the tax indemnities set out at paragraph 2 of Schedule 4 (*Tax Covenant*);

"**Transaction Documents**" means this Deed, the Sale and Purchase Agreements, the Call Option Deed, the Novation Deed and the Settlement and Framework Agreement;

"**US$**" means the lawful currency of the United States of America;

"**Warranties**" means the warranties set out in Schedule 3 (*Warranties*) of this Deed; and

"**Warranty Claim**" means any claim for breach of the Warranties.

1.2     In this Deed unless otherwise specified, reference to:

(a)     a party means a party to this Deed and includes its permitted assignees and/or the successors in title to substantially the whole of its undertaking;

(b)     a reference to a "**person**" includes any individual, firm, body corporate (wherever incorporated), government, state or agency of a state or any joint venture, association, partnership, limited partnership, limited liability partnership, limited liability limited partnership, works council or employee representative body (in each case whether or not having separate legal personality);

(c)     references to "$" are references to the lawful currency from time to time of Hong Kong;

(d)     references to times of the day are to local time in the relevant jurisdiction unless otherwise stated and references to a day are to a period of 24 hours running from midnight to midnight;

(e)     a reference to "includes" or "including" shall be construed as meaning "includes without limitation" or "including without limitation" (as the case may be);

(f)     general words shall not be given a restrictive meaning by reason of their being preceded or followed by words indicating a particular class or examples of acts, matters or things;

(g)     if a period of time is specified and dates from a given day or the day of an act or event, such period shall be calculated exclusive of that day;

(h)     a statute or statutory instrument or accounting standard or any of their provisions is to be construed as a reference to that statute or statutory instrument or accounting standard or such provision as the same may have been amended or re-enacted;

8

(i)     recitals, clauses, paragraphs or the Schedule are to recitals, clauses and paragraphs of and the Schedule to this Deed. The Schedules form part of the operative provisions of this Deed and references to this Deed shall, unless the context otherwise requires, include references to the recitals and the Schedule;

(j)     writing shall include typewriting, printing, lithography, photography and other modes of representing words in a legible form (other than writing on an electronic or visual display screen) or other writing in non-transitory form; and

(k)     words denoting the singular shall include the plural and vice versa and words denoting any gender shall include all genders.

1.3     The index to and the headings in this Deed are for information only and are to be ignored in construing the same.

2.     **WARRANTIES**

2.1     Each of the Obligors hereby jointly and severally warrants to the Grantee that the statements in Schedule 3 (*Warranties*) are true, accurate and not misleading. The Warranties shall be deemed repeated immediately before (a) Debt Completion; and (b) Completion, by reference to the then existing facts and circumstances.

2.2     The Warranties are given subject to any matter Disclosed.

2.3     Each of the Warranties is given independently from and shall not be limited by reference to any of the others of them nor anything else contained in the Transaction Documents.

2.4     Any statement in the Warranties qualified by the expression "so far as the Warrantors are aware" or any similar expression shall mean that the Warrantors are deemed to have, when making the statement, the knowledge which the board of directors of the Warrantors has or would have had if they had made due and careful inquiry as to the matter which is the subject of the statement and is deemed to include a warranty by the Warrantors that such due and careful enquiry have been made.

2.5     The Obligors shall promptly Disclose to the Grantee any matter or thing which may arise or become known to it which is or could be a breach of or inconsistent with or may render inaccurate or misleading any of the Warranties.

2.6     Each of the Obligors irrevocably waives all rights and claims which it may have against any Target Company or any of its officers or employees in respect of any misrepresentation, inaccuracy or omission in or from any information or advice given by it or any of its officers or employees to each of the Obligors to enable it to give any of the Warranties or to assume any of the obligations assumed or to be assumed by it under or pursuant to any of the Transaction Documents.

2.7     Each of the Obligors acknowledge that it has given the Warranties with the intention of inducing the Grantee to enter into the Transaction Documents and the Grantee has been induced to enter into the Transaction Documents on the basis of and in reliance upon the Warranties.

2.8 The Warranties shall not be extinguished or affected in any way by Debt Completion or Completion and this Deed (other than obligations which have already been fully performed) shall continue in full force and effect after Debt Completion and Completion.

3. **GUARANTEE**

3.1 Subject to clause 5.5, each Guarantor irrevocably and unconditionally jointly and severally:

    (a) guarantees to the Grantee the punctual performance by all relevant entities in the Group of all their obligations under the Transaction Documents to which such entity in the Group is a party (the "**Relevant PAIH Party**") (the "**Guaranteed Obligations**");

    (b) undertakes with the Grantee that whenever a Warrantor does not pay any amount when due under or in connection with any Transaction Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

    (c) agrees with the Grantee that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify the Grantee immediately on demand against any cost, loss or liability it incurs as a result of a Warrantor or Relevant PAIH Party not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Transaction Document on the date when it would have been due. The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this clause 3 if the amount claimed had been recoverable on the basis of a guarantee.

3.2 This guarantee is to be a continuing guarantee and accordingly is to remain in force until all the Guaranteed Obligations shall have been performed or satisfied, or cease pursuant to the limitations set forth in clause 5. This guarantee is in addition to and without prejudice to and not in substitution for any rights which the Grantee may now or in future have or hold for the performance and observance of the Guaranteed Obligations.

3.3 As a separate and independent stipulation each of the Guarantors agree that any of the Guaranteed Obligations (including, without limitation, any monies payable) which is or becomes unenforceable against or recoverable from any Warrantor by reason of any legal limitation, disability or incapacity on or of such Warrantor or any other fact or circumstance shall nevertheless be enforceable against and recoverable from the Guarantors as though the same had been incurred by the Guarantors and the Guarantors were the sole or principal obligors in respect of the Guaranteed Obligations and shall be performed or paid by the Guarantors within five (5) Business Days following demand.

3.4 Each Guarantor waives any right it may have of first requiring the Grantee to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this clause 3. This waiver applies irrespective of any law or any provision of any Transaction Document to the contrary.

4. **INDEMNITIES**

In addition and without prejudice to the Warranties and the other provisions of the Transaction Documents, each of the Obligors jointly and severally undertakes to indemnify the Grantee and each of the Target Companies from and against all Losses which may be suffered or

incurred by the Grantee and/or any of the Target Companies which arise (directly or indirectly) from, in relation to or as a result of or otherwise in connection with:

(a)    any breach of the Warranties contained in this Deed;

(b)    any breach by any of Warrantors, Guarantors or Relevant PAIH Parties of any covenant, acknowledgement, warranty, agreement or obligation contained in any Transaction Document;

(c)    the demolition, reinstatement, repair or other works in respect of any illegal or unauthorised additions, erections or alterations to any of the Properties to be undertaken to comply with any Applicable Law and any fines and penalties which may be levied against the relevant Target Company by any Governmental Entity as a result of any such illegal and/or unauthorised additions, erections or alterations to any of the Properties and any loss which may be suffered by the Grantee and/or the Target Companies if any of the Properties shall be re-entered by the Government as a result of the existence of any such illegal or unauthorised additions, erection or alterations to the Properties;

(d)    all liabilities, commitments and contingencies of any Target Company not fully provided for or taken into account in the Accounts and the Management Accounts;

(e)    any enquiry, investigation, inspection, claim, prosecution, litigation, arbitration, dispute resolution proceedings, adversarial motion and/or application whether in court or not with respect to Target Group Debt and/or the novation of the Target Group Debt under or in accordance with the terms of the Call Option Deed and the Novation Deed;

(f)    if CITIC and the Grantee enter into a Sale and Purchase Agreement (the "**CITIC Sale and Purchase Agreement**") in respect of the Optional Unsecured Debt Claims (as defined in the Settlement and Framework Agreement) held by CITIC:

(i)    CITIC failing to effect the sale and assignment of the Purchased Assets (as defined in the CITIC Sale and Purchase Agreement) other than by reason of the Grantee failing to satisfy any of the Pre-Completion Conditions (as defined in the CITIC Sale and Purchase Agreement);

(ii)    the CITIC Sale and Purchase Agreement being unenforceable, illegal or invalid for any reason; and/or

(iii)    the entry into and the performance of the CITIC Sale and Purchase Agreement and the transactions contemplated therein;

(g)    indemnifying Malayan Banking Berhad, Hong Kong Branch ("**Maybank**") against all out-of-pocket costs incurred by Maybank in relation to any litigation proceedings, adversarial motion and/or application in court which Maybank is obliged to commence, support or join as referred to in Sections 5.2(a) and/or 11.2 of the Sale and Purchase Agreement entered or to be entered into between Maybank (as seller) and the Grantee (as purchaser);

(h)    the Grantee failing to (under or pursuant to the Sale and Purchase Agreement entered or to be entered into between Maybank (as seller) and the Grantee (as purchaser)) perfect, protect, or receive, or (under or pursuant to the Call Option Deed) assign to

Pacific Andes International Holdings (BVI Limited) the benefit of the Encumbrances created or intended to be created by or pursuant to (i) the share charge over the share capital of Pacific Andes Food (BVI) Limited dated as of 21 March 2014 (as amended, restated, modified or supplemented from time to time) by and among Pacific Andes International Holdings (BVI) Limited as chargor, and Maybank (and any of its assignees or successors) as security trustee; or (ii) the equity pledge over the equity in Pacific Andes Food Limited dated as of 27 May 2014 (as amended, restated, modified or supplemented from time to time) by and among Pacific Andes Food (BVI) Limited as chargor, and Maybank (and any of its assignees or successors) as security trustee;

(i) any enquiry, investigation, inspection, claim, prosecution, litigation, arbitration, dispute resolution proceedings, adversarial motion and/or application whether in court or not regarding PAE Limited's assumption, performance or compliance or intended assumption, performance or compliance of its obligations under or pursuant to, or in connection with, the PAIH Debt Documents (as defined in the Sale and Purchase Agreement entered or to be entered into between Maybank (as seller) and the Grantee (as purchaser));

(j) any enquiry, investigation, inspection, claim, prosecution, litigation, arbitration, dispute resolution proceedings, adversarial motion and/or application in court regarding the failure to effect the sale, assignment, transfer or novation to the Grantee of (i) the obligations of the holders of the Debt Claims under or in respect of the documents, trade payables and/or intercompany loan balances detailed in Appendices 2, 3 and 7 of the Settlement and Framework Agreement, and (ii) the claims of the holders of the Debt Claims against the relevant PAIH Affiliates under the guarantees or security documents executed in connection with the documents, trade payables and/or intercompany loan balances detailed in Appendices 2, 3 and 7 of the Settlement and Framework Agreement, from the relevant holders of the Debt Claims to the Grantee;

(k) any non-compliance with any Applicable Law in relation to the conduct of the business of the Target Companies on or before Completion, including:

(i) the failure to file or any late filings in relation to a change of particulars for any of the directors or company secretaries of a relevant Target Company on time and in accordance with the Hong Kong Companies Ordinance;

(ii) the failure by a relevant Target Company to hold annual general meetings each year on time and in accordance with the Hong Kong Companies Ordinance;

(iii) the failure by any Target Company to maintain complete and up-to-date corporate registers in accordance with the Hong Kong Companies Ordinance and the BVI Business Companies Act, 2004 (No. 16 of 2004) (as the case may be);

(iv) the failure to update the business licence of a relevant Target Company in accordance with the requirements set out in the Hong Kong Business Registration Ordinance (Cap. 310);

(v) the investigation of PAIH by the Securities and Futures Commission of Hong Kong as disclosed in the announcement by PAIH dated 20 August 2015 and the investigation of China Fishery Group Limited and Pacific Andes Resources

Development Limited by the Monetary Authority of Singapore and the Commercial Affairs Department as disclosed in the announcement by Pacific Andes Resources Development Limited dated 20 August 2015;

    (vi)    the failure to file Accounts that give a true and fair view of any Target Company's affairs, its losses and cash flows in accordance with the Hong Kong Financial Reporting Standards;

    (vii)    the failure to file or any late filings in relation to any annual returns of a relevant Target Company on time and in accordance with the Hong Kong Companies Ordinance;

    (viii)    the failure to file or any late filings in relation to any financial statements of a relevant Target Company on time and in accordance with the Hong Kong Companies Ordinance;

**(l)**    any non-compliance with any legal or regulatory requirements to which a Target Company is subject to under Applicable Law;

**(m)**    any defect in the title of the shares of any Target Company;

**(n)**    the Restructuring;

**(o)**    any breach of any covenant, agreement or obligation of any Target Company contained in the Debt Documents to which such Target Company is a party;

**(p)**    (if the Pickenpack Entities and the Grantee enter into a Sale and Purchase Agreement (the "**Pickenpack Sale and Purchase Agreement**") in respect of the Debt Claims held by such Pickenpack Entities), the conversion of the Purchase Price (as defined in the Pickenpack Sale and Purchase Agreement) from Dollars to Euros at the Available Exchange Rate (as defined in the Pickenpack Sale and Agreement) by or on behalf of the Grantee; and

**(q)**    any enquiry, investigation, inspection, claim, prosecution, litigation, arbitration, dispute resolution proceedings, adversarial motion and/or application whether in court or not regarding the Grantee's entry into the Transaction Documents, or the assumption, performance or compliance or intended assumption, performance or compliance of its obligations under or pursuant to, or in connection with the Transaction Documents.

## 5.    LIMITATIONS

5.1    Any Warranty Claim and Claim under the Indemnities shall be subject to the limitations and other provisions set out in this clause 5.

5.2    The Obligors shall not be liable for any Warranty Claim or Claim under the Indemnities unless the Grantee gives written notice of the Warranty Claim to the Obligors:

**(a)**    in the case of a Warranty Claim which is not a Fundamental Warranty Claim, a Warranty Claim under the Tax Warranties or a Claim under the Indemnities, prior to the expiry of five (5) years following Completion; or

**(b)**    in the case of a Warranty Claim under the Tax Warranties, prior to the expiry of seven (7) years following Completion.

13

5.3 None of the limitations in this clause 5 shall apply to any Warranty Claim or other Claim under this Agreement which arises (or to the extent that it is increased) as a consequence of fraud or fraudulent misrepresentation or wilful non-disclosure on the part of any member of the Target Group, any Obligor or any of their respective officers, employees or advisers.

5.4 None of the limitations in this clause 5 shall apply to any Fundamental Warranty Claim.

5.5 Notwithstanding clauses 5.2 and 5.4, in the event that a Property is sold and the Target Company that sold such Property is thereafter voluntarily liquidated, any Warranties to the extent specifically related to the relevant Property that was sold and the relevant Target Company that was voluntarily liquidated shall cease with respect to such Property and Target Company (but not with respect to any other matter) after the date of such voluntary liquidation. The Grantee will cause any such Target Company to liquidate within six (6) months of the later of (a) the date of the sale of such Property and (b) the date that any obligations under the sale agreement in relation to the sale of such Property have expired.

5.6 Notwithstanding any provision in this Deed, (a) the aggregate sum payable by Meridian for all Claims shall not exceed US$11,500,000; and (b) the aggregate sum payable by all Guarantors, in the aggregate, shall not exceed US$56,000,000.

6. **ASSIGNMENT AND SUCCESSION**

6.1 The Grantee may charge the rights of this Deed to any bank or financial institution for the purpose of procuring warranty and indemnity insurance and may charge, assign and/or novate the rights and/or obligations of this Deed to any Affiliate of the Grantee by way of security or otherwise provided that the Obligors shall incur no greater liability to the assignee than they would have had to the Grantee if any such assignment or novation had not taken place.

6.2 This Deed binds each Party's successors and permitted assigns and personal representatives (as the case may be).

6.3 Except as expressly provided above, none of the rights of the Parties under this Deed may be transferred.

7. **ANNOUNCEMENTS**

Except as required by law, no announcement or public statement shall be made in relation to this Deed or any of the Parties to this Deed, except for an announcement in or consistent with the announcement in the Agreed Form or otherwise as specifically agreed between the Parties. The Parties acknowledge that in the event that PAIH continues to be listed on The Stock Exchange of Hong Kong Limited it may be required by law to refer to this Deed in an announcement to The Stock Exchange of Hong Kong Limited.

8. **RIGHTS AND REMEDIES OF THE GRANTEE**

8.1 The rights and remedies of the Grantee shall not be affected by, and the Warranties shall not be regarded as being qualified:

(a) by any investigation made by or on behalf of the Grantee into the business and affairs of the Target Group; or

(b)    by any matter within the actual, imputed or constructive knowledge of the Grantee or of any of its agents or advisers other than a matter Disclosed in accordance with clause 2.2.

8.2    The rights and remedies of the Grantee in respect of any breach of the Warranties shall continue to subsist notwithstanding Completion, subject to the limitations in clause 5.

## 9.    WITHHOLDING TAX AND GROSSING-UP

9.1    Each of the Obligors shall pay all sums payable by it under or pursuant to the terms of this Deed free and clear of any counterclaim or set-off of any kind.

9.2    Each of the Obligors shall pay all sums payable by them under or pursuant to the terms of this Deed free and clear of all deductions or withholdings except for those required by law. If a deduction or withholding is required by law and is not assumed in any award of damages or compromise agreed with the Grantee, the relevant Obligor(s) shall pay such additional amount as will ensure that the net amount the payee receives equals the full amount which it would have received had the deduction or withholding not been required.

9.3    In the event that any sum paid or payable by any of the Obligors to the Grantee under or pursuant to this Deed is or will be chargeable to tax in the hands of the payee (or would be so chargeable but for the availability of any relief), then (except to the extent that such taxation liability has been taken into account in the calculation of the sum payable) that Obligor shall pay such additional amount as will ensure that the total amount received, net of tax chargeable on such amount (or that would be so chargeable but for such relief), is equal to the amount that would otherwise be payable under or pursuant to this Deed.

## 10.    CLAIMS PROCEDURE

10.1    If the Grantee becomes aware of any Claim (except to the extent that the Warrantors are already aware of such Claim), the Grantee shall give or procure that notice of the Claim concerned is given to the Warrantors in the manner provided by this Deed as soon as is reasonably practicable (but so that failure so to do shall not of itself relieve the Warrantors of any liability in respect of it) and the Warrantors shall be entitled, to require the Target Company to take such action as the Grantee may approve in writing (such approval not to be unreasonably withheld) to resist, avoid, dispute, appeal against, compromise or defend the Claim concerned.

10.2    If in any respect with regard to a claim which the Warrantors seek to dispute or resist it appears to the Grantee that the Warrantors or the Target Group whilst it was under the control of the Warrantors has committed acts or omissions which may constitute fraud, wilful default or neglect or wilful concealment then clause 10.1 shall not take effect and the Grantee and each of the Target Companies shall (without prejudice to its rights under this Deed) be free to pay or settle such claim or take such other action in connection with the same as it may in its absolute discretion decide.

## 11.    DUE DATE OF PAYMENT

11.1    Where the Obligors become liable to make any payment under this Deed the payment shall be due, in cleared funds, no later than the earlier of (a) twenty (20) Business Days after the date of demand therefor; and (b) insofar as the Claim relates to a tax liability, three (3) Business Days before the last day on which a payment of that tax may be made by the Target Companies without incurring any liability to interest and/or penalties (the "**Due Date**").

11.2 Time shall be of the essence for the purposes of all sums to be paid by the Obligors under this Deed.

## 12. INTEREST

12.1 If any payment due to be made by the Obligors under this Deed is not made on the Due Date, the same shall carry interest accruing and calculated on a daily basis from such due date of payment until and including the day of actual payment at the rate (as well after as before judgement) of five per cent. per annum above the annual base rate from time to time of HSBC compounded quarterly. Any such interest shall be payable on demand by the person entitled to receive the outstanding payment concerned.

12.2 If any repayment of tax due to the Target Company from any Tax Authority is withheld or delayed pending agreement or resolution of any dispute or question concerning any tax liability for which the Obligors are or may be liable under this Deed and/or any tax computations or matters relating to any accounting period of the Target Company ending on or before the Accounts Date, the Obligors shall pay to the Grantee (or as it shall direct) on demand interest on the amount of the repayment for the time being withheld or delayed, calculated at the rate provided in clause 12.1 from the date on which the same would have fallen due for repayment (but for the said dispute or question) up to and including the date of repayment or, as the case may be, the date on which the Obligors shall pay an equivalent amount in settlement of a claim under Schedule 4 (*Tax Covenant*) by reference to the relevant repayment (or part of it).

## 13. SATISFACTION OF CLAIMS

13.1 The Grantee shall be entitled (at its sole discretion) to satisfy all (to the extent possible) or part of any Obligor's liability to pay any amount due or amount claimed by the Grantee against any Obligor under this Deed or the Call Option Deed for the Specific Indemnities and for breach in or inaccuracy of the Warranties by way of set-off or deduction against the Deferred Payment, and to treat its obligation to make the Deferred Payment as being reduced pro tanto by the amount so set off or deducted. Nothing in this clause 13.1 shall prejudice, limit or otherwise affect: (a) any right or remedy the Grantee may have against the Obligors from time to time under this Deed or the Call Option Deed; or (b) the Grantee's right to recover against the relevant Obligor, whether before or after the Deferred Payment is made in accordance with the relevant Sale and Purchase Agreement.

13.2 In the event that the Grantee elects not to satisfy all (to the extent possible) or part of any Obligor's liability to pay any amount due or amount claimed by the Grantee against any Obligor under this Deed or the Call Option Deed for the Specific Indemnities and for breach in or inaccuracy of the Warranties by way of set-off or deduction against the Deferred Payment, the Grantee may make a claim in respect of the indemnified Losses from any one or more of the Obligors.

## 14. COSTS

The Obligors shall jointly and severally bear all legal, accountancy and other costs, charges and expenses connected with the negotiation, preparation and implementation of all Transaction Documents and any other agreement incidental to or referred to in any Transaction Document.

16

## 15. DESIGNATED REPRESENTATIVE

15.1 Each of the Obligors hereby irrevocably and unconditionally appoints Ng Puay Yee Annie (the "**Designated Representative**") as his/its attorney in such Obligor's name to:

(a) serve and accept delivery of any notice under this Deed;

(b) grant or vary the terms of any approval or consent which may be given by or on behalf of the Obligors (or any of them) in connection with this Deed; and/or

(c) defend, compromise and settle any claim by the Grantee against the Obligors (or any of them) in connection with this Deed,

in each case as the Designated Representative in his absolute discretion thinks fit and to execute all such documents and do all things as the Designated Representative shall, in his absolute discretion, consider necessary or desirable in connection with the above.

15.2 Each of the Obligors agrees to be bound by the actions of the Designated Representative and to perform promptly any obligations entered into by the Designated Representative on his/ its behalf pursuant to the exercise of the powers delegated to him under clause 15.1.

15.3 If the person appointed in clause 15.1 (or his successor as appointed pursuant to this clause 15.3) shall become incapable of performing the role of the Designated Representative, the Obligors shall agree upon, and notify the Grantee of, a successor within 30 days thereafter and failing such notification within such period, the Grantee shall be entitled to jointly appoint such person (such person being an Obligor) by notice to each of Obligors. Notwithstanding that the appointment of the Designated Representative ceases to be effective, until the Grantee is notified in writing of the appointment of the new Designated Representative, the Grantee shall be entitled to serve notice on the outgoing Designated Representative as if the appointment had not ceased. Nothing contained in this clause shall affect the right to serve process in any other manner permitted by law.

## 16. APPOINTMENT OF PROCESS AGENTS

16.1 Each of the Obligors shall ensure that there is at all times appointed an agent for service of process on them in Hong Kong in relation to any claims, disputes or proceedings or other matters arising out of or in connection with this Deed, and agrees that the process by which any proceedings are commenced may be served on them by being delivered to that agent, service upon whom shall be deemed completed whether or not forwarded to or received by the Obligors and the Obligors shall notify the Grantee of the name of such agent and their contact details.

16.2 If any process agent appointed by the Obligors pursuant to this clause 16 ceases to have an address in Hong Kong or ceases to be effectively appointed, the Obligors irrevocably agree to appoint a new process agent acceptable to the Grantee (acting reasonably) and to deliver to the Grantee within fourteen (14) days a copy of a written acceptance of appointment by its new process agent. Should the Obligors fail to effect any such appointment and notification within the required fourteen (14) day period, the Grantee shall be entitled to appoint such an agent at the Obligors' expense by written notice to the Obligors.

17

17. **ENTIRE AGREEMENT**

17.1 Each of the Parties acknowledges that:

    (a) the Transaction Documents constitute the entire and only agreement between the Parties relating to the subject matter of the Transaction Documents and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof; and

    (b) it has not been induced to enter the Transaction Documents in reliance on, nor has it been given, any representation or other statement of any nature whatsoever other than those set out in the Transaction Documents.

17.2 This clause 17 shall not exclude any liability for (or remedy in respect of) fraudulent misrepresentation.

18. **WAIVER/AMENDMENT**

18.1 No breach of any provision of this Deed shall be waived or discharged except with the express written consent of the Parties.

18.2 No failure or delay by a Party to exercise any of its rights under this Deed shall operate as a waiver thereof and no single or partial exercise of any such right shall prevent any other or the further exercise of that or any other right.

18.3 No variation to this Deed shall be effective unless made in writing and signed by all the Parties.

19. **FURTHER ASSURANCE**

At all times after the date of this Deed, the Parties shall at their own expense execute all such documents and do such acts and things as may reasonably be required for the purpose of giving full effect to this Deed (including for the avoidance of doubt, the execution of any deed of novation to give effect to clause 6).

20. **NOTICES**

20.1 Any notice, demand or other communication given or made under or in connection with the matters contemplated by this Deed shall be in writing and shall be delivered by hand or by courier or sent by electronic mail or air mail to:

| Designated Representative | - | Attention: Ng Puay Yee Annie |
| | | Address: Room 3312 Hong Kong Plaza, 188 Connaught Road West, Hong Kong |
| | | Email: Jessie.ng@pacificandes.com |
| The Grantee | - | Attention: Ivan Wong/ May Chan/ Amy Yuen |
| | | Address: 22/F South China Building, 1-3 Wyndham Street, Central, Hong Kong |

and shall be deemed to have been duly given or made as follows:

(a) if delivered by hand or by courier, upon delivery at the address of the relevant Party;

(b) if sent by first class post, two (2) Business Days after the date of posting;

(c) if sent by air mail, three (3) Business Days after the date of posting; and

(d) if sent by electronic mail when actually received by the intended recipient in readable form;

provided that if, in accordance with the above provision, any such notice, demand or other communication would otherwise be deemed to be given or made after 5.00 p.m. such notice, demand or other communication shall be deemed to be given or made at 9.00 a.m. on the next Business Day.

20.2 A Party may notify the other Parties to this Deed of a change to its name, relevant addressee, address (including e-mail address) for the purposes of clause 20.1 provided that such notification shall only be effective:

(a) on the date specified in the notification as the date on which the change is to take place; or

(b) if no date is specified or the date specified is less than five (5) Business Days after the date on which notice is given, the date falling five (5) Business Days after notice of any such change has been given.

21. **COUNTERPARTS**

This Deed may be executed in any number of counterparts, each of which when executed shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement.

22. **THIRD PARTY RIGHTS**

22.1 Except as set forth in clause 22.2 below, the Parties do not confer any rights of remedies upon any person other than the Parties to this Deed and their respective successors and permitted assigns.

22.2 The Parties hereby designate Affiliates of the Grantee and the Target Companies as third-party beneficiaries of this Deed (collectively, the "**Third Parties**" and each a "**Third Party**").

22.3 The Parties may amend, vary or terminate this Deed in such a way as may affect any rights or benefits of any Third Party which are directly enforceable against the Parties without the consent of such Third Party.

22.4 Any Third Party entitled to enforce any rights or benefits conferred on it by this Deed may not veto any amendment, variation or termination of this Deed which is proposed by the Parties.

23.    **JOINT AND SEVERAL LIABILITY**

23.1    The Obligors shall be jointly and severally liable for their obligations under this Deed.

23.2    The Grantee may take action against, or release or compromise the liability of, an Obligor, without affecting the liability of any other Obligor.

24.    **GOVERNING LAW AND JURISDICTION**

24.1    This Deed, and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this Deed or its formation (including any non-contractual disputes or claims) shall be governed by and construed in accordance with laws of Hong Kong S.A.R.

24.2    Each of the Parties to this Deed irrevocably agrees that the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**") shall maintain non-exclusive jurisdiction over any disputes which arise between the Parties. Each Party (a) agrees to submit to such jurisdiction, (b) to waive any defense based on the location or jurisdiction of such court, and (c) to consent to the Bankruptcy Court hearing and finally determining any action or proceeding with respect to this Deed. To the extent the Bankruptcy Court declines to exercise jurisdiction for any reason, each Party consents that jurisdiction is appropriate before the New York state and federal courts sitting in the Borough of Manhattan.

    **IN WITNESS** whereof this Deed has been executed on the date first above written.

## SCHEDULE 1

### INDIVIDUAL GUARANTORS

| No. | Individual Guarantor | Identity Card No. | Residential Address | Email |
|---|---|---|---|---|
| 1. | Ng Joo Siang | K701590(9) | House 36, Manderly Garden, 48 Deep Water Bay Road, Hong Kong | Ng.JooSiang@pacificandes.com |
| 2. | Ng Joo Kwee | K938487(1) | Flat B, 8/F, Celestial Garden, 5 Repulse Bay Road, Hong Kong | JooKwee.ng@pacificandes.com |
| 3. | Ng Joo Thieng | P377550(3) | Block B33, Woodgreen Estate, 5 Shouson Hill Road, Hong Kong | NJT@pacificandes.com |
| 4. | Ng Joo Puay, Frank | K508738(4) | Flat A1, 20/F, Block A, 43 Stubbs Road, Evergreen Villa, Mid-levels, Hong Kong | Frank.ng@pacificandes.com |
| 5. | Ng Puay Yee Annie | K458928 (9) | 14/F, Repulse Bay Garden, 40 Belleview Drive, Hong Kong | Jessie.ng@pacificandes.com |

## SCHEDULE 2

## DETAILS ON THE TARGET GROUP

### *Heng Holdings (BVI) Limited*

| 1. | Date of incorporation/formation: | 8 October 1993 |
|---|---|---|
| 2. | Jurisdiction of incorporation/formation: | British Virgin Islands |
| 3. | Registered number: | 97173 |
| 4. | Previous names: | Not Applicable |
| 5. | Issued share capital: | US$1.00 |
| 6. | Directors: | Ng Joo Puay |
| 7. | Secretary (if applicable): | PAE Limited |
| 8. | Registered office/place of business: | Newhaven Corporate Services (B.V.I) Limited 3rd Floor, J&C Building, Road Town, Tortola, British Virgin Islands, VG1110 |
| 9. | Accounting date: | 28 September |
| 10. | Auditors/accountants: | Not Applicable |
| 12. | Charges outstanding: | The Company does not maintain a Register of Mortgages and Charges |

| | Date of charge: | Date of registration: | Property charged: | Sums secured: | Chargee: |
|---|---|---|---|---|---|
| | None | None | None | None | None |

### *PROPERTY HOLDING ENTITIES*

### *Fastact Group Limited*

| 1. | Date of incorporation/formation: | 31 October 1996 |
|---|---|---|
| 2. | Jurisdiction of incorporation/formation: | British Virgin Islands |
| 3. | Registered number: | 204380 |
| 4. | Previous names: | Not Applicable |
| 5. | Issued share capital: | US$1.00 |
| 6. | Directors: | (1) Ng Joo Kwee |

|   |   | (2) Ng Joo Puay, Frank |
|---|---|---|
| 7. | Secretary (if applicable): | PAE Limited |
| 8. | Registered office/place of business: | Portcullis Chambers<br>4th Floor, Ellen Skelton Building, 3076 Sir Francis Drake Highway, Road Town, Tortoloa, British Virgin Islands VG1110 |
| 9. | Accounting date: | 28 September |
| 10. | Auditors/accountants: | Not Applicable |
| 12. | Charges outstanding: | |

|   | Date of charge: | Date of registration: | Property charged: | Sums secured: | Chargee: |
|---|---|---|---|---|---|
| 1. | None | None | None | None | None |

### *Rawley Trading Limited*

| 1. | Date of incorporation/formation: | 4 April 1996 |
|---|---|---|
| 2. | Jurisdiction of incorporation/formation: | British Virgin Islands |
| 3. | Registered number: | 181424 |
| 4. | Previous names: | Not Applicable |
| 5. | Issued share capital: | US$1.00 |
| 6. | Directors: | (1) Ng Joo Kwee<br>(2) Ng Joo Puay, Frank |
| 7. | Secretary (if applicable): | PAE Limited |
| 8. | Registered office/place of business: | Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG 1110, British Virgin Islands |
| 9. | Accounting date: | 28 September |
| 10. | Auditors/accountants: | Not Applicable |
| 12. | Charges outstanding: | |

|   | Date of charge: | Date of registration: | Property charged: | Sums secured: | Chargee: |
|---|---|---|---|---|---|
| 1. | None | None | None | None | None |

16-11195-jlg Doc 23-6 Filed 09/28/21 Entered 09/28/21 14:29:31 Exhibit B 3B to Ng Declaration (Warranty Deed) Pg 116 of 59

Case 1-18958-jlg Doc 2342-6 Filed 09/28/21 Entered 09/28/21 14:29:31 Exhibit B to Ng Declaration (Warranty Deed) Pg 236 of 236

*Bonaire Developments Limited*

| 1. | Date of incorporation/formation: | 2 January 1996 | | |
|---|---|---|---|---|
| 2. | Jurisdiction of incorporation/formation: | British Virgin Islands | | |
| 3. | Registered number: | 169957 | | |
| 4. | Previous names: | Not Applicable | | |
| 5. | Issued share capital: | US$1.00 | | |
| 6. | Directors: | Ng Joo Puay, Frank | | |
| 7. | Secretary (if applicable): | PAE Limited | | |
| 8. | Registered office/place of business: | Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG 1110, British Virgin Islands | | |
| 9. | Accounting date: | 28 September | | |
| 10. | Auditors/accountants: | Not Applicable | | |
| 12. | Charges outstanding: | | | |
| | Date of charge: | Date of registration: | Property charged: | Sums secured: | Chargee: |
| 1. | None | None | None | None | None |

*Grandluck Enterprises Limited* 鴻瑞企業有限公司

| 1. | Date of incorporation/formation: | 6 January 2005 |
|---|---|---|
| 2. | Jurisdiction of incorporation/formation: | British Virgin Islands |
| 3. | Registered number: | 636013 |
| 4. | Previous names: | Grandluck Enterprises Limited |
| 5. | Issued share capital: | US$1.00 |
| 6. | Directors: | (1) Ng Joo Puay, Frank<br>(2) Ng Puay Yee, Annie |
| 7. | Secretary (if applicable): | Not Applicable |

| 8. | Registered office/place of business: | Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG 1110, British Virgin Islands |
|---|---|---|
| 9. | Accounting date: | 28 September |
| 10. | Auditors/accountants: | Not Applicable |
| 12. | Charges outstanding: | |

| | Date of charge: | Date of registration: | Property charged: | Sums secured: | Chargee: |
|---|---|---|---|---|---|
| 1. | None | None | None | None | None |

### *Pacific Andes Enterprises (Hong Kong) Limited 太平洋恩利企業（香港）有限公司*

| 1. | Date of incorporation/formation: | 29 May 1973 |
|---|---|---|
| 2. | Jurisdiction of incorporation/formation: | Hong Kong |
| 3. | Registered number: | 33853 |
| 4. | Previous names: | (1) Andes Enterprises (Hong Kong) Limited<br>(2) Andes Enterprises (Hong Kong) Limited 恩利企業（香港）有限公司<br>(3) Pacific Andes Enterprises (Hong Kong) Limited (太平洋恩利企業（香港）有限公司)<br>(4) Pacific Andes Enterprises (Hong Kong) Limited 恩利企業（香港）有限公司 |
| 5. | Issued share capital: | $10,000,200 |
| 6. | Directors: | (1) Ng Joo Puay, Frank<br>(2) Ng Puay Yee |
| 7. | Secretary (if applicable): | PAE Limited |
| 8. | Registered office/place of business: | Room 3201-10, Hong Kong Plaza, 186-191 Connaught Road West, Hong Kong |
| 9. | Accounting date: | 28 September |
| 10. | Auditors/accountants: | Smart CPA (Hong Kong) Limited |
| 12. | Charges outstanding: | |

| | Date of charge: | Date of registration: | Property charged: | Sums secured: | Chargee: |
|---|---|---|---|---|---|

| 1. | None | None | None | None | None |
|----|------|------|------|------|------|

**Chasterton Group Limited**

| 1. | Date of incorporation/formation: | 2 January 1996 |
|----|----------------------------------|----------------|
| 2. | Jurisdiction of incorporation/formation: | British Virgin Islands |
| 3. | Registered number: | 169749 |
| 4. | Previous names: | Not Applicable |
| 5. | Issued share capital: | US$1.00 |
| 6. | Directors: | Ng Joo Puay, Frank |
| 7. | Secretary (if applicable): | PAE Limited |
| 8. | Registered office/place of business: | Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG 1110, British Virgin Islands |
| 9. | Accounting date: | 28 September |
| 10. | Auditors/accountants: | Not Applicable |
| 12. | Charges outstanding: | |

| | Date of charge: | Date of registration: | Property charged: | Sums secured: | Chargee: |
|----|-----------------|----------------------|-------------------|---------------|----------|
| 1. | None | None | None | None | None |

## SCHEDULE 3

## WARRANTIES

1. **THE WARRANTORS**

1.1 Each Warrantor is duly incorporated, in existence and duly registered and/or in good standing (as applicable) under the laws of its country of incorporation.

1.2 Each Warrantor has full power and authority to enter into and perform this Deed and each of the other Transaction Documents to be entered into pursuant to this Deed, and the provisions of this Deed and each of the other Transaction Documents will, when executed, constitute valid and binding obligations on each Warrantor, in accordance with their respective terms.

1.3 The execution and delivery of, and the performance by each Warrantor of its obligations under this Deed and each of the other Transaction Documents will not:

(A)   result in a breach of any provision of its articles of association, by-laws or any similar constitutional document or any order or judgment that applies to or binds it or any of its assets;

(B)   result in a breach of any Applicable Laws;

(C)   cause any Target Company to lose the benefit of any right or privilege it presently enjoys;

(D)   give any Governmental Entity or third party the right to revoke, withdraw, suspend, cancel or terminate any Permit held by any Target Company;

(E)   contravene, conflict with or result in a violation or breach of or default under or the acceleration or cancellation of any obligation under, or give rise to a right by any person to terminate, cancel, modify or amend, any contract to which any Target Company is a party or by which any Target Company or its properties or assets are bound; or

(F)   result in the imposition, creation or crystallisation of any Encumbrance upon or with respect to any property owned, leased or used by any Target Company.

1.4 All Permits and filings with any Governmental Entity and all consents, approvals and agreements of any other person which are necessary for each Warrantor, or the relevant member of the Target Group, to obtain in order to enter into and perform its obligations under this Deed and each of the other Transaction Documents in accordance with their respective terms have been unconditionally obtained in writing.

1.5 There are no:

(A)   judgments, orders, injunctions or decrees of any Governmental Entity or court or arbitration tribunal outstanding against or affecting any member of the Target Group;

(B)   law suits, actions or proceedings pending or, to the knowledge of the Warrantors, threatened against or affecting any member of the Target Group; or

(C)   investigations by any Governmental Entity which are pending or threatened against any member of the Target Group,

and which, in any such case, will have an adverse effect on the ability of the Warrantors or the relevant member of the Target Group to execute and deliver, or perform, its obligations under this Deed or any of the other Transaction Documents.

1.6    No Warrantor is a party to any agreement or bound by any obligation the terms of which will prevent the Grantee from enjoying the full benefit of this Deed.

2.    **THE OPTION SECURITIES AND THE TARGET COMPANIES**

2.1    Each Target Company is validly incorporated, in existence and duly registered and/or in good standing (as applicable) under the laws of its jurisdiction of incorporation and has full power and authority under its articles of association, by-laws or any similar constitutional document to conduct its business as currently conducted and to own, lease and operate its assets and properties. Each Target Company is a property holding company and has not conducted any other business since its incorporation.

2.2    All the Option Securities and all of the shares or other equity interests in each of the Target Companies are duly authorised, validly issued and, to the extent relevant in its jurisdiction of incorporation, fully paid or properly credited (under Applicable Laws) as fully paid.

2.3    PAIH BVI is the sole legal and beneficial owner, free from all Encumbrances, of the relevant Option Securities and, has the full right, power and authority to sell and transfer the Option Securities free from all Encumbrances to the Grantee pursuant to the Call Option Deed. The entry into and performance by PAIH BVI of, and the transactions contemplated by, the Call Option Deed do not and will not conflict with any Applicable Law or any judgment or order of a court, arbitration tribunal or agency.

2.4    Other than Fastact Group Limited which will continue to be held directly by PAIH BVI, Heng Holdings (BVI) Limited is the sole legal and beneficial owner, free from all Encumbrances, of every share or other equity interest in the capital of each of the Property Holding Entities set out in Schedule 2 (*Details on the Target Group*).

2.5    No agreement or arrangement (other than this Deed) exists pursuant to which any person has or may in the future have the right (exercisable now or in the future and whether contingent or not) to call for the issue, allotment, conversion or transfer of any share or loan capital in any Target Company (including by way of option or under any right of conversion or pre-emption). There are no voting agreements, proxies or other agreements or understandings with respect to the voting of any of the shares in any Target Company.

2.6    The Option Securities constitute the whole of the issued and allotted share capital of Fastact Group Limited and Heng Holdings (BVI) Limited.

2.7    The information in respect of the Target Group set out in Schedule 2 (*Details on the Target Group*) is true, complete and accurate.

2.8    Save for the Disposed Subsidiaries and the Property Holding Entities set out in Schedule 2 (*Details on the Target Group*), no Target Company controls, or has ever controlled any other person.

2.9    No person is authorised to act as agent for any Target Company or to bind any Target Company other than the directors of that Target Company acting as its board.

3.      **RESTRUCTURING**

3.1     As at the date of this Deed, the Restructuring has been completed in all respects.

3.2     Each relevant member of the Group has obtained all consents which are required to be obtained by it respectively in respect of the implementation of the Restructuring from any third party or Governmental Entity in accordance with all applicable contractual, constitutional and other formalities and/or all Applicable Law.

4.      **CONSTITUTION**

4.1     The Warrantors have Disclosed a true and complete copy of the articles of association, by-laws or any similar constitutional document of each Target Company. The provisions of all such constitutional documents have been complied with in all respects.

4.2     The statutory or other corporate record books (including all registers and minute books) of each Target Company have been properly kept and contain a complete and accurate record of the matters which should be dealt with in them under Applicable Law and no notice or allegation that any of them is incorrect or should be rectified has been received.

4.3     No Target Company nor any class of its members or other holders of equity interests has passed any resolution required to be filed with any Governmental Entity that has not yet been so filed.

5.      **SOLVENCY**

5.1     No order has been made and no resolution has been passed or proposed for the winding up of any Target Company or for a provisional liquidator or manager to be appointed in respect of any Target Company and no petition has been presented and no meeting has been convened for the purpose of considering the winding up of any Target Company, and no corporate action, legal proceedings or other procedure or step is being taken or has been taken by any person in respect of any of the foregoing.

5.2     No administration order has been made and no petition for such an order has been presented in respect of any Target Company.

5.3     No intention to appoint administrators has been issued or proposed in respect of any Target Company.

5.4     No receiver, administrator or manager (which expression shall include an administrative receiver) has been appointed or is proposed to be appointed in respect of all or any of the assets of any Target Company, nor has any power of sale or power to appoint a receiver or manager under the terms of any mortgage, charge or other security in respect of all or any assets of any Target Company become exercisable.

5.5     In respect of each Target Company, no secured party has taken possession of all or substantially all its assets nor has any distress, execution, attachment, sequestration or other legal process been levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days.

5.6     No Target Company is, nor has admitted itself to be, unable to pay its debts as they fall due, nor has it failed to pay its debts when due, nor is it otherwise liable to be found unable to pay its debts or otherwise.

29

5.7     No statutory demand has been served on any Target Company which has not been paid in full or been withdrawn.

5.8     In the seven (7) years before the date of this Deed, no Target Company has been a party to any transaction at an undervalue nor given or received any preference.

5.9     No Target Company has at any time been party to any transaction defrauding creditors.

5.10    No loan capital, borrowings or interest is overdue for payment by any Target Company and no other material obligation or Indebtedness of any Target Company is overdue for performance or payment.

5.11    No creditor of any member of the PAIH Material Group has taken steps to (A) enforce any debt or other sum owed by that member of the PAIH Material Group; or (B) make any demand under any guarantee granted by a member of the PAIH Material Group in favour of such creditor.

5.12    No event or circumstance is outstanding which constitutes a default under any agreement or instrument which is binding on a member of the PAIH Material Group or to which the assets of a member of the PAIH Material Group or the shares of any Target Company are subject.

5.13    No unsatisfied judgment is outstanding against any Target Company.

5.14    No Target Company has entered into a general assignment, arrangement or composition with or for the benefit of its creditors.

5.15    No Target Company has suspended or ceased or threatened to suspend or cease to carry on all or a material part of its business.

5.16    No Target Company has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in, any of the foregoing acts.

5.17    No event analogous to and/or with analogous effect to any of those described in paragraphs 5.1 to 5.16 of this Schedule has occurred in or outside Hong Kong.

6.      **ACCOUNTING MATTERS**

6.1     The Accounts and the equivalent accounts for the prior three (3) financial years or periods (the "**Past Accounts**"):

(A)     comply with the requirements of Applicable Law;

(B)     have been prepared under the historical cost convention and in accordance with Hong Kong Financial Reporting Standards;

(C)     are true and accurate and show a true and fair view of the state of affairs of each Target Company as at date to which they were prepared and of its results for the accounting reference period ended on that date, except as qualified in the auditors' report;

(D)     have been prepared on bases and policies of accounting consistent with each other;

(E)     make full and proper provision for (or, if appropriate, disclose by way of note) all assets and Liabilities and all capital and financial commitments of each Target Company as at or on the date to which they were prepared;

(F)     make full and proper provision for depreciation in accordance with accepted accounting principles, having regard to the condition and age of the fixed assets included in the same;

(G)     include any slow-moving stock and non-recoverable work in progress at an appropriate written down value, attribute no value to any redundant or obsolete stock and include the remaining stock at a value which does not exceed the lower of its cost and net realisable value at the date to which the relevant accounts were prepared.

6.2     The profits shown in the Accounts and in the Past Accounts have not to a material extent been affected by any extraordinary or exceptional event or circumstance or by any other factor rendering them unusually high or low, other than disposals of properties held by any of the Target Companies which have been Disclosed.

6.3     All books of account, ledgers and financial records required by Applicable Law to be maintained by the Target Group:

(A)     have been fully, properly and accurately kept and completed by each Target Company as required by Applicable Law; and

(B)     are under the exclusive ownership and direct control of the Target Group.

6.4     During the period covered by the Accounts and the Past Accounts, not more than ten per cent of any description of goods or services supplied to or by any Target Company were supplied by or to any one person or group of connected persons.

6.5     The Management Accounts have been prepared in accordance with Hong Kong Financial Reporting Standards consistently applied (and on a basis consistent with that upon which the Accounts were prepared) and adequately reflect in all material respects the assets and Liabilities and the state of affairs and financial position of each Target Company at the dates to which they have been prepared and its results over the period from the Accounts Date to the date to which they were prepared.

6.6     No Target Company has any Liabilities except those specifically provided for in the Accounts or Management Accounts or incurred in the normal course of trading since the Accounts Date.

6.7     Each Target Company is only owed money as original creditor and is not owed any money other than trade debts incurred in the ordinary course of business and cash at bank.

6.8     No amounts are owing to any Target Company as a result of any loan or advance made by any Target Company prior to the date of this Deed (otherwise than as a result of giving credit in the normal course of business) and no Target Company has agreed to make any such loan or advance, other than as Disclosed in the Accounts.

7.      **CHANGES SINCE THE ACCOUNTS DATE**

7.1     Since the Accounts Date:

(A)     the business of each Target Company has been carried on in the ordinary course and so as to maintain it as a going concern and there has been no material adverse change in the financial position or trading or of any Target Company;

(B)     there has been no material reduction in the aggregate value of the net assets of any Target Company as shown in the Accounts;

31

(C)     no Target Company has made or agreed to make any payment or entered into any transaction or commitment or incurred any liability except in the ordinary course of its trading and for full value;

(D)     no Target Company has acquired or disposed of or agreed to acquire or dispose of any business or any material asset other than trading stock in the ordinary course of trading;

(E)     no dividend or distribution (whether in cash, stock or in kind) of capital or income has been declared made or paid by or in respect of any share or other equity capital or assets of any Target Company;

(F)     each Target Company has paid its creditors within the times agreed with them and there has been no change in the manner or timing of the invoicing or debt collection of any Target Company;

(G)     no Target Company has offered or agreed to offer price reductions, discounts or rebates on the sale of goods or services, other than in the ordinary course of business and in accordance with past practice; and

(H)     as at the date of this Deed, the business of the Target Group has not been materially and adversely affected by the loss of or any reduction in business or supplies from any important customer(s), client(s) or source(s) of supply or any abnormal factor(s) not affecting similar businesses to a similar extent.

## 8. FINANCIAL COMMITMENTS AND BORROWINGS

8.1     The Warrantors have Disclosed:

(A)     a true, complete and accurate summary of the Indebtedness of the Target Group and copies of all material documents relating to or evidencing the same; and

(B)     full particulars of all the bank accounts of each Target Company and of the bank mandates applicable to them.

8.2     Other than the restrictive covenants contained in the Relevant Facilities, no event has occurred which has resulted or could reasonably be expected to result in any Indebtedness of any Target Company becoming due or any Encumbrance granted by or over any property, assets, undertaking, goodwill, reserves or share capital of any Target Company becoming enforceable.

8.3     No Target Company has created nor has it agreed to create and nor is there subsisting any Encumbrance over all or any of its property, assets, undertaking, goodwill, reserves or share capital.

8.4     No Target Company is nor has been engaged in any arrangements which are not properly shown or reflected in the Accounts and which involve the raising of finance under which that Target Company is or may become liable to repay Indebtedness.

8.5     No investment or other grants or allowance and or loans or financial aid of any kind has been applied for or received or is receivable by any Target Company from any Governmental Entity.

## 9. DEBT DOCUMENTS

9.1     Other than the indebtedness incurred pursuant to the Debt Documents, the Target Group Debt which will be novated to the Grantee on Completion and the intercompany debt owing between certain members of the Target Group to other members of the Target Group set out in Schedule

8 (*Outstanding Intercompany Debt Among the Target Companies*) (the "**Target Group Intercompany Debt**") which will remain outstanding on Completion, each member of the Target Group does not have any other outstanding Indebtedness.

9.2     No security exists over all or any of each member of the Target Group's assets or its shares.

9.3     Other than the transactions contemplated by the Transaction Documents, none of the PAIH Material Group have received notice of any sale, lease, transfer, conveyance, assignment or other disposal or any proposed sale, lease, transfer, conveyance, assignment or other disposal of any of the Debt Documents or any interest therein (including, without limitation, any other transaction or arrangement pursuant to which the economic benefit of or beneficial interest in such asset is reduced or diluted).

9.4     The entry into, delivery and performance by the relevant member of the Group of, and the transactions contemplated by, the Debt Documents do not and will not conflict with any agreement or instrument binding upon such member of the Group or any assets of such member of the Group, or constitute a default, termination or acceleration event (howsoever described) under any such agreement or instrument.

9.5     The relevant member of the Group has full power and authority to enter into and perform the Debt Documents, and the provisions of the Debt Documents will, when executed, constitute valid and binding obligations on each Warrantor, in accordance with their respective terms.

9.6     The execution and delivery of, and the performance by the relevant member of the Group of its obligations under Debt Documents will not:

(A)     result in a breach of any provision of its articles of association, by-laws or any similar constitutional document or any order or judgment that applies to or binds it or any of its assets;

(B)     result in a breach of any Applicable Laws;

(C)     cause such member of the Group to lose the benefit of any right or privilege it presently enjoys;

(D)     give any Governmental Entity or third party the right to revoke, withdraw, suspend, cancel or terminate any Permit held by such member of the Group;

(E)     contravene, conflict with or result in a violation or breach of or default under or the acceleration or cancellation of any obligation under, or give rise to a right by any person to terminate, cancel, modify or amend, any contract to which such member of the Group is a party or by which such member of the Group or its properties or assets are bound; or

(F)     result in the imposition, creation or crystallisation of any Encumbrance upon or with respect to any property owned, leased or used by such member of the Group.

9.7     No Debt Document identified in a Sale and Purchase Agreement that has not been made available by or on behalf of the Warrantors or the Grantee or its employees or professional advisers prior to the date of this Deed for the purposes of due diligence or other investigation carried out by or on behalf of the Grantee prior to entering into this Deed contains any provision which, in the opinion of a Grantee (acting reasonably), does, or would be expected to, result in the assumption or imposition of any adverse or onerous obligation or liability on the lender, the beneficiary of any credit support or chargee under any such Debt Document which obligation or liability would continue on or after Completion.

10. **MATERIAL CONTRACTS**

10.1 True and accurate copies of all contracts, covenants, commitments or arrangements to which any Target Company is party whether or not made in the ordinary course of trading or business under which the amount receivable or payable over the lifetime of the contract is in excess of $500,000 (including unusual or long term contracts, capital commitments, licences, agency, licensing, franchise distributorship and factoring agreements, agreements for services, supply agreements, outsourcing agreements any other agreements which might restrict its freedom to carry on its business) and which remain in force have been Disclosed (together the "**Material Contracts**").

10.2 Each Target Company and the other parties to each Material Contract have complied with and performed the Material Contracts in all material respects. No Target Company has received any notice alleging that it has not complied with or performed a Material Contract in any material respect.

10.3 No notice has been given or received by a Target Company to terminate any Material Contract.

11. **ASSETS**

11.1 Other than trading stock (inventory) disposed of in the ordinary course of trading, the assets included in the Accounts or acquired by any Target Company since the Accounts Date, and all other assets used or employed by any Target Company, are the absolute property of the relevant Target Company free from any Encumbrance and none of them are the subject of any leasing, hiring, hire purchase, assignment, factoring or other similar agreement or arrangement, nor any agreement or arrangement for payment on deferred terms. All such assets are in the possession or under the control of the relevant Target Company.

11.2 There is no trading stock(inventory) kept by any Target Company.

11.3 The assets and rights of each Target Company are now and at Completion will be sufficient to enable it to carry on over the next twelve (12) months its business in the ordinary course as carried on in the twelve (12) months ended on the date of this Deed.

11.4 No plant, machinery, office equipment or vehicles are owned by any Target Company.

12. **THE PROPERTIES**

12.1 Other than the Leases, a Target Company has good and marketable title to each of the Properties and is the beneficial and legal owner in exclusive possession of the estate or interest in each Property specified in Schedule 5 (*Properties*) free from any Encumbrance, debenture, lease, underlease, tenancy adverse right, condition, privilege, easement, overriding claim, covenant, restriction, exceptance, reservation, claim or other interest and any matters or things registered or capable of registration in any registry and a Target Company is in a position (without incurring any liabilities) to sell each Property with full title guarantee.

12.2 The information in respect of each of the Properties set out in Schedule 5 (*Properties*) is true, complete and accurate, copies of all material documents relating to each of the Properties have been supplied prior to the date of this Deed.

12.3 No Target Company, by its use or occupation of the Properties or any of them, contravenes any lease or other right under which it occupies the same and/or any requirement or restriction having the force of law and:

34

(A)    each Target Company has complied with all covenants, conditions, restrictions, statutory and other requirements, by-laws, orders and regulations affecting each Property, none of which is of an unusual or onerous nature or prejudicially affects the Property or the relevant Target Company's use, occupation or powers of disposal of the same; and

(B)    so far as the Warrantors are aware, nothing has been done or has occurred which could prevent or restrict any development or use of the Properties (or any of them, or any part of any of them) for which planning permission has been or is expected to be obtained.

12.4    No notices, orders, proposals, applications, requests or schedules of dilapidations affecting or relating to any of the Properties have been served or made by any person and, so far as the Warrantors are aware, there are no circumstances which are likely to result in any being served or made.

12.5    No Target Company, nor any person on its behalf, has expressly or impliedly waived any breach by any tenant or other person of any covenant, agreement, restriction, stipulation or obligation relating to any of the Properties, or any part of any of them or of which any of the Properties or any part of any of them has the benefit, and every lessee, tenant, licensee or occupier of the Properties has in all material respects observed and performed all covenants (including covenants as to payment of rent, charges or fees) and all other agreements, restrictions, stipulations or obligations aforesaid.

12.6    The buildings and other structures on the Properties are in good and substantial repair and fit for the purposes for which they are used, there is no material defect in the construction or condition of any of the Properties and no dangerous or deleterious materials (including high alumina cement, blue asbestos or calcium chloride accelerator) have been used in the construction of any of them.

12.7    In the case of such of the Properties as are leasehold, there are no rights for any landlord to break the term and there are no circumstances which would entitle or require any landlord or any other person to exercise any power of entry upon or, right to be in possession of any of such Properties, or which would otherwise restrict or terminate the continued possession or occupation of any of them, and all rents and service charges in respect of any such Properties have been paid to date and when due.

12.8    There is no outstanding monetary claim or liability (contingent or otherwise) affecting the Properties and, in the case of any Property which is leasehold, there are no rent reviews in the course of being determined or exercisable by the landlord from a date prior to Completion.

12.9    All documents necessary to prove the title of any Target Company to any of the Properties or which relate to any Target Company's title to the same have been duly registered where necessary and are now in the exclusive possession or under the exclusive control of the relevant Target Company free from any Encumbrance or other rights and interests of any third parties.

12.10    Other than the Properties, no Target Company owns, occupies or otherwise uses or has any interest in any land or buildings (whether of freehold, leasehold or other tenure) nor any rights or obligations to acquire any such interest, and no Target Company has any liability (existing or contingent) in respect of any such land or building previously owned, occupied or otherwise used by it or in which it had any interest.

13.    **LEASES**

13.1    In relation to each leasehold Property, each person in whom any superior interest was, at the relevant time, vested had at the date of the grant of each relevant Lease and at the date of the

grant of each relevant superior lease (as the case may be), and all consents necessary to the grant of that Lease and of each such superior lease were obtained.

13.2    The terms of each Lease are such as would normally be found in a lease of the same type as the Lease and, in particular:

    (A)    each Lease is on terms that it is assignable with the consent of the landlord (which cannot be unreasonably withheld), no Lease which is a new tenancy contains any agreement specifying either circumstances in which the landlord may withhold consent to an assignment or conditions to which such consent may be granted where those circumstances or conditions are not such as would be normally found in a lease of the same type as the Lease and no Lease is on terms that the relevant Target Company must offer the Property back to the landlord before assigning it;

    (B)    each Lease is on terms that the Grantee will be entitled, without any consent from the landlord, to carry on the business at the Property; and

    (C)    where the rent reserved by any Lease is subject to review, all reviews are calculated on an open market basis and there are no outstanding rent reviews.

13.3    No Lease has been varied nor have any licences or consents been issued under any Lease and no collateral assurances or undertakings have been entered into with any relevant reversioner or any third party.

13.4    There is no obligation to reinstate any leasehold Property during or at the end of the term granted by the Lease relating to the Property by removing any alteration or addition which has been made to it.

13.5    There is no major item of expenditure already incurred by the landlord of any leasehold Property or expected to be incurred by him within the next 12 months, which is recoverable in whole or in part from the Warrantor or those deriving title under it.

13.6    No notice has been given or received under any Lease and there is no subsisting dispute between any of the Target Companies and the reversioner in relation to any Lease.

14.    **ENVIRONMENTAL**

14.1    Each Target Company has complied and is complying in all respects with all Environmental Laws and all recommendations, requests or demands from any Governmental Entity in relation to Environmental Matters, and there are no facts or circumstances which may lead to any breach of or liability under any Environmental Laws.

14.2    No Target Company, nor any of its officers or employees, has incurred or become subject to any civil or criminal liability in relation to any matters referred to in paragraph 14.1 of this Schedule and the Warrantors are not aware of any matters or circumstances which might give rise to any such liability, including any current, pending or threatened Court or administrative proceedings.

14.3    None of the Properties nor any premises adjacent to any of the Properties:

    (A)    is or has been nor is likely to have been, contaminated by any Hazardous Substances and/or has been subject to any land use which might reasonably be expected to have resulted in its being contaminated, and there are no circumstances which may require expenditure in remediating any Property in order to comply with Environmental Laws or otherwise for the protection of the Environment; or

        (B)     comprises reclaimed, made or filled land.

14.4    No Target Company nor any Property has been the subject of any enquiry, investigation, inspection, claim, prosecution, litigation, arbitration, dispute resolution proceedings, enforcement, prohibition, stop, remediation, improvement or other notice or other proceeding under any Environmental Laws other than merely routine inspections, and, so far as the Warrantors are aware, no such matters are pending, threatened or proposed; and there are no facts or circumstances which may lead to any such enquiries, investigations, inspections, claims, prosecutions or other proceedings.

14.5    There are, and have been, no landfills, underground storage tanks, mining operations or uncontained or unlined storage treatment or disposal areas for Hazardous Substances or waste (whether permitted by Environmental Laws or otherwise) present or carried out at, on or under any of the Properties or within 200 metres of any of the Properties. There are no polychlorinated biphenyls at, on or under any of the Properties.

14.6    No Target Company has or is likely to have any actual or potential liability under any Environmental Laws by reason of it having owned, occupied or used any previous properties.

14.7    No Target Company has given or received any warranties, representations, undertakings or indemnities in respect of (or has otherwise attempted to apportion) any liabilities, duties or obligations that arise under any Environmental Laws.

## 15.    HEALTH AND SAFETY

15.1    Each Target Company has complied and is complying in all respects with all Health and Safety Laws and all recommendations, requests or demands from any Governmental Entity in relation to Health and Safety Matters and there are no facts or circumstances which may lead to any breach of or liability under any Health and Safety Laws.

15.2    No Target Company nor any of its directors, officers or employees has incurred or become subject to any civil or criminal liability in relation to any matters referred to in paragraph 15.1 of this Schedule and the Warrantors are not aware of any matters or circumstances which might give rise to any such liability including any current, pending or threatened court or administrative proceedings.

15.3    The Grantee has been supplied with true and complete copies of all reports, surveys, investigations, assessments, audits, correspondence, health and safety policy statements, records of accidents, illnesses and reportable diseases, assessments of substances hazardous to health or data in the relevant Target Company's possession or under its control relating to the application of Health and Safety Laws to the Target Companies or its business or the Properties.

15.4    No Target Company nor any Property has been the subject of any enquiry, investigation, inspection, claim, prosecution, litigation, arbitration, dispute resolution proceedings, enforcement, prohibition, stop, remediation, improvement or other notice or other proceeding under any Health and Safety Laws other than merely routine inspections, and so far as the Warrantors are aware, no such matters are pending, threatened or proposed and there are no facts or circumstances which may lead to any such investigations, inspections, claims, prosecutions or other proceedings.

15.5    No Target Company has given or received any warranties or indemnities in respect of (or has otherwise attempted to apportion) any liabilities, duties or obligations that arise under any Health and Safety Law.

15.6    There is no asbestos and there are no asbestos-containing or any other deleterious materials at, on or under any of the Properties and there are no outstanding costs or expenses, for which any Target Company is or could be liable, associated with the surveying, labelling, encasement, treatment, removal or disposal of any such materials.

## 16.    INTELLECTUAL PROPERTY

16.1    No Target Company owns any registered or unregistered Intellectual Property Rights.

16.2    No Target Company requires any Intellectual Property Rights or any licence to use any Intellectual Property Rights for any of the operations of any of its business or for the use of any of its assets.

16.3    Each Target Company is entitled to carry on the businesses now carried on by it in the manner in which it is now carried on and neither the manner of such business nor the operations of any Target Company infringes or is likely to infringe or conflict with any Intellectual Property Rights of any other person or will or may give rise to a liability on any Target Company to make payment of any royalty or other compensation pursuant to any Applicable Laws.

16.4    No person has outstanding any claim against any Target Company based on such person's Intellectual Property Rights and there are no grounds to anticipate that there will be any such claim.  No amounts, whether by royalty or otherwise, are due to any person in respect of the ownership or use by any Target Company of any Intellectual Property Rights.

16.5    Each Target Company has ownership in all inventions which were made by officers, directors, employees, freelance workers, consultants and subcontractors and which arose in connection with and pursuant to a job at or the work for such Target Company in circumstances where such ownership would normally and reasonably be expected to result from such a job or work.

16.6    So far as the Warrantors are aware, no Target Company's Intellectual Property Rights are being nor have been infringed by any person.

16.7    No Target Company has disclosed or permitted to be disclosed, or undertaken or arranged to disclose, to any person any of its know-how, secrets, confidential information, technical processes or lists of customers or suppliers other than pursuant to a written and binding confidentiality agreement between the Target Company and the recipient of such information and materials.  So far as the Warrantors are aware, there has been no breach of any confidentiality obligations owed by any person to any Target Company.

16.8    No Target Company uses or has ever used any name other than its corporate name for any purpose, and each Target Company retains all rights to use such names as its corporate name.

16.9    Neither this Deed nor the transactions contemplated by it will result in any Target Company (i) granting to any person any right to or with respect to any Intellectual Property Rights or (ii) being obligated to pay any royalties or other amounts to any person in excess of those payable by it.

## 17.    IT SYSTEMS

No Target Company owns any of the IT Systems used by it in the operation of its business.

## 18.    DATA PROTECTION

18.1    Each Target Company has complied fully with the Data Protection Laws, including all requirements relating to:

(A)     notifications and registrations;

(B)     use of personal data for marketing purposes;

(C)     use of cookies and tracking devices;

(D)     use of CCTV systems; and

(E)     monitoring employee use of IT systems.

18.2    No websites are operated by any Target Company.

18.3    Each Target Company has implemented appropriate technical and organisational measures against unauthorised or unlawful processing of personal data and against accidental loss or destruction of, or damage to, personal data.

18.4    No Target Company has received any enforcement or other notice from any Governmental Entity or any notices from data subject or other third parties alleging non-compliance with the Data Protection Laws nor are there any outstanding data subject access requests.

19.     **REGULATORY MATTERS**

19.1    All Permits (including Environmental Consents and licences under the consumer credit legislation) necessary to enable each Target Company to carry on its business and/or use its assets effectively in the places and in the manner in which such business is now carried on and/or assets are presently used have been obtained by the relevant Target Company and the relevant Target Company has complied with all conditions attaching to such Permits.  All Permits are in full force and effect and have been fully complied with by the relevant Target Company and the Warrantors are not aware of any circumstances indicating that any of them is likely to be suspended, cancelled, revoked, varied or not renewed in the ordinary course.

19.2    No Target Company has ever been the subject of any enquiry, investigation, inquiry or complaint by, or the threat of the same from, any Governmental Entity.

19.3    No Target Company has ever been engaged in or threatened with legal proceedings for any breach or alleged breach of competition laws or taken steps to compromise any such action or threatened action.

19.4    No Target Company, nor any person for whom it is or could be vicariously responsible, has committed any breach of or failed to perform or observe any provision of its memorandum or articles of association, by-laws or any similar constitutional document or of any legislation in any part of the world, or any covenant, agreement, or the terms or conditions of any Permit or any other consent or licence or any judgment or order of a Court or other competent tribunal or authority by which the relevant Target Company is bound or to which it is a Party or which affects any of its assets.

19.5    No Target Company is or has been engaged in procedures leading to the award of a contract which contravenes the requirements of any Applicable Law concerning public procurement.

19.6    Each Target Company has complied with the provisions of the Hong Kong Companies Ordinance or the equivalent legislation in the country of its incorporation and all returns, particulars, resolutions and other documents required under any legislation to be delivered on behalf of the relevant Target Company to the registrar of companies or to any other Governmental Entity have been properly made and delivered within the requisite time limits.

20. **ANTI-CORRUPTION AND TRADE**

20.1    No Target Company nor any current or former directors, officers, employees or agents of a Target Company has directly or indirectly made, promised or given any financial or other advantage to any government official, political party or political party official or candidate for office.

20.2    Each Target Company has complied with all Anti-Corruption Laws. So far as the Warrantors are aware, each distributor, agent, contractor or representative engaged by each Target Company ("**Business Intermediary**") has conducted its business in compliance with all Anti-Corruption Laws.

20.3    Each Target Company has in place appropriate policies and procedures designed to ensure compliance by it and its directors, officers, employees and Business Intermediaries with all Anti-Corruption Laws, and each Target Company has undertaken and continues to undertake proper and adequate procedures (including training procedures) so that all directors, officers, employees and Business Intermediaries are aware of such anti-corruption policies and procedures.

20.4    No Target Company nor so far as the Warrantors are aware no Business Intermediary is or has been the subject of any investigation, inquiry or enforcement proceedings by any Governmental Entity, customer or potential customer or supplier or potential supplier, regarding any offence or alleged offence under any Anti-Corruption Laws or in relation to any corrupt act, and no such investigations, enquiries or proceedings have been threatened, proposed or are pending and there are no grounds or circumstances which would be likely to give rise to any investigation, enquiry or proceedings.

20.5    No Target Company has conducted (or is conducting) an internal investigation in relation to any allegation involving a violation of any Anti-Corruption Law or any corrupt act.

20.6    No Target Company: (a) has directly or indirectly engaged in any transaction, activity or conduct: (i) in Cuba, Iran, North Korea, Sudan, Syria or with any country, territory, person, or organisation that is the subject of Sanctions; (ii) that would reasonably be expected to result in a violation of applicable Sanctions; (iii) that would or could reasonably be expected to result in it becoming the target or subject of Sanctions; or (b) has received notice of, or is otherwise aware of, any claim, action, suit, proceedings or investigation involving it with respect to Sanctions.

20.7    No Target Company is implementing any trade embargoes or other prohibitions or restrictions which would violate any Applicable Laws of the United States, the United Kingdom or the European Union.

20.8    Each Target Company has in place appropriate policies and procedures designed to ensure compliance by the Target Company with Sanctions and with all Applicable Laws relating to import and export controls.

21. **COMPLIANCE WITH APPLICABLE LAWS**

Each Target Company has at all times complied with Applicable Laws.

22. **LITIGATION**

22.1    No Target Company, nor any person for whose acts or defaults any Target Company may be vicariously liable, is subject to any outstanding order or decree of any court or tribunal and no such person is engaged or proposing to engage in or the subject of any litigation, arbitration,

40

investigation, prosecution or other tribunal or legal proceedings or any claims or actions. So far as the Warrantors are aware, no such litigation, arbitration, investigation, prosecution or other tribunal or legal proceedings or claims or actions are pending or threatened by or against any Target Company or any such person or in respect of which any Target Company is or could be liable to indemnify or compensate any third party and there are no facts or other circumstances which will or could reasonably be expected to give rise to or result in any such litigation, arbitration, investigation, prosecution or other tribunal or legal proceedings or claims or actions.

22.2    No litigation, arbitration, investigation, prosecution or other tribunal or legal proceedings or any claims or actions which, if adversely determined, might reasonably be expected to have an adverse effect on the Debt Completion and/or the final, non-appealable order from the United States Bankruptcy Court for the Southern District of New York, approving the Transaction Documents and the transactions contemplated thereby, has or have been started or threatened against any member of the Group.

23.    **INSURANCE**

23.1    Each Target Company is and has at all material times been fully covered by valid insurances against all normal risks, having regard to the type of business carried on and assets owned or used by it, including adequate insurance for the full replacement or reinstatement value of such business and assets, against liability to third parties (including product liability and risks which it is contractually obliged by a third party to cover public and employee's liability).

23.2    Full particulars of all insurances of each Target Company and true, complete and accurate copies of all policies of insurance of each Target Company have been Disclosed.

23.3    The policies of insurance to which each Target Company is a party are valid and enforceable and all premiums due have been paid to date and when due and, so far as the Warrantors are aware, there are no outstanding claims or circumstances likely to give rise to a claim under any such policy and nothing has been done or omitted to be done which has made or could make any such policy void or voidable or whereby the renewal of any such policy might be affected or the premiums due in respect of any of them are likely to be increased.

24.    **EMPLOYEES, OFFICERS, CONSULTANTS AND AGENTS**

None of the Target Companies have any employees, officers, consultants and/or agents.

25.    **PENSIONS**

No Target Company is a party to nor does it participate in or contribute to any scheme, agreement or arrangement (including any ex gratia amounts) for the provision of any pension, retirement, lump sum, death, incapacity, ill-health, disability, accident or other like benefits for any employee or his spouse, civil partner, child or dependant, and no Target Company has given any undertaking or assurance as to the continuance, introduction, improvement or increase of any such benefits.

26.    **ARRANGEMENTS WITH CONNECTED PERSONS**

26.1    Other than the execution of new lease agreements in respect of the Properties leased to the related companies of PAIH (in form and substance (including the identity of the tenant)) satisfactory to the Grantee, neither any of the Warrantors nor any director or shareholder of any Target Company, nor any Affiliate or Connected Person of any of them, has any interest (direct or indirect) in any agreement or arrangement to which any Target Company is party or in any

41

business which has a close trading relationship with that of any Target Company or which is or is likely to become competitive with the business of any Target Company.

26.2   Other than remuneration and expenses properly due to its directors in the ordinary course, there are no amounts owing by or to any Target Company to or by any of the Warrantors or any shareholder or officer of any Target Company, or Connected Person of any of them, and any Target Company is under any liability (contingent or otherwise) in respect of any guarantee, suretyship, indemnity or like obligation given by or binding on any Target Company in respect of any liabilities or obligations of any of the Warrantors, such shareholders, directors or Connected Persons.

27.   **DISCLOSURE**

All information contained in this Deed and all other information which has been given in writing or made available by or on behalf of the Warrantors or the Target Group to the Grantee or its respective agents, employees or professional advisers in the course of the negotiations leading up to this Deed or in the course of any due diligence or other investigation carried out by or on behalf of the Grantee prior to entering into this Deed was when given and (other than when superseded by information subsequently given in writing or made available by or on behalf of the Warrantors) remains true, complete and accurate in all material respects and not misleading in any material respect and there are no facts or matters or circumstances not disclosed in writing to the Grantee which render any such information untrue, inaccurate or misleading in any material respect or the disclosure of which might reasonably affect the willingness of the Grantee to purchase the Option Securities and/or the shares in the Target Companies.

28.   **TAX**

28.1   Each Target Company has within the requisite time limits duly made all returns, given all notices and supplied all other information required to be supplied to the Tax Authority and all such information, returns and notices were when given or supplied and are now accurate in all material respects and made on a proper basis and are not, so far as the Warrantors are aware, likely to be the subject of any dispute with any Tax Authority.

28.2   The provisions or reserves for tax appearing in the Accounts are sufficient (on the basis of the rates of tax current at the date of this Deed) to cover all tax for which any Target Company was at the Accounts Date or may after that date become or have become liable on or in respect of, or by reference to, any profits, gains or income (whether deemed or actual) for any period ended on or before the Accounts Date or in respect of any distribution or transaction made or entered into, or deemed made or entered into, on or before the Accounts Date.

28.3   Each Target Company is in possession and control of all records and documentation that it is obliged to hold, preserve and retain for the purposes of any tax and of sufficient information to enable it to compute correctly its liability to tax in so far as it relates to any event occurring on or before Completion.

28.4   Each Target Company has duly deducted, withheld, paid and accounted for all tax due to have been deducted, withheld, paid or accounted for by it before the date of this Deed and is not and has not at any time since the Accounts Date been liable to pay interest on any unpaid tax.

28.5   The amount of the trading losses available to the Target Group for carry forward have been (or will prior to Completion be) agreed with the tax authority and nothing has been done which (whether of itself or taken together with any other event or circumstance occurring on, before or after the date of this Deed) might result in the Target Group being unable to use as a credit against its corporation tax liability.

28.6    Since the Accounts Date, no Target Company has made and no Target Company is subject to any present or future liability to make or provide any payment or consideration which could be disallowed as a deduction in computing the profits of any Target Company.

28.7    No Target Company has made any borrowings in a foreign currency such that on repayment a charge to corporation tax might arise on any profit or gain accruing in relation or by reference to any such repayment.

28.8    No Target Company is the lessee of any lease of plant and machinery.

28.9    There exist no circumstances under which the lessor or owner of any plant and equipment subject to any lease will or may be denied any allowances by reference to which the initial rental under the lease was calculated.

28.10   The book value of each of the capital assets of each Target Company stated in or adopted for the purposes of the Accounts, in the case of assets acquired after the Accounts Date, in the accounting records of the relevant Target Company is such that on the disposal or deemed disposal of such assets or any of the same at that value no balancing charge, or chargeable gain, would arise, accrue or crystallise.

28.11   No chargeable gain will arise on the disposal of any debt owing to any Target Company (not being a debt on a security) and/or the settlement of any intercompany or creditor balances and no Target Company has acquired any benefit under any policy of insurance other than as original beneficial owner.

28.12   No allowance or loss which might accrue on the disposal by any Target Company of any share in or security of any company is liable to be reduced.

28.13   All transactions or arrangements made by each Target Company have been made on fully arm's length terms.

28.14   In relation to each transaction for the supply of goods or services or the lending or borrowing of money into which any Target Company has entered with a party with which it was connected, the relevant Target Company has full contemporaneous documentary evidence of the process used to establish that arm's length terms applied.

28.15   There are no circumstances which could give rise to any Target Company being denied time apportionment in computing chargeable gains.

28.16   No Target Company has ever reduced its share capital or repurchased, repaid or redeemed any share capital nor capitalised any profits, reserves or share premium account in the form of, or in paying up, any amounts unpaid on any shares, debentures or other securities, nor has any Target Company ever agreed or resolved to do any of the foregoing.

28.17   Except by reason of being a member of the Target Group, no Target Company is nor has it ever been a member of a group of companies or consortium or associated with any company for tax purposes and no Target Company is under any liability to tax (contingent or otherwise) in respect of any other company which at any time has been a member of the same group or consortium as the relevant Target Company or an associated company of the relevant Target Company for tax purposes.

28.18   No Target Company is under any liability to pay stamp duty and/or stamp duty land tax and/or stamp duty reserve tax and:

(A) any document that may be necessary or desirable in proving the title of any Target Company to any asset which is owned by that Target Company (including the Properties), and each document which the relevant Target Company may wish to enforce or produce in evidence, is duly stamped for stamp duty purposes, if applicable;

(B) neither entering into this Deed nor Completion will result in the withdrawal of a stamp duty or stamp duty land tax relief granted on or before Completion which will affect any Target Company; and

(C) since the Accounts Date, no Target Company has incurred any liability to, or been accountable for, any stamp duty reserve tax.

28.19 No Target Company is under any liability (whether actual or contingent) to pay any transfer or transaction tax and any document that may be necessary to prove the title of any Target Company to its assets (including the Properties) owned at Completion and which the Target Company may wish to enforce or produce in evidence, have been properly taxed (if applicable) and no such documents which are outside any jurisdiction would attract any transfer or transaction tax if they were brought into such jurisdiction.

28.20 No Target Company has been a party to, nor has been otherwise involved in, any transaction, scheme or arrangement designed wholly or mainly or containing steps or stages having no commercial purpose and designed wholly or mainly for the purpose of avoiding or deferring tax or reducing a liability to tax.

28.21 No Target Company has, at any time, been a party to or otherwise involved in a transaction or series of transactions in relation to which advisers considered that there was a risk that the Target Company could be liable to tax.

28.22 No sub-contractor or other independent contractor of any Target Company is or has been for tax purposes an employee of a Target Company at any time and nor has any allegation that is or may be the case been made by any such contractor or Tax Authority.

28.23 No Target Company is under any tax liability (actual or contingent) referable to any shares or securities or options issued or otherwise acquired or granted before Completion to or by reason of the employment or engagement of any present or former employee or officer of a Target Company or member of the Target Group or any Affiliate of such member, under any share option scheme formerly operated by any such company or otherwise.

28.24 All tax deductible under any Applicable Laws relating to tax has, so far as is required to be deducted, been deducted from all payments made (or treated to be made) by the Target Companies. All amounts due to be paid to the relevant Tax Authority on or before the date of this Deed have been so paid.

28.25 All necessary directions required to be obtained from any Tax Authority in order for the relevant Target Company to make payments without deducting any withholding tax have been so obtained by that Tax Authority.

28.26 Since the Accounts Date:

(A) none of the Target Companies own an asset which has ceased to be a chargeable intangible asset;

(B) none of the Target Companies have realised or acquired an intangible fixed asset; and

(C)    no circumstances have arisen which have required, or will require, a credit to be brought into account by any of the Target Companies on a revaluation of an intangible fixed asset.

28.27    All tax deductible and payable under any Applicable Law has, so far as is required to be deducted, been deducted from all payments made (or treated as made) by the relevant Target Company. All amounts due to be paid to the relevant Tax Authority prior to the date of this Deed have been so paid by the due date, including, without limitation, all tax chargeable on benefits provided for directors, employees or former employees of each of the Target Companies or any persons required to be treated as such.

# SCHEDULE 4

## TAX COVENANT

1. **INTERPRETATION**

1.1    In this Schedule, the following words and expressions shall have the following meanings:

"**event**" includes every event, act, transaction and every occurrence, circumstance, dealing, arrangement, default or omission of any kind whatsoever done or omitted to be done by a member of the Target Group or a Target Company or in any way concerning or affecting the Target Company, whether or not done or omitted to be done by it or any member of the Target Group;

"**Grantee's Group**" means the Grantee and its Affiliates;

"**Relief**" means any relief, allowance or credit in respect of any tax or any deduction in computing income, profits or gains for the purposes of any tax; and

"**Taxation Statutes**" means all statutes, statutory instruments, decrees, orders, enactments, laws, directives and regulations, whether domestic or foreign, providing for or imposing any tax.

1.2    References in this Schedule to any "**tax liability**" shall include liabilities of the Target Companies to make actual payments of tax (or amounts in respect of tax).

1.3    References in this Schedule to:

(A)    income, profits or gains as being earned, accrued or received on or before a particular date or in respect of a particular period shall include income, profits or gains which are deemed to have been earned, accrued or received on or before that date or in respect of that period for the purposes of any tax;

(B)    any payment or distribution as being made on or before a particular date shall include (i) any payment or distribution which has fallen due to be made on or before that date and (ii) any event which has occurred on or before that date and is, or is deemed to be, a payment or distribution for (in either such case) the purposes of any tax; and

(C)    the result of an event on or before a particular time shall include the combined result of two (2) or more events the first or some of which shall have taken place on or before the relevant time.

2. **TAX INDEMNITIES**

2.1    In addition and without prejudice to the Warranties and the other provisions of the Transaction Documents, each of the Warrantors jointly and severally undertakes to indemnify and keep indemnified the Grantee and/or the Target Companies from and against all Losses which may be suffered or incurred by the Grantee and/or the Target Companies which arise (directly or indirectly) from, in relation to or as a result of or otherwise in connection with:

(A)    any tax liability of a Target Company arising directly or indirectly from any fact or matter in existence before Completion, including, the disposal of Pacific Andes Development Sdn Bhd by Pacific Andes Enterprises (Hong Kong) Limited;

46

(B)    the settlement of intercompany balances between the PAIH Material Group and other entities in the Group and/or their Affiliates and outstanding creditor balances from Pacific Andes Enterprises (Hong Kong) Limited to each of Valeriy Fedorovich Kolomlin and Meridian Investment Group Pte. Ltd.;

(C)    the release of the corporate guarantees of the Debt Claims;

(D)    any related party transactions among the Target Group (including Pelican Food) not on an arm's length basis and/or for which transfer pricing documentation has not been entered into;

(E)    any tax liability of a Target Company arising by reason of the failure of any person fully to pay and discharge when due (even if after Completion) any liability to taxation on its part where a Target Company is so liable by reason of having been, for tax purposes on or at any time before Completion, a member of the same group or consortium or otherwise connected or associated with, or a settlor or beneficiary in relation to, such person;

(F)    any depletion or reduction in the value of the assets of the Grantee or the Target Company, or increase in the liabilities of either of them which (i) arises in consequence of any transfer of value received or effected by the Target Company prior to Completion; or (ii) is at Completion a charge on or gives rise to a power to sell, mortgage or charge any of the shares or assets of the Target Company, and which after Completion becomes a charge on or gives rise to a power to sell, mortgage or charge any of the shares or assets of the Target Company after a transfer of value occurring prior to Completion;

(G)    any tax liability of a Target Company arising in respect of or in connection with or in consequence of (i) any income, profit or gain actually or deemed or treated as having been earned, accrued or received on or before Completion and/or (ii) any event occurring or entered into or deemed to have occurred or to have been entered into on or before Completion;

(H)    any tax liability of a Target Company to pay, or to pay any amount in respect of the surrender by or to a Target Company of, any amount by way of group relief arising directly or indirectly from any fact or matter in existence before Completion;

(I)    any non-compliance with any Applicable Law in relation to the conduct of the business on or before Completion including the failure to furnish tax returns and/or to inform the Hong Kong Inland Revenue Department on the chargeability of any assessable profits to tax, the qualifying expenditure adopted by any Target Company when claiming for commercial building allowance in relation to the capital expenditure incurred on the construction or acquisition of the Properties;

(J)    any tax liability of a Target Company arising in respect of or in connection with or in consequence of the Restructuring; and/or

(K)    any third party costs and expenses incurred or payable in connection with any tax liability or any such depletion of assets or in investigating, assessing, contesting or settling the same, or in connection with all proceedings in relation to the same including steps taken to avoid such tax liability or depletion of assets, in respect of which the Warrantors are liable to make payment under the foregoing paragraphs.

2.2    In determining the liability of the Warrantors under this Schedule, no account shall be taken of any Relief or other event which, in either case, arises wholly or mainly by reason of events

47

occurring after Completion and accordingly where any tax liability in respect of which the Warrantors are liable to indemnify the Grantee and/or the Target Companies under paragraph 2.1 is, or can be, reduced or prevented from arising by virtue of any such Relief or event. The Warrantors shall nevertheless be liable to indemnify the Grantee and/or the Target Companies in respect of such tax liability as if an actual payment of tax had been made and in any event without regard to such Relief or event.

3.    **OVER-PROVISIONS AND RELIEFS**

3.1    If the auditors for the time being of the Target Companies shall report (at the request and expense of the Warrantors) that any provision for tax in the Accounts (excluding any provision for deferred tax) has proved to be an over-provision, then the amount of such over-provision shall be dealt with in accordance with paragraph 3.3.

3.2    If the auditors for the time being of the Target Companies shall report (at the request and expense of the Warrantors) that any tax liability which has resulted in a payment having been made or becoming due from the Warrantors under this Schedule will give rise to a Relief for the relevant Target Company which would not otherwise have arisen, then, as and when the liability of such Target Company to make an actual payment of or in respect of tax is reduced by reason of that Relief (and after taking account of the effect of all other Reliefs that are or become available to such Target Company including any Relief derived from a subsequent accounting period), the amount by which that liability is so reduced shall be dealt with in accordance with paragraph 3.3.

3.3    Where it is provided under paragraphs 3.1 or 3.2 that any amount (the "**Relevant Amount**") is to be dealt with in accordance with this paragraph 3.3:

   (A)    the Relevant Amount shall first be set off against any payment then due from the Warrantors under this Schedule;

   (B)    to the extent there is an excess, a refund shall be made to the Warrantors of any previous payment or payments made by the Seller under this Schedule and not previously refunded under this paragraph, up to the amount of such excess; and

   (C)    to the extent that the excess referred to in paragraph 3.3(B) is not exhausted under that paragraph, the remainder of that excess shall be carried forward and set off against any future payment or payments which become due from the Warrantors under this Schedule.

4.    **RECOVERY FROM OTHER PERSONS**

4.1    If after the Warrantors have irrevocably and unconditionally satisfied in full any liability under paragraph 2.1 (and all further liability or loss or damage the subject of the relevant claim (including all related costs and expenses) has been made good to the relevant Target Company and the Grantee) the Target Company is entitled to recover from some other person (not being a member of the Grantee's Group but including any Tax Authority) any sum in respect of the tax liability that resulted in the relevant liability of the Warrantors, or subsequently becomes entitled to make such a recovery, then the relevant Target Company shall (in either of those cases) as soon as reasonably practicable after becoming aware of such entitlement notify the Warrantors of its entitlement and shall, if reasonably and promptly so required by the Warrantors in writing, and subject first to being fully indemnified and secured to its satisfaction by the Warrantors in respect of all Losses it may thereby incur, take all reasonable steps to enforce that recovery (keeping the Warrantors informed of the progress of any action taken) and shall account to the Warrantors for whichever is the lesser of:

(A)    any sum so recovered (including any interest or repayment supplement paid by a Tax Authority relating to the period after receipt of the relative payment from the Warrantors) less any tax chargeable on the relevant Target Company in respect of the sum so recovered; and

(B)    the amount paid by the Warrantors pursuant to paragraph 2 in respect of the tax liability in question.

4.2    Paragraph 4.1 shall not apply to any recovery or repayment of any tax liability giving rise to a payment by the Warrantors under paragraph 2 where such repayment or recovery arises by virtue of any such Relief or event as is referred to in paragraph 2.2.

## SCHEDULE 5

### PROPERTIES

| | Property Owner | Property Address |
|---|---|---|
| 1. | Rawley Trading Limited | Flat A1, 20/F & Roof, Blk A, Evergreen Villa, 43 Stubbs Road and Car Parking Space No. 108, Hong Kong |
| 2. | Fastact Group Limited | Block 1, 14/ F and Car Port Space No. G122 and Car Parking Space No. 250, Repulse Bay Garden, Nos. 18-40 Belleview Drive, Hong Kong |
| 3. | Chasterton Group Limited | House No. 36, Manderly Garden, 48 Deep Water Bay Road, Hong Kong |
| 4. | Pacific Andes Enterprises (Hong Kong) Limited | House No. 34, Manderly Garden, 48 Deep Water Bay Road, Hong Kong |
| 5. | Bonaire Development Limited | Unit 8B and Car Parking Space No. L39 on Lower Ground Floor, Celestial Garden, 5 Repulse Bay Road, Hong Kong |
| 6. | Grandluck Enterprises Limited | Apartment B33, 2/F, Block B3, Woodgreen Estate, 5 Shouson Hill Road, Hong Kong & Car parking Space No.10 & 20 |

## SCHEDULE 6

### LEASES

| Relevant Target Company | Description of Lease Agreement |
|---|---|
| Rawley Trading Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 January 2015 on the lease of property Flat A1, 20/F & Roof, Block A, Evergreen Villa, 43 Stubbs Road and Car Parking Space No. 108, Hong Kong |
| Fastact Group Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 January 2015 on the lease of property 14/F of No. 40 Belleview Drive, Car Port Space No. G122 and Car Parking Space No. 250, Repulse Bay Garden, 18-40 Belleview Drive, Hong Kong |
| Chasterton Group Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 January 2015 on the lease of property House No. 36 Manderly Garden, No. 48 Deep Water Bay Road, Hong Kong |
| Bonaire Developments Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 January 2015 on the lease of property Unit 8B and Car Parking Space No. 39 on Lower Ground Floor, Celestial Garden, 5 Repulse Bay Road, Hong Kong |
| Grandluck Enterprises Limited | Lease agreement with Pacific Andes Enterprises (Hong Kong) Limited dated 1 April 2015 on the lease of property Apartment B33, 2/F Block B3 and Car Parking Space No. 10 & 20, Woodgreen Estate, No. 5 Shouson Hill Road, Hong Kong |
| Pacific Andes Enterprises (Hong Kong) Limited | Lease agreement with Pelican Food Limited dated 1 April 2015 on the lease of property House No. 34 Manderly Garden, No. 48 Deep Water Bay Road, Hong Kong |

**SCHEDULE 7**

**RESTRUCTURING**

| Step | Process |
|------|---------|
| 1. | The disposal of Dynamic Choice Ltd, Rich System Ltd, Ace Field Ltd, Pacific Andes Development Sdn. Bhd., Full Enrich Limited, Glorious Ocean Limited, and Fortune Midas Limited (the "**Disposed Subsidiaries**") by Heng Holdings (BVI) Limited at net book value through the transfer of 100% of the shares held by Heng Holdings (BVI) Limited in the Disposed Subsidiaries to Pelican Food Limited. |
| 2. | The transfer of 100% of the shares held by Peaksville Limited in Rawley Trading Limited to Heng Holdings (BVI) Limited such that Rawley Trading Limited is 100% legally and beneficially owned by Heng Holdings (BVI) Limited. |
| 3. | The cessation of any trust arrangements with respect to the shareholdings in Pacific Andes Enterprises (Hong Kong) Limited such that it is 100% legally and beneficially owned by Heng Holdings (BVI) Limited. |

# SCHEDULE 8

**OUTSTANDING INTERCOMPANY DEBT AMONG THE TARGET COMPANIES**

**The Warrantors**

Executed and delivered as a deed by )
**PACIFIC ANDES INTERNATIONAL** )
**HOLDINGS LIMITED** acting by )
a director )

in the presence of:

Name of witness:
Signature of witness:
Address

Executed and delivered as a deed by )
**PACIFIC ANDES INTERNATIONAL** )
**HOLDINGS (BVI) LIMITED** acting by a )
director )

in the presence of:

Name of witness:
Signature of witness:
Address

**The Grantee**

Executed and delivered as a deed by                    )
**ASIA UNION LIMITED** acting by a director            )

in the presence of:
Name of witness:
Signature of witness:
Address:

**The Guarantors**

Executed and delivered as a deed by                    )
**MERIDIAN INVESTMENT GROUP PTE. LTD.** acting )
by a director

in the presence of:
Name of witness:
Signature of witness:
Address:


Signed, sealed and delivered as a deed by            )
**NG JOO SIANG**                                      )


in the presence of:
Name of witness:
Signature of witness:
Address


Signed, sealed and delivered as a deed by            )
**NG JOO KWEE**                                       )


in the presence of:
Name of witness:
Signature of witness:
Address


Signed, sealed and delivered as a deed by            )
**NG JOO THIENG**                                     )


in the presence of:
Name of witness:
Signature of witness:
Address


[Signature Page to Warranty Deed]

Signed, sealed and delivered as a deed by )
**NG JOO PUAY, FRANK** )


in the presence of:
Name of witness:
Signature of witness:
Address



Signed, sealed and delivered as a deed by )
**NG PUAY YEE ANNIE** )


in the presence of:
Name of witness:
Signature of witness:
Address

# CALL OPTION DEED

## DATED _____ 2021

## BETWEEN

## PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI) LIMITED

### as Grantor

## AND

## ASIA UNION LIMITED

### as Grantee

**THIS CALL OPTION DEED** (this "**Deed**") is made on _____.

**BETWEEN:**

(1)     **PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI) LIMITED**, a company incorporated in the British Virgin Islands, with its registered office at 3rd Floor, J&C Building, PO Box 362, Road Town, Tortola, British Virgin Islands VG1110 (the "**Grantor**"); and

(2)     **ASIA UNION LIMITED**, a company incorporated in Hong Kong whose registered office is at 22/F South China Building, 1-3 Wyndham Street, Central, Hong Kong (the "**Grantee**"),

(each of the Grantor and the Grantee, a "**Party**" and, together, the "**Parties**").

**RECITALS**

(A)     The Grantor is the legal and beneficial owner of the Option Securities (defined below).

(B)     The Grantor has agreed to grant to the Grantee a call option in respect of the Option Securities on the terms and subject to the conditions of this Deed.

(C)     The Grantor has agreed to novate to the Grantee the Target Group Debt on the terms and subject to the conditions of the Novation Deed.

**NOW THIS DEED WITNESSES AS FOLLOWS:**

1.      **INTERPRETATION**

1.1     In this Deed, the following words and expressions have the following meanings unless the context otherwise requires:

"**Affiliate**" means, in relation to any person, any other person controlling, controlled by or under common control with that person or persons. For the purposes of this definition, "**control**" when used with respect to any person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "**controlling**" and "**controlled**" shall be construed accordingly. For the avoidance of doubt, an entity will control a second entity or entities if it: (a) owns or controls, directly or indirectly, at least 50% of the voting equity of the second entity or entities; or (b) it possesses, directly or indirectly, the power to direct or cause the direction of the affairs or management of the second entity or entities, whether through the ownership of voting securities, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of management or similar body governing the affairs of the second entity or entities;

"**Bankruptcy Cases**" has the meaning ascribed to it in the Settlement and Framework Agreement;

1

"**Business Day**" means a day (excluding Saturday) on which banks are generally open in the British Virgin Islands, Hong Kong and New York City for the transaction of normal banking business;

"**Cash Balance**" means in respect of each member of the Target Group, the cash in hand and cash deposits with or cash balances at any banking, lending or similar institution or organization;

"**Completion**" means completion of the sale and purchase of the Option Securities in accordance with clause 6.2, following the exercise of the Option;

"**Completion Net Liabilities Amount**" means the amount, as set out in the Net Liabilities Statement, by which the sum of the aggregate Liabilities of the Target Group (excluding the Target Group Debt) is greater than the sum of the aggregate Cash Balances of the Target Group, in each case as calculated at the date of Completion and as determined in accordance with the provisions of **Error! Reference source not found.** (*Net Liabilities Adjustment*);

"**Compromised Debt Claims**" has the meaning ascribed to it in clause 5.1.

"**Debt Claims**" has the meaning ascribed to it in the Settlement and Framework Agreement;

"**Debtors**" has the meaning ascribed to it in the Settlement and Framework Agreement;

"**Deferred Payment**" means the Purchase Price as defined in the Sale and Purchase Agreement among Meridian Investment Group Pte. Ltd. and the Grantee;

"**Designated Representative**" has the meaning ascribed to it in clause 9.1;

"**Encumbrance**" means any interest or equity of any person (including any right to acquire, option or right of first refusal, right of pre-emption or conversion) or any mortgage, charge, pledge, lien, assignment, hypothecation, security interest, title retention or any other security agreement or preferential arrangement or any agreement to create any of the above;

"**Exercise Notice**" means a notice substantially in the form set out in Schedule 1 (*Form of Exercise Notice*) to this Deed;

"**Grantee's Accountants**" means an independent firm of internationally recognised chartered accountants to be appointed by the Grantee;

"**Indebtedness**" means any obligation for the payment or repayment of money, whether as principal or as surety and whether present or future, actual or contingent (whether as principal, interest, fees, expenses, gross up obligation, under indemnity or otherwise) in respect of or in connection with (a) money borrowed or raised, (b) any bond, note, loan stock, debenture or similar instrument, (c) acceptance or documentary credit facilities, (d) foreign exchange options, (e) rental and periodic payments, under leases and hire purchase agreements and instalments under conditional sale agreements

(in all cases whether in respect of land, machinery, equipment or otherwise) entered into primarily as a method of raising finance or of financing the acquisition or use of the asset concerned, (f) payments in the nature of finance charges or repurchase amounts and debt indemnity under factoring and invoice discounting arrangements, (g) guarantees, indemnities, bonds, standby letters of credit or other instruments issued in connection with the performance of contracts and or in respect of the indebtedness of any other person, (h) amounts payable (other than to another Target Company) in respect of any redemptions or other returns of capital or other entitlements on shares or securities or partnership interests of any Target Company and any associated Liability in respect of tax, (i) Liabilities in respect of financial grants received and (j) any accrued interest, success fees, prepayment premiums, break fees, make-whole premiums or penalties and fees or expenses (including legal fees) associated with the prepayment or redemption of any Indebtedness including any such prepayment or redemption to be made as contemplated by this Deed;

"**Intellectual Property Rights**" means patents, trade marks, service marks, logos, get-up, trade names, brand names, internet domain names, rights in designs, copyright (including rights in computer software) and moral rights, database rights, rights in know-how and other intellectual property rights, in each case whether registered or unregistered, and all rights or forms of protection having equivalent or similar effect anywhere in the world and "**registered**" includes applications for registration;

"**Lapse**" means the lapse of the Option in accordance with clause 3;

"**Liabilities**" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, absolute, contingent, disputed, current, future or otherwise;

"**Losses**" means any loss, action, governmental order, remediation costs, damage, fine, penalty, expense (including court costs and reasonable attorneys' or other professional fees and expenses), liability or tax, whether or not involving the claim of another person;

"**Net Liabilities Adjustment**" means the amount (if any) by which the Completion Net Liabilities Amount is greater than zero;

"**Net Liabilities Statement**" means the statement as at the date of Completion which is to be prepared in accordance with the provisions of Schedule 4 (*Net Liabilities Adjustment*);

"**Novation Deed**" means the novation deed made among the Grantor, the Grantee and the Target Group a form of which is set out in Schedule 6 (*Form of Novation Deed*);

"**Optional Unsecured Debt Claims**" has the meaning ascribed to it in the Settlement and Framework Agreement;

"**Option**" means the call option granted by the Grantor to the Grantee under clause 2;

"**Option Consideration**" means the consideration payable upon Completion as set out in clause 5.1;

"**Option Securities**" means the entire issued and paid up share capital of Heng Holdings (BVI) Limited and Fastact Group Limited;

"**Properties**" means certain properties in Hong Kong, the details of which are set out in Schedule 3 (*Properties*);

"**Purchased Debt Claims**" has the meaning ascribed to it in the Settlement and Framework Agreement, the details of which are set out in Schedule 2 (*Purchased Debt Claims*);

"**Relevant Professionals**" has the meaning ascribed to it in the Settlement and Framework Agreement;

"**Remaining Cash Amount**" has the meaning ascribed to it in the Settlement and Framework Agreement;

"**Sale and Purchase Agreements**" means the sale and purchase agreements made between the Grantee and holders of the Debt Claims, each a "**Sale and Purchase Agreement**";

"**Settlement and Framework Agreement**" means that certain Settlement and Framework Agreement dated as of _____ among the Grantor, the Grantee, the Target Group and Pacific Andes International Holdings Limited;

"**Subsidiary**" means an entity of which a person has direct or indirect control or owns directly or indirectly more than 50% of the voting capital or similar right of ownership and control for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise;

"**Target Companies**" or "**Target Group**" means Fastact Group Limited, Heng Holdings (BVI) Limited and its Subsidiaries, "**Target Company**" means any of them and the expression "**relevant Target Company**" shall be construed accordingly;

"**Target Group Debt**" means the Indebtedness owing by any of the Target Companies to the Grantor which are set out in Schedule 5 (*Target Group Debt*);

"**tax**" or "**taxation**" means all forms of taxation, dues, duties, imposts, levies and rates of Hong Kong or any other jurisdiction whenever and wheresoever charged, imposed or deducted, or otherwise payable as a consequence of any direction or order of any Tax Authority, together with all costs, charges, interest, penalties, fines and expenses incidental or relating to or arising in connection with any and all such taxes, dues, duties, imposts, levies and rates or the negotiation of any settlement of any dispute as to the liability of any person therefor or any actual claim in respect of the same, including income tax, national insurance contributions, corporation tax, advance corporation tax, capital gains tax, value added tax, customs and other import duties,

stamp duty, stamp duty reserve tax, stamp duty land tax, withholding tax, diverted profits tax, capital transfer tax and inheritance tax;

"**Tax Authority**" means any taxing or other authority (whether within or outside Hong Kong) competent to impose any tax liability;

"**Transaction Documents**" this Deed, the Sale and Purchase Agreements, the Warranty Deed, the Novation Deed and the Settlement and Framework Agreement;

"**Transactions**" has the meaning ascribed to it in the Settlement and Framework Agreement;

"**Warranties**" mean the warranties set out in the Warranty Deed, and "**Warranty**" means any one of them; and

"**Warranty Deed**" means the warranty deed entered into among others, the Grantor, the Grantee, the Target Group and the Debtors on _____.

1.2    In this Deed unless otherwise specified, reference to:

(a)    a party means a party to this Deed and includes its permitted assignees and/or the successors in title to substantially the whole of its undertaking;

(b)    a reference to a "**person**" includes any individual, firm, body corporate (wherever incorporated), government, state or agency of a state or any joint venture, association, partnership, limited partnership, limited liability partnership, limited liability limited partnership, works council or employee representative body (in each case whether or not having separate legal personality);

(c)    references to "$" are references to the lawful currency from time to time of the United States of America;

(d)    references to times of the day are to local time in the relevant jurisdiction unless otherwise stated and references to a day are to a period of 24 hours running from midnight to midnight;

(e)    a reference to "includes" or "including" shall be construed as meaning "includes without limitation" or "including without limitation" (as the case may be);

(f)    general words shall not be given a restrictive meaning by reason of their being preceded or followed by words indicating a particular class or examples of acts, matters or things;

(g)    if a period of time is specified and dates from a given day or the day of an act or event, such period shall be calculated exclusive of that day;

(h)    a statute or statutory instrument or accounting standard or any of their provisions is to be construed as a reference to that statute or statutory instrument or

accounting standard or such provision as the same may have been amended or re-enacted;

(i)     recitals, clauses, paragraphs or the Schedule are to recitals, clauses and paragraphs of and the Schedule to this Deed. The Schedules form part of the operative provisions of this Deed and references to this Deed shall, unless the context otherwise requires, include references to the recitals and the Schedule;

(j)     writing shall include typewriting, printing, lithography, photography and other modes of representing words in a legible form (other than writing on an electronic or visual display screen) or other writing in non-transitory form; and

(k)     words denoting the singular shall include the plural and vice versa and words denoting any gender shall include all genders.

1.3     The index to and the headings in this Deed are for information only and are to be ignored in construing the same.

## 2.    GRANT OF THE OPTION

The Grantor hereby grants to the Grantee the sole and exclusive option to purchase all of the Option Securities (but not a part thereof) held by the Grantor for the Option Consideration on the terms of this Deed (the "**Option**").

## 3.    OPTION PERIOD

The Grantor irrevocably acknowledges and agrees with the Grantee that the Option may be exercised by the Grantee from the date of this Deed to the date falling two (2) years after the date hereof, and if the Option is not exercised on or before such date, it shall lapse ("**Lapse**")

## 4.    EXERCISE OF THE OPTION

4.1     The Grantee may exercise the Option only by serving an Exercise Notice on the Grantor at any time after the date hereof.

4.2     Exercise of the Option shall oblige the Grantor to sell and the Grantee to purchase all of the Option Securities.

4.3     The Option Securities shall be sold free from all Encumbrances and together with all rights attaching to the Option Securities at the date of service of the Exercise Notice (including any distributions in relation thereto).

4.4     All dividends and other distributions resolved or declared to be paid or made by Heng Holdings (BVI) Limited or Fastact Group Limited for the Option Securities by reference to a record date which falls on or before Completion shall belong to and be payable to the Grantee.

5.    **OPTION CONSIDERATION**

5.1    The consideration of $56 million for the acquisition of the Option Securities and the
novation of the Target Group Debt shall consist of (a) the Purchased Debt Claims as
compromised under section 6.02 of the Settlement and Framework Agreement
("**Compromised Debt Claims**"); and (b) the Remaining Cash Amount (if any)
("**Option Consideration**"), as adjusted by the Net Liabilities Adjustment (if any).

5.2    The Option Consideration shall be satisfied as follows:

(a)    by the prepayment of the Remaining Cash Amount (if any) to PAIH at Closing
(as defined under the Settlement and Framework Agreement) for such funds to
be used for the benefit of the Bankruptcy Cases, including but not limited to,
discharging further fees incurred by the Relevant Professionals;

(b)    subject to clause 5.3 below, by the assignment of the legal and beneficial title to
the Compromised Debt Claims and any other rights owned by the Investors in
relation to the Compromised Debt Claims at Completion from the Grantee to
the Grantor, the sufficiency of which the Grantor irrevocably and
unconditionally acknowledges and agrees to;

(c)    by the payment of the Net Liabilities Adjustment (if any) by the Grantor to the
Grantee on a date falling not more than five (5) Business Days after the final
determination of the Net Liabilities Statement in accordance with **Error!
Reference source not found.** (*Net Liabilities Adjustment*), which payment shall
be made by way of set-off or deduction against the Deferred Payment and, to
the extent that the Net Liabilities Adjustment exceeds the Deferred Payment, in
cash in immediately available funds; and

(d)    by the novation of the Target Group Debt to the Grantee in accordance with the
terms and conditions of the Novation Deed.

5.3    The Grantor irrevocably acknowledges and agrees that (a) the Sale and Purchase
Agreement executed by China CITIC Bank International Limited ("**CITIC**") and the
Grantee (if any) may not be effective in assigning the legal and beneficial title of the
Optional Unsecured Debt Claims held by CITIC from CITIC to the Grantee, and (b)
nothing in this Agreement shall be construed as an express or implied representation
or warranty that the Investor has the legal or beneficial title to the Optional Unsecured
Debt Claims held by CITIC.

6.    **COMPLETION**

6.1    Completion of the sale and purchase of the Option Securities following the exercise of
the Option shall take place on the date of service of the Exercise Notice.

6.2    The Grantor shall cause the Option Securities held by it to be assigned and transferred
to the Grantee or its nominees in such manner as shall be directed by the Grantee,
acting reasonably, to effect the assignment and transfer of the full legal and beneficial

title of all the Option Securities to the Grantee or any nominee including, without limitation, delivering or procuring the delivery to the Grantee or any nominee any assignment, conveyance, transfer or other documents, notices or writings reasonably required by the Grantee or any nominee to effect the assignment and transfer of legal and beneficial title to the Option Securities as contemplated by the transactions hereunder. Without prejudice to the generality of the foregoing, the Grantor agrees that it shall, at Completion deliver to or, if the Grantee so agrees, make available to the Grantee:

(a)     transfers in common form relating to all the Option Securities duly executed in favour of the Grantee (or as it may direct);

(b)     share certificates relating to the Option Securities;

(c)     the certified true copies of all title deeds in relation to the Properties;

(d)     resignations in the agreed terms duly executed as deeds of all the directors and the secretaries of the Target Group;

(e)     releases in agreed terms duly executed as deeds of all the present and past directors and secretaries of the Target Group; and

(f)     the common seals, certificates of incorporation, statutory books and share certificate books of the Target Group.

6.3     Against the satisfaction of the Grantor's obligations in clause 6.2, the Grantee shall, subject to clause 5.3, assign the Compromised Debt Claims in such manner as shall be determined by the Grantee in its sole discretion, to effect the assignment of the full legal and beneficial title of all the Compromised Debt Claims to the Grantor or any of its nominees including, without limitation, delivering or procuring the delivery to the Grantor or any of its nominees any assignment or other documents, notices or writings reasonably required by the Grantor or any of its nominees to effect the assignment of legal and beneficial title to the Compromised Debt Claims as contemplated by the transactions hereunder.

7.    **UNDERTAKINGS**

7.1     From the date of this Deed and at each moment until Completion, the Grantor shall not, without the prior written consent of the Grantee sell, transfer or otherwise dispose of or mortgage, charge, pledge or otherwise create any Encumbrance over its legal or beneficial interest in any of the Option Securities (or any interest in any of them).

7.2     Until the earlier of Completion and Lapse, the Grantor shall:

(a)     ensure that each Target Company shall in reasonable consultation with the Grantee carry on business in the normal course and with a view to profit and not do anything outside the normal course of its day to day trading;

(b)    procure that each Target Company uses best endeavours to preserve and protect its business and assets;

(c)    not, and shall procure that no Target Company shall, take or permit to be taken any action which (except in the ordinary course of trading) results or is likely to result in the net assets of the Target Group being reduced and/or which could have an adverse effect on the financial or trading position or prospects of the Target Group;

(d)    to the extent permitted by Applicable Laws, promptly give, or procure to be given, to the Grantee and its advisers copies of all management reports and financial reports following their preparation and such further information regarding the businesses, assets, liabilities, contracts and affairs of the Target Group as the Grantee may reasonably require, together with access on reasonable notice and during normal working hours to premises from which any Target Company operates; and

(e)    procure that neither the Target Group nor any Target Company shall, except with the prior written consent of the Grantee:

    (i)    dispose of or transfer or acquire any business or part of any business or any shares or securities or ownership interest in any entity;

    (ii)   except in the case of current assets acquired or disposed of in the ordinary course of trading, acquire or dispose of any assets at a cost or with a value individually or in aggregate in excess of $250,000;

    (iii)  enter into any contract or materially modify or terminate or waive any material rights under or breach in any material respect any contract;

    (iv)   create or permit to be created any Encumbrance over any of the Option Securities, any of the shares in any of the Subsidiaries or any of the other assets of the Target Group;

    (v)    engage or employ any person;

    (vi)   terminate or give notice to terminate the employment of any employee;

    (vii)  in relation to the employees, enter into any collective bargaining agreement, or materially modify or terminate their employment terms and/or any material rights under any collective bargaining agreement subsisting at the date of this Deed;

    (viii) enter into any agreement, arrangement or understanding pursuant to which any person is or may become entitled to any commission or bonus in respect of any of the transactions contemplated by this Deed;

    (ix)   enter into any joint venture, co-operation, consortium, partnership or similar agreement;

9

(x)      dispose of or licence or enter into or vary in any material respect any agreement relating to any Intellectual Property Rights;

(xi)      acquire or dispose of any interest in land or premises or enter into any new (or amend in any material respect, renew or give notice to terminate any existing) lease or licence for or in respect of any of the Properties;

(xii)      initiate or settle any litigation, arbitration, prosecution or other legal proceedings (other than normal debt collection);

(xiii)      make or commit to make any expenditure on capital items other than in amounts and for items and in accordance with the timing arrangements which have been Disclosed for this purpose;

(xiv)      incur any Indebtedness or cancel, release or assign or prepay or vary in any material respect the terms of any Indebtedness, except as otherwise provided in the Transaction Documents;

(xv)      fail to take any action required to maintain or comply with the conditions of cover under any material insurance policies in force at the date of this Deed in respect of any member of the Target Group;

(xvi)      resolve to change its name or to alter its memorandum or articles of association or byelaws or any similar constitutional document;

(xvii)      allot or issue, or agree to allot or issue, any shares or any other securities or grant or agree to grant rights which confer on the holder any rights to acquire any shares or other securities;

(xviii)      declare, pay or make any dividend or other distribution;

(xix)      repay or redeem or reduce any of its share capital;

(xx)      pass any ordinary or special resolution or enter into any agreement of equivalent effect; or

(xxi)      resolve to be convened, or convene, any general meeting at which a resolution is to be proposed that it shall be voluntarily wound-up;

(xxii)      do or omit to do, and shall procure that no Target Company shall do or omit to do, any act or thing which would give rise to a breach of the Warranties when the Warranties are repeated at Completion; and

(xxiii)      procure that no Target Company shall enter into any agreement or commitment to do anything which if done or omitted to be done would be in breach of any of the provisions of foregoing paragraphs.

10

8.     **COSTS**

The Grantor shall bear all legal, accountancy and other costs, charges and expenses connected with the negotiation, preparation and implementation of this Deed and any other agreement incidental to or referred to in this Deed.

9.     **DESIGNATED REPRESENTATIVE**

9.1    The Grantor hereby irrevocably and unconditionally appoints Ng Puay Yee Annie (the "**Designated Representative**") as its attorney in such Grantor's name to:

(a)    serve and accept delivery of any notice under this Deed;

(b)    grant or vary the terms of any approval or consent which may be given by or on behalf of the Grantor in connection with this Deed;

(c)    defend, compromise and settle any claim by the Grantee against the Grantor in connection with this Deed,

in each case as the Designated Representative in her absolute discretion thinks fit and to execute all such documents and do all things as the Designated Representative shall, in his absolute discretion, consider necessary or desirable in connection with the above.

9.2    The Grantor agrees to be bound by the actions of the Designated Representative and to perform promptly any obligations entered into by the Designated Representative on its behalf pursuant to the exercise of the powers delegated to her under clause 9.1.

9.3    If the person appointed in clause 9.1 (or her successor as appointed pursuant to this clause 9.3) shall become incapable of performing the role of the Designated Representative, the Grantor shall agree upon, and notify the Grantee of, a successor within 30 days thereafter and failing such notification within such period, the Grantee shall be entitled to appoint such person (such person being a Grantor) by notice to the Grantor. Notwithstanding that the appointment of the Designated Representative ceases to be effective, until the Grantee is notified in writing of the appointment of the new Designated Representative, it shall be entitled to serve notice on the outgoing Designated Representative as if the appointment had not ceased. Nothing contained in this clause shall affect the right to serve process in any other manner permitted by law.

10.    **APPOINTMENT OF PROCESS AGENTS**

10.1   The Grantor shall ensure that there is at all times appointed an agent for service of process on it in Hong Kong in relation to any claims, disputes or proceedings or other matters arising out of or in connection with this Deed, and agrees that the process by which any proceedings are commenced may be served on them by being delivered to that agent, service upon whom shall be deemed completed whether or not forwarded to or received by the Grantor and the Grantor shall notify the Grantee of the name of such agent and their contact details.

10.2 If any process agent appointed by the Grantor pursuant to this clause 10 ceases to have an address in Hong Kong or ceases to be effectively appointed, the Grantor irrevocably agrees to appoint a new process agent acceptable to the Grantee (acting reasonably) and to deliver to the Grantee within fourteen (14) days a copy of a written acceptance of appointment by its new process agent. Should the Grantor fail to effect any such appointment and notification within the required fourteen (14) day period, the Grantee shall be entitled to appoint such an agent at the Grantor's expense by written notice to the Grantor.

11. **ASSIGNMENT**

11.1 The Grantor may not without the prior written consent of the Grantee, assign, transfer or declare a trust of any benefit arising under or out of this Deed nor shall it delegate or subcontract to any third party any of its obligations hereunder.

11.2 At any time after the date hereof, the Grantor hereby irrevocably agrees that the Grantee may, at any time and from time to time, assign, transfer, novate, or otherwise dispose of its rights and/or obligations hereunder to any Affiliate of the Grantee and the Grantor hereby consents thereto.

11.3 With respect to any transfer or novation referred to in clause 11.2 above, the Grantor hereby agrees with the Grantee to enter into such agreements, and to execute or procure the execution of such documents, as the Grantee may reasonably request in relation thereto.

11.4 Each of the Parties confirms that it is acting on its own behalf and not for the benefit of any other person.

12. **ENTIRE AGREEMENT**

12.1 Each of the Parties acknowledges that:

(a) the Transaction Documents constitute the entire and only agreement between the Parties relating to the subject matter of the Transaction Documents and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof; and

(b) it has not been induced to enter the Transaction Documents in reliance on, nor has it been given, any representation or other statement of any nature whatsoever other than those set out in the Transaction Documents.

12.2 This clause 12 shall not exclude any liability for (or remedy in respect of) fraudulent misrepresentation.

13. **WAIVER/AMENDMENT**

13.1 No breach of any provision of this Deed shall be waived or discharged except with the express written consent of the Parties.

13.2 No failure or delay by a Party to exercise any of its rights under this Deed shall operate as a waiver thereof and no single or partial exercise of any such right shall prevent any other or the further exercise of that or any other right.

13.3 No variation to this Deed shall be effective unless made in writing and signed by all the Parties.

14. **INDEPENDENT RIGHTS**

Each of the rights of the Parties hereto under this Deed are independent, cumulative and without prejudice to all other rights available to them, and the exercise or non-exercise of any such rights shall not prejudice or constitute a waiver of any other right of the Party, where under this Deed or otherwise.

15. **FURTHER ASSURANCE**

15.1 At all times after the date of this Deed, the Parties shall at their own expense execute all such documents (including the Novation Deed) and do such acts and things as may reasonably be required for the purpose of giving full effect to this Deed.

15.2 The Grantee undertakes to the Grantor that it shall do such acts and things as may be in its power to procure that the Target Companies execute the Novation Deed so that full effect may be given to the provisions of this Deed.

16. **NOTICES**

16.1 Any notice, demand or other communication given or made under or in connection with the matters contemplated by this Deed shall be in writing and shall be delivered by hand or by courier or sent by electronic mail or air mail to:

The Grantor    -    Attention: Ng Puay Yee Annie

Address: Room 3312 Hong Kong Plaza, 188 Connaught Road West, Hong Kong

Email: Jessie.ng@pacificandes.com

The Grantee    -    Attention: Ivan Wong/ May Chan/ Amy Yuen

Address: 22/F South China Building, 1-3 Wyndham Street, Central, Hong Kong

Email:  ivan_wong@petersonhk.com/  mayc@petersonhk.com/ amy_yuen@petersonhk.com

and shall be deemed to have been duly given or made as follows:

(a)    if delivered by hand or by courier, upon delivery at the address of the relevant Party;

13

(b)     if sent by first class post, two (2) Business Days after the date of posting;

(c)     if sent by air mail, three (3) Business Days after the date of posting; and

(d)     if sent by electronic mail when actually received by the intended recipient in readable form;

provided that if, in accordance with the above provision, any such notice, demand or other communication would otherwise be deemed to be given or made after 5.00 p.m. such notice, demand or other communication shall be deemed to be given or made at 9.00 a.m. on the next Business Day.

16.2    A communication to the Grantor which is delivered in accordance with clause 16.1 to the Designated Representative shall be deemed to have been sent to the Grantor.

16.3    A Party may notify the other Parties to this Deed of a change to its name, relevant addressee, address (including e-mail address) for the purposes of clause 16.1 provided that such notification shall only be effective:

(a)     on the date specified in the notification as the date on which the change is to take place; or

(b)     if no date is specified or the date specified is less than five (5) Business Days after the date on which notice is given, the date falling five (5) Business Days after notice of any such change has been given.

## 17.    COUNTERPARTS

This Deed may be executed in any number of counterparts, each of which when executed shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement.

## 18.    THIRD PARTY RIGHTS

18.1    Except as set forth in clause 18.2 below, the Parties do not confer any rights of remedies upon any person other than the Parties to this Deed and their respective successors and permitted assigns.

18.2    The Parties hereby designate Affiliates of the Grantee and the Target Group as third-party beneficiaries of this Deed (collectively, the "**Third Parties**" and each a "**Third Party**").

18.3    The Parties may amend, vary or terminate this Deed in such a way as may affect any rights or benefits of any Third Party which are directly enforceable against the Parties without the consent of such Third Party.

18.4    Any Third Party entitled to enforce any rights or benefits conferred on it by this Deed may not veto any amendment, variation or termination of this Deed which is proposed by the Parties.

14

19. **GOVERNING LAW AND JURISDICTION**

19.1   This Deed, and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this Deed or its formation (including any non-contractual disputes or claims) shall be governed by and construed in accordance with the laws of Hong Kong S.A.R.

19.2   Each of the Parties to this Deed irrevocably agrees that the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**") shall maintain non-exclusive jurisdiction over any disputes which arise between the Parties. Each Party (a) agrees to submit to such jurisdiction, (b) to waive any defense based on the location or jurisdiction of such court, and (c) to consent to the Bankruptcy Court hearing and finally determining any action or proceeding with respect to this Deed. To the extent the Bankruptcy Court declines to exercise jurisdiction for any reason, each Party consents that jurisdiction is appropriate before the New York state and federal courts sitting in the Borough of Manhattan.

**IN WITNESS** whereof this Deed has been executed on the date first above written.

**SCHEDULE 1**
**FORM OF EXERCISE NOTICE**

**[On the letterhead of the Grantee]**

To:

Dear Sirs

**RE: CALL OPTION DEED, DATED _____, MADE BETWEEN PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI) LIMITED AND ASIA UNION LIMITED (THE "DEED")**

We refer to the Deed and to the Option granted by you to us under clause 2 of the Deed.

We hereby give notice pursuant to clause 4.1 of the Deed that we exercise the Option granted by you in respect of all of the Option Securities (as defined in the Deed).

Yours faithfully

………………………………………….

For and on behalf of Asia Union Limited

**SCHEDULE 2**
**PURCHASED DEBT CLAIMS**

**SCHEDULE 3**
**PROPERTIES**

|  | **Property Owner** | **Property Address** |
|---|---|---|
| 1. | Rawley Trading Limited | Flat A1, 20/F & Roof, Blk A, Evergreen Villa, 43 Stubbs Road and Car Parking Space No. 108, Hong Kong |
| 2. | Fastact Group Limited | Block 1, 14/ F and Car Port Space No. G122 and Car Parking Space No. 250, Repulse Bay Garden, Nos. 18-40 Belleview Drive, Hong Kong |
| 3. | Chasterton Group Limited | House No. 36, Manderly Garden, 48 Deep Water Bay Road, Hong Kong |
| 4. | Pacific Andes Enterprises (Hong Kong) Limited | House No. 34, Manderly Garden, 48 Deep Water Bay Road, Hong Kong |
| 5. | Bonaire Development Limited | Unit 8B and Car Parking Space No. L39 on Lower Ground Floor, Celestial Garden, 5 Repulse Bay Road, Hong Kong |
| 6. | Grandluck Enterprises Limited | Apartment B33, 2/F, Block B3, Woodgreen Estate, 5 Shouson Hill Road, Hong Kong & Car parking Space No.10 & 20 |

## SCHEDULE 4
## NET LIABILITIES ADJUSTMENT

### Part A -  NET LIABILITIES STATEMENT

1.   The Net Liabilities Statement will include all elements of the Completion Net Liabilities Amount and, in relation to each member of the Target Group, include a statement of the constituent parts of the Completion Net Liabilities Amount definition.

2.   The Net Liabilities Statement will be prepared on the basis that it relates to each member of the Target Group as a going concern and exclude any effects of the change of control or ownership of any of them contemplated by the Transaction Documents.

### Part B -  METHOD OF PREPARATION

1.   The Grantor will, as soon as reasonably practicable after the date of Completion, prepare a draft of the Net Liabilities Statement.

2.   The Grantor on the one hand, and the Grantee and the Grantee's Accountants on the other, will be entitled to review the books, records and papers of the other of them as they relate to each member of the Target Group and which are relevant for the purposes of preparing or, as the case may be, evaluating the Net Liabilities Statement. The Grantor will, and will procure that each member of the Target Group, on the one hand, and the Grantee will, and will procure that the Grantee's Accountants (if appropriate), on the other hand will, provide to the other of them all reasonable assistance to prepare or, as the case may be evaluate, the Net Liabilities Statement, including the provision of access to all working papers and relevant personnel of each of their respective entities referred to in this paragraph 2.

3.   The Grantor shall procure that the draft Net Liabilities Statement is delivered to the Grantee within twenty (20) Business Days after the date of Completion.

4.   The Grantee will notify the Grantor within ten (10) Business Days after receipt of the draft Net Liabilities Statement whether the Grantee agrees with the draft Net Liabilities Statement. If the Grantee does not so agree, such notification by the Grantee must give reasonable details of any disagreement (including the basis for such disagreement) and the adjustments (including the quantification of the item) which, in the opinion of the Grantee, should be made (the "**Disputed Details**"). In the case of disagreement, the Grantor and the Grantee will meet and discuss the Disputed Details in order to seek to reach agreement upon such adjustments (if any) to the draft Net Liabilities Statement as are acceptable to the Grantee and the Grantor in order to put such draft document in final form.

5.   If the Grantee does not notify the Grantor of any Disputed Details within the said ten (10) Business Day period, the draft Net Liabilities Statement will constitute the Net Liabilities Statement for the purposes of this Deed.

6.   If the Grantee and the Grantor are unable to resolve all matters in dispute within ten (10) Business Days after the notification by the Grantee in accordance with paragraph 4 above of the Disputed Details (the "**Dispute Resolution Period**"), the unresolved

Disputed Details (but no other matters) will be referred for determination on the application of either the Grantee or the Grantor to an independent firm of internationally recognised chartered accountants which is nominated by written agreement between the Grantee and the Grantor (the "**Independent Accountant**").

7.  If reference is made to the Independent Accountant, the Independent Accountant will state what adjustments (if any) are necessary to the draft Net Liabilities Statement in order for each of the unresolved Disputed Details to have been prepared in accordance with this Deed. Such draft Net Liabilities Statement will, subject to and following any such adjustments, constitute the Net Liabilities Statement for the purposes of this Agreement.

8.  If there is a referral to an Independent Accountant the following provisions shall apply to its appointment and its determination:

    (A)  the Grantee and/or Grantor shall promptly notify the Independent Accountant of its selection and shall request it to confirm within five (5) Business Days whether or not it is willing and able to accept the appointment. If such firm is either unwilling or unable to accept such appointment, or shall not have confirmed its willingness and ability to accept such appointment within the said five (5) Business Day period (or such extended period as the Grantee and the Grantor may agree in writing), then an alternative independent firm of internationally recognised chartered accountants shall be nominated in accordance with paragraph 6 above and this paragraph 8 shall apply to such appointment;

    (B)  the Grantee and the Grantor shall act in good faith to agree as soon as reasonably practicable the terms on which the Independent Accountant shall act (and for these purposes acting in good faith shall include agreeing to any commercially reasonable terms proposed by the Independent Accountant (including without limitation its fees, costs and any limitations on its liability));

    (C)  the Grantee and/or the Grantor shall be entitled to make submissions and shall do so as soon as reasonably practicable in writing to the Independent Accountant, together with any relevant documents required by the Independent Accountant for the purposes of making its determination in accordance with this Schedule;

    (D)  the Independent Accountant will determine its own procedure and will determine only whether any of the adjustments proposed by the Grantee in the Disputed Details and which remain in dispute are correct in whole or in part, and, if applicable, what alterations should be made to the Net Liabilities Statement in order to correct the relevant inaccuracies in them;

    (E)  the Grantor and the Grantee will use all reasonable endeavours to procure that the Independent Accountant is given all such assistance and access to documents and other information, promptly after request, as it may reasonably require in order to make its determination;

(F)    save in the case of fraud or manifest error, the determination by the Independent Accountant will be final and binding on all concerned and will be given by the Independent Accountant acting as an expert and not as an arbitrator;

(G)    the costs of the Independent Accountant (including its expenses and the costs of any advisers to the Independent Accountant) will be borne by the Grantor; and

(H)    if the Independent Accountant fails to notify the Grantee and the Grantor of its determination pursuant to this paragraph 8 within fifteen (15) Business Days of its appointment date (or such different time period as agreed by the Grantee and the Grantor in writing).

**SCHEDULE 5**
**TARGET GROUP DEBT**

**SCHEDULE 6**
**FORM OF NOVATION DEED**

## EXECUTION PAGES

<u>**The Grantor**</u>

| | |
|---|---|
| Executed and delivered as a deed by | ) |
| **PACIFIC ANDES INTERNATIONAL** | ) |
| **HOLDINGS (BVI) LIMITED** acting by | |
| a director | |

in the presence of:

Name of witness:
Signature of witness:
Address:

**EXECUTION PAGES**

<u>**The Grantee**</u>

Executed and delivered as a deed by                    )
**ASIA UNION LIMITED** acting by a director             )

in the presence of:

Name of witness:
Signature of witness:
Address

# DEED OF NOVATION

**THIS DEED OF NOVATION** is entered into on the      day of            2021 between:

(1)    **ASIA UNION LIMITED** (Company Registration No. 3000497), a company incorporated in Hong Kong, with its registered office at 22/F South China Building, 1-3 Wyndham Street, Central, Hong Kong (the "**Investor**");

(2)    **PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI) LIMITED** a company incorporated in the British Virgin Islands, with its registered office at 3rd Floor, J&C Building, PO Box 362, Road Town, Tortola, British Virgin Islands VG 1110 (the "**PAIH BVI**");

(3)    **HENG HOLDINGS (BVI) LIMITED,** a company incorporated in the British Virgin Islands, with its registered office at 3rd Floor, J&C Building, PO Box 362, Road Town, Tortola, British Virgin Islands VG 1110 ("**Heng Holdings**");

(4)    **RAWLEY TRADING LIMITED**, a company incorporated in the British Virgin Islands, with its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG 1110, British Virgin Islands ("**RTL**");

(5)    **FASTACT GROUP LIMITED**, a company incorporated in the British Virgin Islands, with its registered office at Portcullis Chambers, 4th Floor, Ellen Skelton Building, 3076 Sir Francis Drake Highway, Road Town, Tortola, VG 1110, British Virgin Islands ("**FGL**");

(6)    **CHASTERTON GROUP LIMITED**, a company incorporated in the British Virgin Islands, with its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, British Virgin Islands VG 1110 ("**Chasterton**");

(7)    **BONAIRE DEVELOPMENTS LIMITED**, a company incorporated in the British Virgin Islands, with its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG 1110, British Virgin Islands ("**BDL**");

(8)    **GRANDLUCK ENTERPRISES LIMITED**, a company incorporated in the British Virgin Islands, with its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG 1110, British Virgin Islands ("**Grandluck**"); and

(9)    **PACIFIC ANDES ENTERPRISES (HONG KONG) LIMITED** (Company Registration No. 0033853), a company in Hong Kong, with its registered office at Room 3312 Hong Kong Plaza, 186 Connaught Road West, Hong Kong ("**PAE HK**").

Heng Holdings, RTL, FGL, Chasterton, BDL, Grandluck, and PAE HK shall collectively be referred to as the "**Target Group**", and each shall be referred to as a "**Target Company**".

Each of the Investor, PAIH BVI and Target Company shall be referred to as a "**Party**", and collectively they shall be referred to as the "**Parties**".

**WHEREAS**:

(A)    Each Target Company had in the ordinary course of business entered into various loans with PAIH BVI (collectively, the "**Intercompany Loans**" and each an "**Intercompany Loan**").

(B)    The Appendix set out details of the Intercompany Loan balances owed by each Target Company to PAIH BVI (collectively, the "**Intercompany Loan Balances**").

(C)     The Parties have agreed that PAIH BVI will novate all of its rights, benefits, duties and obligations under, arising out of, and in connection with, the various Intercompany Loan Balances to the Investor.

**IT IS HEREBY AGREED** as follows:

**1.      NOVATION**

With effect on and from the date of this Deed (the "**Effective Date**") and in consideration of the mutual representations, warranties and covenants contained in this Deed and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the Parties), PAIH BVI hereby unconditionally, irrevocably and absolutely novates all of its rights, benefits, duties and obligations under, arising out of, and in connection with, the various Intercompany Loan Balances (the "**Novated Rights and Obligations**") to the Investor (such that each of the Target Companies and the Investor shall assume duties and obligations towards one another and/or acquire rights and benefits against one another which differ from the Novated Rights and Obligations only insofar as the Investor has assumed and/or acquired the same in place of PAIH BVI), and each Target Company, unconditionally, irrevocably and absolutely acknowledges and consents to the novation of the Novated Rights and Obligations, on the condition that PAIH BVI irrevocably and unconditionally releases and discharges each Target Company, from its rights, duties, liabilities, and obligations owing or with respect to PAIH BVI under, arising out of, or in connection with, the Intercompany Loan Balances.

**2.      ACKNOWLEDGEMENT**

Each of the Target Companies and PAIH BVI acknowledges that, as at the date of this Deed and as of the Effective Date, the Intercompany Loan Balances set out in the Appendix are true and accurate, and that other than the Intercompany Loan Balances there are no other amounts due and owing by any Target Company to PAIH BVI.

**3.      FURTHER ASSURANCE**

Each Party to this Deed shall at the request of any other Party execute and perform all such actions and do such things reasonably necessary to carry out the provisions of this Deed.

**4.      GENERAL**

4.1     This Deed may be executed in any number of counterparts, and by the Parties on separate counterparts, but will not be effective until all the Parties have executed at least one counterpart but all the counterparts will together constitute one and the same instrument. Each counterpart will constitute an original of this Deed.

4.2     In the event that any provision of this Deed is void or unenforceable by reason of any provision of applicable law, such provision will be deemed to be modified to the extent necessary to render it legal, valid and enforceable.  If no such modification is possible, it will be deleted and the remaining provisions of this Deed will continue in full force and effect and if necessary, be so amended as is necessary to give effect to the spirit of this Deed so far as possible.

4.3     Save as expressly provided for in this Deed, the Parties do not intend that any term of this Deed is enforceable under the Contracts (Rights of Third Parties) Ordinance (Cap. 623) of Hong Kong by a person who is not a party to this Deed and the consent of any person who is not a party to this Deed shall not be required for the amendment, variation, rescission or termination of the same.

**5.      GOVERNING LAW**

5.1 This Deed, and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this Deed or its formation (including any non-contractual disputes or claims) shall be governed by, and construed in accordance with, the laws of Hong Kong S.A.R.

5.2 Each of the Parties to this Deed irrevocably agrees that the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**") shall maintain non-exclusive jurisdiction over any disputes which arise between the Parties. Each Party (a) agrees to submit to such jurisdiction, (b) to waive any defense based on the location or jurisdiction of such court, and (c) to consent to the Bankruptcy Court hearing and finally determining any action or proceeding with respect to this Deed. To the extent the Bankruptcy Court declines to exercise jurisdiction for any reason, each Party consents that jurisdiction is appropriate before the New York state and federal courts sitting in the Borough of Manhattan.

*[Signature Pages to Follow]*

**APPENDIX**
**Outstanding Intercompany Loan Balances**

| Borrower | Lender | Amount (HKD) |
|---|---|---|
| Heng Holdings | PAIH BVI | […] |
| RTL | PAIH BVI | […] |
| FGL | PAIH BVI | […] |
| Chasterton | PAIH BVI | […] |
| BDL | PAIH BVI | […] |
| Grandluck | PAIH BVI | […] |
| PAE HK | PAIH BVI | […] |

**IN WITNESS WHEREOF** each Party has executed and delivered this Deed on the date which first appears above.

**THE INVESTOR**

Executed and Delivered as a Deed by )
)
)
)
**ASIA UNION LIMITED** acting by a director )
) ...........................................................

in the presence of:

Witness signature .......................................

Name: .......................................

Address: .......................................

.......................................

**PAIH BVI**

Executed and Delivered as a Deed by )
)
)
**PACIFIC ANDES INTERNATIONAL HOLDINGS (BVI)** )
**LIMITED** acting by a director )
) ...........................................................

in the presence of:

Witness signature .......................................

Name: .......................................

Address: .......................................

.......................................

**TARGET GROUP ENTITIES**


**HENG HOLDINGS**

Executed and Delivered as a Deed by                    )
                                                       )
                                                       )
**HENG HOLDINGS (BVI) LIMITED** acting by a director   )
                                                       )    ............................................................
in the presence of:

Witness signature          ........................................

Name:                      ........................................

Address:                   ........................................

                           ........................................


**RTL**

Executed and Delivered as a Deed by                    )
                                                       )
                                                       )
**RAWLEY TRADING LIMITED** acting by a director        )
                                                       )    ............................................................
in the presence of:

Witness signature          ........................................

Name:                      ........................................

Address:                   ........................................

                           ........................................

*[Signature Page to Deed of Novation of Intercompany Loans]*

**FGL**

Executed and Delivered as a Deed by           )
           )
           )
           )

**FASTACT GROUP LIMITED** acting by a director    )

in the presence of:           )   ...........................................................

Witness signature       ......................................

Name:                 ......................................

Address:          ......................................

                     ......................................


**CHASTERTON**

Executed and Delivered as a Deed by           )
           )
           )
           )

**CHASTERTON GROUP LIMITED** acting by a director    )

in the presence of:           )   ...........................................................

Witness signature       ......................................

Name:                 ......................................

Address:          ......................................

                     ......................................

**BDL**

Executed and Delivered as a Deed by )
)
)
)
**BONAIRE DEVELOPMENTS LIMITED** acting by a director )
) ..........................................................
in the presence of:

Witness signature ......................................

Name: ......................................

Address: ......................................

......................................

**GRANDLUCK**

Executed and Delivered as a Deed by )
)
)
)
**GRANDLUCK ENTERPRISES LIMITED** acting by a director )
) ..........................................................
in the presence of:

Witness signature ......................................

Name: ......................................

Address: ......................................

......................................

*[Signature Page to Deed of Novation of Intercompany Loans]*

**PAE HK**

| | |
|---|---|
| Executed and Delivered as a Deed by | ) |
| | ) |
| | ) |
| | ) |
| **PACIFIC ANDES ENTERPRISES (HONG KONG) LIMITED** | ) |
| acting by a director | ) |
| | )      ............................................................ |
| in the presence of: | |

Witness signature         ......................................

Name:                    ......................................

Address:                 ......................................

                         ......................................

*[Signature Page to Deed of Novation of Intercompany Loans]*

# SALE AND PURCHASE AGREEMENT

## DATED _____ 2021

## BETWEEN

## [•]

### as Seller

## AND

## [ASIA UNION LIMITED]

### as Purchaser

# CONTENTS

**CLAUSE**                                                                                                    **PAGE**

1.  INTERPRETATION AND CONSTRUCTION ............................................................3
2.  SALE AND PURCHASE ...................................................................................11
3.  CONDITIONS TO COMPLETION .....................................................................11
4.  SELLER'S COVENANTS ................................................................................12
5.  COMPLETION ................................................................................................14
6.  PAYMENT AND PAYMENT ADMINISTRATION ...............................................15
7.  RECOVERIES NET AMOUNT ........................................................................16
8.  REPRESENTATIONS AND WARRANTIES .......................................................17
9.  NON-RELIANCE AND INDEPENDENT INVESTIGATION ................................18
10. CONFIRMATIONS ..........................................................................................21
11. FURTHER ASSURANCE .................................................................................21
12. EXPENSES AND TAXES ................................................................................22
13. TERMINATION ...............................................................................................23
14. SPECIFIC PERFORMANCE ...........................................................................23
15. CHANGES TO THE PARTIES .........................................................................24
16. WAIVERS AND REMEDIES CUMULATIVE .....................................................24
17. CONFIDENTIALITY ........................................................................................24
18. SEVERABILITY ..............................................................................................25
19. COUNTERPARTS ...........................................................................................25
20. NOTICES ........................................................................................................26
21. THIRD PARTY RIGHTS ..................................................................................27
22. AMENDMENTS ...............................................................................................27
23. ENTIRE AGREEMENT ....................................................................................27
24. GOVERNING LAW AND JURISDICTION ........................................................27
SCHEDULE 1 PAIH DEBT DOCUMENTS ...............................................................28
SCHEDULE 2 BANK ACCOUNT DETAILS .............................................................29
SCHEDULE 3 PROPERTIES ...................................................................................30
SCHEDULE 4 PAIH AFFILIATES ............................................................................31
SCHEDULE 5 NOTICE OF TRANSFER ..................................................................34
SCHEDULE 6 NOTICE OF ASSIGNMENT .............................................................35

**THIS AGREEMENT** is dated _____ 2021.

**BETWEEN:**

(1)      [•] (the "**Seller**"); and

(2)      **[ASIA UNION LIMITED]**, a company incorporated in [•], with its registered office at [•] (the "**Purchaser**" which expression shall include its successors and assigns in accordance with their respective interests).

**WHEREAS:**

(a)      The Purchaser intends to enter into agreement(s) with the holders of the Debt Claims (as defined below) to purchase from such holders the relevant Debt Claims for cash consideration.

(b)      The Purchaser has, on or about the date hereof, entered into the Settlement and Framework Agreement (as defined below). Simultaneous with the purchase of the Debt Claims in accordance with the terms of the relevant Debt Purchase Agreement (as defined below), the Purchaser intends to enter into a call option deed (the "**Call Option Deed**") with Pacific Andes International Holdings (BVI) Limited to acquire an exclusive option ("**Call Option**") to purchase the entire issued and paid up share capital of Heng Holdings (BVI) Limited and Fastact Group Limited.

(c)      Following the completion of the Group Restructuring (as defined in the Settlement and Framework Agreement), Fastact Group Limited and certain Subsidiaries of Heng Holdings (BVI) Limited, namely, Bonaire Developments Limited, Chasterton Group Limited, Grandluck Enterprises Limited, Pacific Andes Enterprises (Hong Kong) Limited and Rawley Trading Limited, hold the title to certain property assets, the details of which are set out in Schedule 3 (*Properties*) (the "**Property Assets**").

(d)      The Purchaser may exercise the Call Option in accordance with the terms of the Call Option Deed following acquisition of the Purchased Assets and the other Debt Claims.

**(e)**      Subsequent to the exercise of the Call Option in accordance with the terms of the Call Option Deed, the Purchaser may at its sole discretion, decide to operate the Property Assets, or effect a sale or disposal of the Property Assets (whether by way of sale or otherwise) to one or more persons (who may, for the avoidance of doubt, be the existing tenant(s) renting the Property Assets).

**IT IS AGREED** as follows:

1.      **INTERPRETATION AND CONSTRUCTION**

1.1      **Definitions**

In this Agreement:

"**Affiliate**" means, in relation to any person, any other person controlling, controlled by or

under common control with that person or persons. For the purposes of this definition, "**control**" when used with respect to any person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "**controlling**" and "**controlled**" shall be construed accordingly. For the avoidance of doubt, an entity will control a second entity or entities if it: (a) owns or controls, directly or indirectly, at least 50% of the voting equity of the second entity or entities; or (b) it possesses, directly or indirectly, the power to direct or cause the direction of the affairs or management of the second entity or entities, whether through the ownership of voting securities, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of management or similar body governing the affairs of the second entity or entities.

"**Assignment**" has the meaning given to such term in Clause 1.4 of this Agreement.

"**Benefit Plan**" means an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, a "plan" as defined in Section 4975 of the Code or any entity whose assets include (for purposes of United States Department of Labour Regulations Section 2510.3-101 as modified by Section 3(42) of ERISA or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in British Virgin Islands, Hong Kong and New York City.

"**Call Option**" shall have the meaning given to such term at recital (b).

"**Call Option Deed**" shall have the meaning given to such term at recital (b).

"**Code**" means the United States Internal Revenue Code of 1986 and the rules and regulations promulgated under it.

"**Collateral**" means any property or assets, whether real, personal or equitable interests, tangible or intangible and whether now owned or acquired or created before or after the date of this Agreement, over which a Security Interest has been, or is purported to have been, granted for the benefit of the Seller under or in connection with any of the PAIH Debt Documents and/or in relation to the PAIH Debt (or any part thereof).

"**Completion**" means the completion of the Assignment pursuant to Clause 5.

"**Completion Date**" means the date mutually agreed by the Parties prior to the Long Stop Date and on which the Assignment is to occur on the terms and subject to the conditions of this Agreement.

"**Debt Claims**" shall have the meaning given to such term in the Settlement and Framework Agreement.

"**Debt Purchase Agreement**" means each sale and purchase agreement entered into or to be

entered into between the Purchaser and each PAIH Priority Creditor, Deferred Priority Creditor, Mandatory PAIH Unsecured Creditor and Optional PAIH Unsecured Creditor, and "**Debt Purchase Agreements**" refers to all such agreements.

"**Deferred Priority Creditor**" shall have the meaning given to such term in the Settlement and Framework Agreement.

"**Distribution**" means all cash payments, interest, fees, notes, securities and/or other property, proceeds or assets or any other form of payment or compensation paid or distributed under or in respect of any of the Purchased Assets (including, without limitation, in respect of principal, interest and fees or any other form of cash, payment in kind or other payment or satisfaction made under or in connection with any of the Purchased Assets howsoever described or arising).

"**Dollars**" and "**US$**" means the lawful currency for the time being of the United States of America.

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974 and the rules and regulations promulgated under it.

"**FATCA**" means:

(a)    sections 1471 to 1474 of the US Internal Revenue Code of 1986 or any associated regulations;

(b)    any treaty, law, regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)    any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"**FATCA Deduction**" means a deduction or withholding from a payment under a Transaction Document as may be required by FATCA.

"**FATCA Exempt Party**" means a party that is entitled to receive payments free from any FATCA Deduction.

"**Group**" means PAIH and its Subsidiaries for the time being and such other company(ies) as will from time to time become a Subsidiary of PAIH.

"**Long Stop Date**" shall have the meaning given to such term in the Settlement and Framework Agreement.

"**Mandatory PAIH Unsecured Creditor**" shall have the meaning given to such term in the Settlement and Framework Agreement.

"**Non-PAIH Obligor**" means any person liable or against whom a claim, demand, obligation, liability and cause of action of whatever kind or nature, whether known or unknown, liquidated or unliquidated, contingent or certain, asserted or unasserted is made or asserted or may or could be made or asserted under or in respect of the Retained Debt Documents (or any of them).

"**Obligor**" means any person liable or against whom a claim is made or may or could be made under or in respect of the PAIH Debt Documents (or any of them).

"**Optional PAIH Unsecured Creditor**" shall have the meaning given to such term in the Settlement and Framework Agreement.

"**PAIH**" means Pacific Andes International Holdings Limited, a company organised under the laws of Bermuda.

"**PAIH Affiliates**" means PAIH and all of its Affiliates (excluding Pacific Andes Resources Development Limited and entities owned directly or indirectly by Pacific Andes Resources Development Limited), as more specifically set out in Schedule 4 (*PAIH Affiliates*).

"**PAIH Debt**" means all of the Seller's rights, interests and benefits (whether direct or indirect) in and under each of the PAIH Debt Documents, but excluding, for the avoidance of doubt, any of the Seller's obligations and liabilities in connection therewith.

"**PAIH Debt Assets**" means all rights, benefits, title, interests and claims (whether legal, equitable or beneficial and whether now or hereafter in existence) of the Seller under or in respect of the PAIH Debt, including (i) proofs of claim numbers [•] and (ii) all of the Seller's other rights, interests, benefits and claims (howsoever described or arising) in, under and to:

(a)     each of the PAIH Debt Documents;

(b)     any amendments, Restructuring or restatement of any of the PAIH Debt Documents in any form including any replacement or substitution thereof with any other debt or other asset pursuant to any Restructuring or otherwise;

(c)     all claims, suits, causes of action, and any other right of the Seller whether known or unknown, against any Obligor or any Affiliate of any Obligor or against any other person under or in respect of, relating to or arising out of any of the PAIH Debt Documents or against any of the respective directors, shareholders, officers, employees, Subsidiaries, Affiliates, agents, representatives, contractors, advisors, agents or representatives of any Obligor, or any other person that in any way is based upon, arises out of, or is related to, or attributable to any of the foregoing, including all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of the Seller against any attorney, accountant, financial advisor, agent, representative or other person arising directly or indirectly, whether by contract, law or otherwise under or in respect of, relating to or arising out of any of the PAIH Debt Documents;

(d)     all cash, securities, or other property, and all set-offs and recoupments, in each case received and applied by or for the account of the Seller on or after the date of this Agreement under or in respect of, relating to or arising out of any PAIH Debt Document, including all Distributions obtained by or through enforcement, redemption, consummation of a plan of reorganisation, Restructuring, liquidation or otherwise relating to the PAIH Debt Documents and all cash, securities, interest, dividends and other property, assets or undertakings that may be exchanged for, or distributed or collected with respect to, any of the foregoing; and

(e)     all proceeds of the above howsoever arising,

but, for the avoidance of doubt, excluding (i) any payments in respect of the PAIH Debt received by the Seller on or before the date hereof, (ii) the Purchase Price and any other amount, right, remedy or benefit received by or available to the Seller under this Agreement, (iii) any of the Seller's rights, title, benefits, interests and remedies in and relating to any Retained Debt Document and any claims, suits, causes of action, or any other right, remedy or benefit of the Seller whether known or unknown against the persons referred to in paragraph (c) of the definition of "**Related PAIH Debt Assets**", and (iv) any of the Seller's obligations and liabilities under or in respect of the PAIH Debt.

"**PAIH Debt Documents**" means all agreements and other documents identified in Schedule 1 (*PAIH Debt Documents*) and all other agreements and documents entered into thereunder or in connection therewith or in connection with the PAIH Debt Assets and the Related PAIH Debt Assets, but excluding, for the avoidance of doubt, any guarantees and/or security documents executed in connection therewith (in respect of which the provisions of Clause 4 (*Seller's Covenants*) shall apply).

"**PAIH Material Group**" means PAIH, Pacific Andes International Holdings (BVI) Limited, Heng Holdings (BVI) Limited and the Subsidiaries of Heng Holdings (BVI) Limited.

"**PAIH Priority Creditor**" shall have the meaning given to such term in the Settlement and Framework Agreement.

"**Party**" means a party to this Agreement and "**Parties**" shall be construed accordingly.

"**Pre-Completion Conditions**" means the conditions set out in Clause 3.1 and "**Pre-Completion Condition**" shall mean any one of them.

"**Property Assets**" shall have the meaning given to such term at recital (c).

"**PTE**" means a prohibited transaction class exemption issued by the United States Department of Labour.

"**Purchase Price**" means the amount identified in Schedule 2 (*Bank Account Details*).

"**Purchased Assets**" means the PAIH Debt Assets and the Related PAIH Debt Assets.

"**Receiving Account**" means the bank account for receipt of the Purchase Price as identified

in Schedule 2 (*Bank Account Details*).

**"Related PAIH Debt Assets"** means:

(a)    all claims, suits, causes of action, and any other right, remedy, interest or benefit of the Seller whether known or unknown, against:

    (i)    any Obligor or any Affiliate of any Obligor or any director, officer or employee of any Obligor or any such Affiliate of any Obligor or any other person in respect of, relating to or arising out of the existence of any of the PAIH Debt Documents and/or any of the PAIH Debt Assets, including (without limitation) under or in connection with any proposed or actual Restructuring of any claims under or in relation to any of the PAIH Debt Documents; and/or

    (ii)    any of the directors, shareholders, officers, employees, Subsidiaries, Affiliates, agents, representatives, contractors, advisors or representatives of any Obligor or any Affiliate of any Obligor that in any way relate to the offering, entry into, incurrence of indebtedness under, performance, non-performance or Restructuring of any obligation expressed to be assumed under or in respect of, relating to or arising out of any of the PAIH Debt Documents and/or any of the PAIH Debt Assets or that could be claimed or asserted against any Obligor, any Affiliate of any Obligor or any director, officer or employee of any Obligor or any such Affiliate of any Obligor or any person signatory to or in any way involved in the offering, entry into, incurrence of indebtedness under, performance, non-performance or Restructuring of any claims under any of the PAIH Debt Documents; and/or

    (iii)    any other person whatsoever that in any way is based upon, arises out of, or is related to, or attributable to any of the foregoing, including all claims (including contract claims, tort claims, breach of duty claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right or remedy (howsoever described or arising) of the Seller against any director or officer or employee of any Obligor, any Affiliate or Subsidiary of any Obligor, any attorney, accountant, financial advisor, agent, representative or other person arising directly or indirectly, whether by contract, tort, law or otherwise, under or in respect of, relating to or arising out of any of the PAIH Debt Documents and/or any Restructuring of any claims under or in connection with any of the PAIH Debt Documents; and

(b)    all rights, interests and claims (howsoever described) of the Seller in, under and to all proceeds of the above howsoever arising, but:

(c)    notwithstanding anything to the contrary in clauses (a) and (b) above and for the avoidance of doubt, the Parties agree and acknowledge that Related PAIH Debt Assets shall not include (1) any of the Seller's obligations and liabilities in and relating to the PAIH Debt, and (2) any of the Seller's rights, title, benefits, interests and remedies in

and relating to any Retained Debt Document or any claims, suits, causes of action, or any other right, remedy or benefit of the Seller whether known or unknown, against:

(i)   any Non-PAIH Obligor or any Affiliate of any Non-PAIH Obligor or any director, officer, employee, auditor or advisor of any Non-PAIH Obligor or any such Affiliate of any Non-PAIH Obligor or any other person, but excluding PAIH, that is any way connected to or arising out of the existence of any of the Retained Debt Documents;

(ii)  any of the directors, shareholders, officers, employees, Subsidiaries, Affiliates, agents, representatives, contractors, advisors or representatives of any Non-PAIH Obligor or any Affiliate of any Non-PAIH Obligor, but excluding PAIH, that in any way relate to the offering, entry into, incurrence of indebtedness under, performance or non-performance under or in connection with any of the Retained Debt Documents that could be claimed or asserted against any Non-PAIH Obligor, any Affiliate of any Non-PAIH Obligor or any director, officer or employee of any Non-PAIH Obligor or any such Affiliate of any Non-PAIH Obligor or any person signatory to or in any way involved in the offering, entry into, incurrence of indebtedness under, performance or non-performance of any claims under any of the Retained Debt Documents; and

(iii) any other person whatsoever that in any way is based upon, arises out of, or is related to, or attributable to any of the foregoing, including all claims (including contract claims, tort claims, breach of duty claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right or remedy (howsoever described or arising) of the Seller against any director, officer, employee, auditor or advisor of any Non-PAIH Obligor on any basis whatsoever, any Affiliate or Subsidiary of any Non-PAIH Obligor (but excluding PAIH), any attorney, accountant, auditor, financial advisor, agent, representative or other person arising directly or indirectly, whether by contract, tort, law or otherwise, under or in connection with any of the Retained Debt Documents,

and the fact that any claim, suit, cause of action, or any other right or remedy or benefit of the Seller and/or any of its Affiliates arising under or in connection with any of the Retained Debt Documents may also relate to potential claims, suits, causes of action, or any other right, remedy or benefit of the Seller arising under or in connection with any PAIH Debt Documents shall not preclude the Seller from seeking and obtaining the benefit of the same solely in respect of the Retained Debt Documents.

"**Restructuring**" means any rescheduling, restructuring, reorganisation, compromise or other arrangement affecting the indebtedness (or of any class of indebtedness) of any Obligor.

"**Retained Debt Documents**" means all agreements and other documents between the Seller and any person (including Pacific Andes Resources Development Limited, Pacific Andes Enterprises (BVI) Limited and Parkmond Group Limited) that are not PAIH Debt

Documents.

"**Security Interest**" means:

(a) any mortgage, pledge, lien, charge, assignment, hypothecation or security interest or any other agreement or arrangement having a similar effect;

(b) purchase or option agreement or option arrangement;

(c) subordination agreement or subordination arrangement; and

(d) agreements or arrangements to create or effect any of the foregoing.

"**Settlement and Framework Agreement**" means that certain Settlement and Framework Agreement dated as of [•] entered into between, among others, PAIH and the Purchaser, pursuant to which, the Purchaser agreed to, among other things, to enter into debt purchase agreements (substantially in the form of this Agreement).

"**Subsidiary**" means an entity of which a person has direct or indirect control or owns directly or indirectly more than 50% of the voting capital or similar right of ownership and control for this purpose means the power to direct the management and the policies of the entity whether through the ownership of voting capital, by contract or otherwise.

"**Surviving Provisions**" means Clauses 1 (*Interpretation and Construction*), 12 (*Expenses and Taxes*), 13 (*Termination*), 16 (*Waivers and Remedies Cumulative*), 17 (*Confidentiality*), 1.1(a)(i)(B) (*Severability*), 19 (*Counterparts*), 20 (*Notices*) and 24 (*Governing Law and Jurisdiction*).

"**Taxes**" means all forms of taxes, including without limitation, all forms of income tax, and services tax, stamp duty, value-added tax and all levies, imposts, duties, penalties, charges, fees, deductions and withholdings whatsoever charged or imposed by any relevant statutory, regulatory or governmental authority.

"**Transaction Documents**" shall have the meaning given to such term in the Settlement and Framework Agreement.

1.2 In this Agreement, unless the context requires otherwise, any reference:

(a) to a Clause or Schedule is to a reference to a clause of or a schedule to this Agreement;

(b) to this Agreement, any other document or any provision of this Agreement or that document is a reference to this Agreement, that document or that provision as in force for the time being or from time to time amended or supplemented in accordance with the terms of this Agreement or that document;

(c) to a person includes an individual, a body corporate, a partnership, any other unincorporated body or association of persons (whether or not having separate legal personality) and any state or state agency;

(d)     to a time of day is a reference to the time in Hong Kong S.A.R., unless expressly indicated otherwise;

(e)     to an enactment includes that enactment as it may be amended, replaced or re-enacted at any time, whether before or after the date of this Agreement, and any subordinate legislation made under it;

(f)     to an "**agreement**" includes any document or deed, an arrangement and any other kind of commitment;

(g)     to a "**right**" includes a power, a remedy and discretion; and

(h)     to "**transfer**" includes any assignment, conveyance, recovery, payment, right, title, interest, sale, pledge, encumbrance, abandonment, disposition, participation or other transfer (or the proceeds of any of the foregoing) and may be used either as a verb or a noun.

1.3     In this Agreement, unless the context otherwise requires:

(a)     words importing the plural include the singular and vice versa;

(b)     words importing a gender include every gender; and

(c)     the words "other", "including" and "in particular" do not limit the generality of any preceding words and are not to be construed as being limited to the same class as the preceding words where a wider construction is possible.

1.4     The headings and the table of contents in this Agreement do not affect its interpretation.

## 2.     SALE AND PURCHASE

2.1     On the terms of this Agreement and subject to the Pre-Completion Conditions being satisfied or, where applicable, waived by the Purchaser, the Seller hereby agrees to sell and assign in accordance with the provisions of this Agreement, the Purchased Assets to the Purchaser on the Completion Date, and the Purchaser hereby agrees to purchase and accept such sale and assignment of the Purchased Assets on the Completion Date, free from all Security Interests and with all rights, benefits and remedies attaching thereto or associated therewith (the "**Assignment**"). The Assignment hereunder is a separate and independent transaction governed solely by the terms of (or otherwise referred to in) this Agreement and shall not be affected by any other transaction entered into between the Parties.

## 3.     CONDITIONS TO COMPLETION

3.1     Completion is subject to and conditional on the following Pre-Completion Conditions being satisfied or, where applicable, waived, in accordance with this Agreement:

(a)     simultaneous closing under the Settlement and Framework Agreement;

(b)     the representations and warranties provided by the Seller under Clause 8.1 (*Seller's Representations and Warranties*) being true, accurate and not misleading in all respects as of the date of this Agreement and as of the Completion Date as though made on and as of that date;

(c)     the representations and warranties provided by the Purchaser under Clause 8.2 (*Purchaser's Representations and Warranties*) being true, accurate and not misleading in all respects as of the date of this Agreement and as of the Completion Date as though made on and as of that date;

(d)     no applicable laws or regulations having been enacted, amended or proposed which would prohibit, materially restrict or materially delay the implementation of the transactions contemplated by this Agreement;

(e)     execution and issuance of notice(s) of assignment (in the form of Schedule 6 (*Notice of Assignment*) hereto) by the Seller to each Obligor in respect of the sale and assignment of the Purchased Assets as contemplated by this Agreement;

(f)     provision of such documentation and other information and evidence by the Purchaser as the Seller reasonably requires in order for the Seller to carry out, and to be satisfied that it has complied with all necessary "know your customer" and/or other similar checks under all applicable laws and regulations; and

(g)     each of the Parties having, as of the Completion Date, performed and complied in all respects with all covenants and agreements contained in this Agreement which are required to be performed or complied with by it, on or prior to the Completion Date.

3.2     If, at any time, any Party becomes aware of a fact or circumstance that might prevent a Pre-Completion Condition from being satisfied, it shall promptly inform the other Party.

3.3     Save for Pre-Completion Conditions 3.1(c) and 3.1(f), the Purchaser shall be entitled in its sole discretion at any time before the Long Stop Date by notice in writing to the Seller to waive in whole or in part satisfaction of all or any of the Pre-Completion Conditions. For the avoidance of doubt, the Purchaser and the Seller may, at any time before the Long Stop Date, together agree in writing to waive in whole or in part satisfaction of all or any of Pre-Completion Conditions 3.1(c) and 3.1(f).

3.4     If any Pre-Completion Condition has not been satisfied (or waived by the Purchaser and/or the Seller, as applicable) on or before the Long Stop Date, this Agreement (save for the Surviving Provisions) will be terminated with immediate effect (unless otherwise agreed by the Parties in writing). For the avoidance of doubt, the Parties may agree to postpone Completion, for as many times as the Parties agree, to such other date as the Parties agree in writing.

4.     **SELLER'S COVENANTS**

**Pre-Completion Covenants**

4.1     Subject to Clause 4.2, the Seller agrees and undertakes that on or after the date of this Agreement, it shall not (directly or indirectly):

(a)     exercise or enforce (or instruct any person to take steps in the exercise or enforcement of) any of its rights, claims, remedies or privileges, or take, commence or continue any other suit, action or proceedings, against any Obligor or any other person under or in connection with any of the Purchased Assets or any guarantees and/or security documents executed in connection therewith, or against any of the associates or Affiliates or any of the employees, officers, directors, agents, promoters or shareholders of any Obligor under or in respect of, relating to or arising out of the Purchased Assets or any guarantees and/or security documents executed in connection therewith; and/or

(b)     demand any payment or satisfaction or instruct any person to demand any payment or satisfaction (whether in money or for money's worth) (including, but not limited to, in relation to any default interest thereunder) in respect of any of the Purchased Assets or any guarantees and/or security documents executed in connection therewith; and/or

(c)     otherwise require or support (or instruct any person to require or support) the enforcement of or against any Collateral (including, but not limited to, instructions to any account bank and/or trustee and/or security agent with respect to the deduction of amounts credited to debt service, interest reserve and/or accounts held with any account bank or collateral agent) granted in connection with any of the Purchased Assets or any guarantees and/or security documents executed in connection therewith; and/or

(d)     create any Security Interest or any other impediment of any nature whatsoever over or with respect to the Purchased Assets (or any of them) or any guarantees and/or security documents executed in connection therewith or otherwise do anything that might be contrary to or inconsistent with its obligations under this Agreement.

4.2     Until the occurrence of the Completion Date, Clause 4.1 does not prevent the Seller from exercising or enforcing (or instructing any person to take steps in the exercise or enforcement of) any of its rights, claims, remedies or privileges, or taking, commencing or continuing any other suit, action or proceedings, against any Obligor or any Obligor's Affiliates or Subsidiaries if the Seller's position is or will be prejudiced as a result of any act of any Obligor or any Obligor's Affiliates or Subsidiaries, including the filing of objections and seeking injunctive relief. In the event that the Seller takes any such action that would, in the Purchaser's reasonable judgement, materially impair the value of the Purchased Assets, the Purchaser shall be permitted to terminate this Agreement and neither the Purchaser nor the Seller shall incur any liability hereunder.

4.3     The obligations imposed on the Seller under or pursuant to Clause 4.1:

(a)     may be enforced against the Seller by any person who has provided a guarantee, or executed security documents, in connection with the PAIH Debt Documents,

notwithstanding the provisions of Clause 21; and

(b)   do not otherwise affect the rights the Seller pursuant to any Retained Debt Documents (other than any guarantees and/or security documents executed in connection with the Purchased Assets).

## 5.   COMPLETION

5.1   Unless this Agreement is previously terminated in accordance with its terms, Completion shall take place on the Completion Date following the satisfaction or waiver in accordance with Clause 3.3 of the Pre-Completion Conditions.

5.2   At Completion:

(a)   Payment for the Purchased Assets shall be made by way of one single payment of the Purchase Price to be made by the Purchaser on the Completion Date. The assignment of the Purchased Assets by the Seller to the Purchaser shall take place in accordance with Clause 5.3 (*Assignment of Purchased Assets*), against the Purchaser's provision of evidence to the Seller that the Purchase Price has been transferred or remitted by the Purchaser to the Seller's Receiving Account in Hong Kong via CHATS in accordance with Clause 6 (*Payment and Payment Administration*). The Seller agrees with the Purchaser to enter into such assignments and other agreements the Purchaser deems necessary or appropriate, acting reasonably, in order to fully and effectively assign the Purchased Assets to the Purchaser on the Completion Date.

(b)   On the Completion Date, the Purchase Price shall be paid by the Purchaser to the Receiving Account in consideration of the Seller making arrangements satisfactory to the Purchaser (in form and in substance) to comply with the terms of Clause 5.2(a) and Clause 5.3 (*Assignment of Purchased Assets*) to the satisfaction of the Purchaser (in form and substance).

5.3   Assignment of Purchased Assets

(a)   In consideration of the promises made by the Purchaser and upon the Purchaser's provision of evidence to the Seller that the payment of the Purchase Price has been made by the Purchaser to the Seller, the Seller unconditionally and irrevocably agrees and acknowledges that on the Completion Date:

(i)   the Seller assigns absolutely to the Purchaser all its legal and beneficial rights, title, interests, claims, remedies and other benefits (howsoever described or arising) under or in connection with the Purchased Assets, and, on and from the Completion Date, the Purchaser shall have and hold all legal and beneficial rights, title, interests, claims, remedies and other benefits (howsoever described or arising) under and in connection with the Purchased Assets to the same extent as if the Purchaser had been a beneficiary thereof instead and in the place of the Seller;

(ii)     (after giving effect to the assignment by the Seller to the Purchaser as set out in paragraph (i) above) the Seller agrees that the Obligors do not have any further obligations to the Seller but only to the Purchaser under or in connection with any of the Purchased Assets, whether present or future, actual or contingent, including its obligation to repay the PAIH Debt to the Seller; and

(iii)    in connection with the assignment referred to in paragraph (i) above, the Seller shall execute and deliver such further agreements, assignments and notices in such form(s) as may be specified by the Purchaser from time to time in its sole and exclusive discretion (acting reasonably) to effect the assignment of the full legal, equitable and beneficial title of all the Purchased Assets to the Purchaser including, without limitation, delivering or procuring the delivery to the Purchaser of any assignment or other documents, notices or writings of whatsoever nature required by the Purchaser (acting reasonably) to effect the assignment of legal, equitable and beneficial title to the Purchased Assets as contemplated by the transactions hereunder.

(b)     The Purchaser undertakes to use its reasonable endeavours to procure written confirmation from those persons for whom the Seller holds certain title documents in support of credit arrangements under the PAIH Debt Documents that they acknowledge and agree the assignment of the Purchased Assets and that the Seller is authorised to release the relevant title documents to the Purchaser (or as it directs), and to provide such written confirmations to the Seller on or before the Completion Date.

(c)     The Purchaser shall execute the notice of transfer in the form of Schedule 5 (*Notice of Transfer*) hereto and, upon Completion but in any event no later than five (5) Business Days thereafter, the Purchaser may file such notice or such other document with the United States Bankruptcy Court for the Southern District of New York in PAIH's bankruptcy case notifying the Bankruptcy Court and all other parties in interest of the sale of the Purchased Assets and the change in the identity of the holder of the debt claims under and in connection with the PAIH Debt Documents. The Seller waives any objection to the assignment of the Purchased Assets (including the proofs of claim) to the Purchaser and waives any notice or hearing requirements imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure. The Seller acknowledges and understands, and hereby stipulates, that an order of the United States Bankruptcy Court for the Southern District of New York may be entered without further notice to the Seller assigning to the Purchaser the Purchased Assets (including the proofs of claim) and recognizing the Purchaser as the sole owner and holder of the Seller's interest in the proofs of claim.

## 6.     PAYMENT AND PAYMENT ADMINISTRATION

6.1     Payment

(a)     The Purchaser shall pay to the Receiving Account, for the account of the Seller,

without any set-off, counter-claim or deduction (whether for bank charges or otherwise), the Purchase Price on the Completion Date. The Parties hereby irrevocably acknowledge and agree that payment of the Purchase Price to, and receipt in full and cleared funds in, the Receiving Account in accordance with the terms of this Agreement shall constitute full and complete settlement of the payment of the Purchase Price hereunder and the Purchaser shall promptly provide the Seller with evidence of the transfer or remittance of the Purchase Price into the Receiving Account in Hong Kong via CHATS. The Purchaser shall have no responsibility for, involvement in, or liability with respect to, any such funds once such payment has been paid into the Receiving Account.

(b)     The Purchaser shall procure that all payments made by it to Seller under this Agreement are made free and clear of any restriction or condition and are made without any deduction, withholding or set-off whatsoever, including without prejudice to the generality of the foregoing, for or on account of any Taxes unless the Purchaser is required by law to make such a payment subject to a deduction or withholding, in which case the relevant payment in respect of which such deduction or withholding is required to be made shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Seller receives and retains (free from any liability in respect of any such deduction or withholding) a net sum equal to the sum which it would have received and so retained had no such deduction or withholding been made or been required to be made.

6.2     Currency and Business Day

Payments under this Agreement in relation to the Purchased Assets must be made in Dollars on the due date at such times and in such funds as are customary at the time for settlement of transactions in such currency in the place of payment. If the payment is due under this Agreement on a day which is not a Business Day, the due date for the payment shall instead be the immediately following Business Day.

7.     **RECOVERIES NET AMOUNT**

7.1     Receipt of Distributions

Provided that the Assignment has occurred, any and all Distributions received or recovered by the Seller on or after the Completion Date in respect of any of the Purchased Assets shall for all purposes of this Agreement form part of the Purchased Assets and shall be held on trust by the Seller for the Purchaser immediately upon receipt.

7.2     Transfer of Distributions

(a)     If any Distribution is received or recovered by the Seller on or after the Completion Date, but provided that the Assignment has occurred, the Seller shall pay or transfer such Distribution to the Purchaser without set-off, counterclaim or any deduction whatsoever within two (2) Business Days of actual receipt of such Distribution in the

case of cash ("**Cash Distribution**") and within ten (10) Business Days of the date of receipt in the case of non-Cash Distributions. The Seller hereby agrees with the Purchaser that in no circumstances shall the Seller seek to exercise or actually exercise any right of set-off, netting or any other similar right against the Purchaser with respect to any such Distribution, it being agreed by the Seller that the full amount of all Distributions must be delivered to the Purchaser in a full and timely manner as required by this Agreement.

(b)     If the Seller receives a Distribution that it is required to remit to the Purchaser, the Purchaser shall furnish to the Seller such forms, certifications, statements and other documents as the Seller may reasonably request to evidence the Purchaser's exemption from the withholding of any Taxes imposed by any applicable governing jurisdiction, whether domestic or foreign, or to enable the Seller to comply with any applicable laws or regulations relating thereto, and the Seller may refrain from remitting such Distribution until such forms, certifications, statements and other documents have been so furnished.

7.3     Refund

If any part of the Distribution which is paid or transferred by the Seller to the Purchaser pursuant to Clause 7.2 is made by the Seller in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the Purchaser shall promptly on demand by the Seller pay to the Seller an amount equal to the part of the Distribution that is so avoided or restored.

8.     **REPRESENTATIONS AND WARRANTIES**

8.1     Seller's Representations and Warranties

The Seller represents and warrants to the Purchaser on the date of this Agreement and at every moment until the Completion Date:

(a)     this Agreement constitutes its legally binding, valid and enforceable obligations and the details of the PAIH Debt Documents set forth in Schedule 1 (*PAIH Debt Documents*) are true, correct and accurate in all respects;

(b)     it is the sole legal and beneficial owner of, and has good, unrestricted and clean title to each and every one of the Purchased Assets, free and clear from all Security Interests and so far as it is aware any other impediment (whether by way of Security Interest, contract or otherwise) of any nature whatsoever;

(c)     subject to the satisfaction of the Pre-Completion Conditions, it has the power to enter into and perform and has taken all necessary action to authorise the entry into and performance of this Agreement and the transactions contemplated by this Agreement;

(d)     subject to the satisfaction of the Pre-Completion Conditions, all authorisations

required by it in connection with the entry into, performance, validity and enforceability, and the transactions contemplated by, this Agreement have been obtained or effected (as appropriate) and are in full force and effect;

(e)     save for (i) the Purchased Assets[, and (ii) [•]], there is no other outstanding indebtedness owed by any PAIH Affiliate or any member of the PAIH Material Group to the Seller; and

(f)      it will support and cooperate in the filing and approval of the relevant motion and the entering of a non-appealable order for the approval of the Debt Purchase Agreements (substantially in the form of this Agreement) pursuant to the Settlement and Framework Agreement in the United States Bankruptcy Court for the Southern District of New York.

8.2     Purchaser's Representations and Warranties

The Purchaser represents and warrants to the Seller on the date of this Agreement and at every moment until the Completion Date that:

(a)     this Agreement constitutes its legally binding, valid and enforceable obligation;

(b)     it is duly organised and validly existing under the laws of the jurisdiction in which it is incorporated;

(c)     it has the power to enter into and perform and has taken all necessary action to authorise the entry into and performance of this Agreement and the transactions contemplated by this Agreement;

(d)     all authorisations required by it in connection with the entry into, performance, validity and enforceability, and the transactions contemplated by, this Agreement have been obtained or effected (as appropriate) and are in full force and effect;

(e)     it is not (nor is it reasonably expected imminently to be) subject to liquidation, winding-up, bankruptcy, administration, receivership, dissolution, reorganization, amalgamation or any analogous event whether voluntary or involuntary (and whether or not involving insolvency) or any assignment of assets for the benefit of creditors or any arrangement with creditors generally; and

(f)      it is entering into this Agreement and will exercise its rights and perform its obligations under it, for its sole benefit and not for or on behalf of any other person, whether as trustee, agent or otherwise.

## 9.     NON-RELIANCE AND INDEPENDENT INVESTIGATION

9.1     Each of the Seller and the Purchaser acknowledges and confirms:

(a)     it is a sophisticated investor with respect to the transactions contemplated under this Agreement and it has made its own independent appraisal of all risks arising under or

in connection with the Purchased Assets (including, without limitation, the financial condition and affairs of each Obligor and its related entities) without reliance on any information provided to it by the other Party in connection with the Purchased Assets or this Agreement; and

(b)     notwithstanding that the other Party currently may have, and later may come into possession of information with respect to the Purchased Assets, or an Obligor or any of its Subsidiaries, Affiliates and related companies that is not known to it and which may be material to its decision to sell or purchase (as the case may be) the Purchased Assets, the other Party shall have no liability to it and it hereby waives and releases any claims it might have against the other Party (whether under applicable securities laws or otherwise) with respect to the non-disclosure of such information.

9.2     The Purchaser acknowledges, agrees and confirms to the Seller that:

(a)     the Purchased Assets are to be sold and assigned to the Purchaser on an "as is" basis; except as expressly set out in Clause 8.1 (*Seller's Representations and Warranties*), the Seller makes no representation or warranty of any kind, express or implied, statutory or otherwise, in respect of the Purchased Assets, this Agreement, the PAIH Debt Documents or any other agreement, document, matter or thing and all such representations and warranties, whether express or implied, are hereby specifically excluded; without limiting the generality of the foregoing, the Purchaser accepts the risk of adverse consequences to it if the Obligors or any of them disputes the amount of its indebtedness under the PAIH Debt Documents and the Purchaser confirms to the Seller that no such dispute shall discharge, release, affect, limit or impair any of the Purchaser's obligations under this Agreement;

(b)     except as expressly set forth in this Agreement, the Seller has no duties, liabilities or obligations, statutory or otherwise, to the Purchaser and the Purchaser shall have no recourse to the Seller on any grounds whatsoever, in respect of any amount which the Obligors, or any of their liquidators or any other party, may fail to pay to the Purchaser as the assignee of the Purchased Assets;

(c)     the Seller has no responsibility, duty or liability to the Purchaser for, or in respect of, the validity or enforceability of the PAIH Debt Documents or any other documents or any of the terms or conditions contained in the PAIH Debt Documents or such other documents or the performance or non-performance by any party to such documents of any of their obligations; without limiting the generality of the foregoing, the Seller shall not be liable to compensate the Purchaser or to repurchase or reacquire all or any part of the Purchased Assets from the Purchaser for or by reason of any loss, liability or expense arising out of or related to any invalidity or unenforceability of the PAIH Debt Documents or the Purchased Assets;

(d)     any Restructuring of the Purchased Assets that occurs on or after the date of this Agreement shall be for the account of, and the responsibility of, the Purchaser, who will be subject to the terms of such Restructuring and the Seller shall not be obliged

to make any payment to the Purchaser in respect of any sum which is required to be used for a specific purpose pursuant to any Restructuring;

(e)    the Seller has no responsibility, duty or liability to the Purchaser with respect to:

    (i)    the due execution, delivery or performance of the PAIH Debt Documents or the recovery of the PAIH Debt or any other amount payable to the Seller by the Obligors or any of them;

    (ii)    any recital and any representation, warranty, undertaking, covenant or statement made by any Obligor;

    (iii)    and the Seller is not a trustee or fiduciary of the Purchaser in respect of, the Purchased Assets during the period between the signing of this Agreement and the Completion Date; or

    (iv)    the status, affairs, business, assets, financial condition, creditworthiness, property, books or records of the Obligors and the Seller has not provided, and has no obligation or duty to provide, the Purchaser with any credit, accounting, financial or other information concerning the status, business, financial condition or creditworthiness of the Obligors or any of them;

(f)    the Purchaser:

    (i)    accepts the risk of any adverse developments affecting the status, business, financial condition or creditworthiness of the Obligors or any of them occurring at any time on or after the date of this Agreement, unless any such adverse developments arise as a result of the fraud, gross negligence, wilful misconduct of the Seller and/or such other actions of the Seller that is inconsistent with the provisions of this Agreement, in respect of the Purchased Assets (but subject to the Seller's rights under Clause 4 (*Seller's Covenants*));

    (ii)    acknowledges that as of the date of this Agreement the Obligors are subject to or directly or indirectly involved in reorganization and/or bankruptcy proceedings;

    (iii)    accepts the risk that on the date of this Agreement and on the Completion Date, the Obligors are, may be or become, insolvent or subject to insolvency or bankruptcy or liquidation proceedings, unless any such insolvency or bankruptcy or liquidation proceedings were commenced and/or supported by the Seller in respect of the Purchased Assets (but subject to the Seller's rights under Clause 4.2);

    (iv)    agrees that its obligations to the Seller under this Agreement shall not be discharged, terminated, released, affected, limited or impaired by any such adverse developments, insolvency or bankruptcy of the Obligors or any of them or by any failure of the Purchaser to collect from the Obligors any amount

payable under the PAIH Debt Documents;

(v)    has made its own independent assessment of the benefits and risks to it of entering into this Agreement and it has not relied on and will not hereafter rely on any advice or information given to it by the Seller; and

(vi)    understands and acknowledges that it has itself been, and will continue to be solely responsible for, making its own independent appraisal of and investigations into the assets, financial condition, creditworthiness, affairs and legal status of the Obligors, and of the matters contemplated by this Agreement and the Settlement and Framework Agreement;

(g)    either (i) no interest in the Purchased Assets is being acquired by or on behalf of a person which is, or at any time while the Purchased Assets are held thereby will be, one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs is applicable with respect to the purchase and holding of the Purchased Assets and the exercise of the Purchaser's rights thereunder; and

(h)    subject to the occurrence of Completion and the provisions of Clause 6 (*Payment and Payment Administration*), the Seller is solely entitled to all right, title, benefit and interest in, under and to the Purchased Assets during the period commencing on the date of this Agreement and ending on the Completion Date.

## 10.    CONFIRMATIONS

10.1    The Parties hereby confirm, without reservation, that nothing in this Agreement shall be considered or regarded as discharging or releasing all or any of the obligations and liabilities of any Obligor or any other person under the Retained Debt Documents.

10.2    The execution and delivery of this Agreement shall not adversely affect or prejudice the rights of the Seller, or limit, discharge or release the obligations and liabilities of any person with respect to any right, benefit, title, interest or claim of the Seller arising under or in connection with the Retained Debt Documents.

10.3    The Purchaser acknowledges and agrees that nothing in this Agreement is intended to or shall be construed or deemed to affect in any way any right, benefit, title, interest or claim of the Seller arising under or in connection with the Retained Debt Documents.

## 11.    FURTHER ASSURANCE

11.1    From and after the Completion Date (inclusive), the Seller will at the reasonable request of the Purchaser from time to time, take any and all actions requested by the Purchaser from time to time in order to ensure that the Purchaser shall obtain the right, benefit, title and interest to the Purchased Assets and otherwise to give full effect to each and every one of the transactions contemplated under this Agreement, including the execution of any further documents that reflect the terms and conditions in this Agreement and the giving of any notice and the making of any registration which may from time to time be reasonably

requested by the Purchaser, in each case, at the Purchaser's cost and expense.

11.2    Without limiting the foregoing Clause 11.1, the Seller will at the reasonable request of the Purchaser from time to time, cooperate in and facilitate the implementation of the transactions contemplated herein, including supporting and/or joining in the filing of any motion or application or request in relation to the consummation of this Agreement, in each case, at the Purchaser's cost and expense.

## 12.    EXPENSES AND TAXES

12.1    Except as provided in Clauses 11.1, 11.2, 12.2 and 12.3, each Party shall bear its own costs and expenses of the preparation, negotiation, execution and consummation of this Agreement and any transactions contemplated herein.

12.2    Each Party shall pay and otherwise be responsible for its own Taxes arising in connection with the execution and consummation of this Agreement and each of the transactions contemplated herein. Each Party shall be responsible for arranging the payment of such Taxes, including fulfilling any administrative or reporting obligation imposed by the jurisdiction in question in connection with their payment. Notwithstanding anything to the contrary contained herein, the Purchaser shall be solely responsible for any and all transfer and similar taxes associated with the Assignment.

12.3    The Seller shall pay all expenses, fees, charges and any other costs arising from or in connection with its holding and ownership of the Purchased Assets (including but not limited to all bank charges and all custodian fees and expenses) relating to dates prior to the Completion Date. The Purchaser shall pay all expenses, fees, charges and any other costs arising from or in connection with its holding and ownership of the Purchased Assets (including but not limited to all bank charges and all custodian fees and expenses) relating to dates from and after the Completion Date.

12.4    FATCA Information:

(a)    Subject to paragraph (c) below, each Party shall, within ten (10) Business Days of a reasonable request by the other Party:

(i)    confirm to that other Party whether it is:

(A) a FATCA Exempt Party; or

(B) not a FATCA Exempt Party;

(ii)    supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

(iii)    supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of

information regime.

(b)   If a Party confirms to the other Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it will not (or is not), or will cease (or has ceased) to be, a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)   Paragraphs (a) and (b) above shall not oblige a party to do anything which would or might in its reasonable opinion constitute a breach of:

(i)   any law or regulation;

(ii)   any fiduciary duty;

(iii)   any duty of confidentiality; or

(iv)   the PAIH Debt Documents.

(d)   If a Party fails to confirm whether it is (and/or remains) a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a) (i) or (ii) above, (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the transaction as if it is not a FATCA Exempt Party.

## 13.   TERMINATION

This Agreement, and the respective obligations of the Parties hereunder, shall terminate and be of no further force or effect if:

(a)   a Party gives the other Party notice to terminate following a breach of this Agreement by the recipient of that notice, including a failure by the Purchaser to pay the Purchase Price in accordance with Clause 5 (*Completion*); or

(b)   Completion has not occurred on or prior to the Long Stop Date,

except that the Surviving Provisions shall continue to have effect. Each Party's further rights and obligations shall cease immediately on termination, but termination does not affect a Party's accrued rights and obligations as at the date of termination.

## 14.   SPECIFIC PERFORMANCE

Without prejudice to any other rights or remedies that each Party may have, each Party acknowledges and agrees that damages alone may not be an adequate remedy for any breach of the terms of this Agreement by the other Party and that the other Party is entitled to enforce this Agreement by seeking the remedies of injunction, specific performance or other equitable relief for any threatened or actual breach of the terms of this Agreement and to institute any action, claim, or legal proceeding to enforce the provisions of this Agreement, and each Party hereby waives any claim or defence that the other Party has an adequate

remedy at law.

## 15.   CHANGES TO THE PARTIES

The Parties may not assign, transfer, encumber or dispose of any of their rights and/or obligations under this Agreement without the prior written consent of the other Party, save that such prior written consent would not be required in respect of any assignment, transfer, encumbrance or disposal of any of the rights and/or obligations of the Purchaser under this Agreement to any Affiliate, Subsidiary, or holding company of the Purchaser.

## 16.   WAIVERS AND REMEDIES CUMULATIVE

16.1   The rights of each Party under this Agreement:

(a)   may be exercised as often as necessary;

(b)   are cumulative and not exclusive of its rights under the general law; and

(c)   may be waived only in writing and specifically.

16.2   Delay in exercising or non-exercise of any right is not a waiver of that right.

## 17.   CONFIDENTIALITY

(a)   Subject to paragraph (b), each Party to this Agreement shall keep confidential:

(i)   all negotiations in connection with the terms of this Agreement (including drafts);

(ii)   any information supplied by any other Party in connection with the negotiations in connection with this Agreement; and

(iii)   any information supplied by the Purchaser regarding the financial condition, business and operations of the Purchaser or any of the Purchaser's Subsidiaries, Affiliates or related companies (including any "know your customer" information required by the Seller) as the Seller may request,

(collectively, the "**Information**").

(b)   Each Party (the "**Disclosing Party**") may deliver or disclose Information:

(i)   that is publicly available, other than as a result of a breach by the Disclosing Party of its obligations under paragraph (a) above;

(ii)   to its Affiliates and the directors, employees, officers, professional advisers and auditors of the Disclosing Party and of its Affiliates;

(iii)   to any other person to which such delivery or disclosure may be necessary or appropriate:

(A)     to effect compliance with any law, rule, regulation or order applicable to it; or

(B)     in response to any subpoena or other legal process; or

(C)     if required or requested to be disclosed by any governmental, banking, taxation or other regulatory authority or similar body or the rules of any relevant stock exchange,

save that with respect to any delivery or disclosure made pursuant to this paragraph (iii) the Disclosing Party shall, to the extent legally permissible, notify the other Party(ies) to the Agreement of such delivery or disclosure in advance of the same but only if such notice may be given in compliance with all laws, rules, regulations or orders applicable to it and there is sufficient time for such notice to be provided to the other Party(ies) to the Agreement before the Disclosing Party is required to make such delivery or disclosure; and

(iv)   in the case of the Purchaser:

(A)     to any party to any of the PAIH Debt Documents, to the extent required thereunder; and

(B)     to its Subsidiaries, Affiliates or related companies or any proposed transferee, assignee or other person proposing to enter into contractual relations with the Purchaser in relation to the Purchased Assets or any part thereof, *provided that* the Purchaser shall inform any Subsidiary, Affiliate or related company or any potential purchaser, transferee, assignee, participant or other person to whom it so discloses the information that the information is confidential and prior to any such disclosure procures that any person to whom it intends to disclose the information complies or confirms that it will comply with the obligations set out in a confidentiality agreement with the Purchaser no less restrictive than this Clause 17.

## 18.     SEVERABILITY

If a term of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

(a)     the legality, validity or enforceability in that jurisdiction of any other term of this Agreement; or

(b)     the legality, validity or enforceability in other jurisdictions of that or any other term of this Agreement.

## 19.     COUNTERPARTS

This Agreement may be executed in any number of counterparts. This has the same effect as

if the signatures on the counterparts were on a single copy of this Agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic mail shall be effective as delivery of a manually executed counterpart of this Agreement.

20. **NOTICES**

20.1    Giving of notices

Any communications in connection with this Agreement must be given in writing in English and signed by or on behalf of the Party giving it. A notice may be delivered personally or sent by electronic mail, pre-paid recorded delivery or international courier to the address or e-mail address provided in Clause 20.3, and marked for the person specified in that clause.

20.2    Deemed receipt

A notice shall be deemed to have been received: (a) at the time of delivery, if delivered personally; (b) at the time it is received in the recipient's inbox if delivered by electronic mail; (c) two Business Days after the time and date of posting if sent by pre-paid recorded delivery; or (d) three Business Days after the time and date of posting if sent by international courier, provided that if deemed receipt of any notice occurs after 6.00 p.m. or is not on a Business Day, deemed receipt of the notice shall be 9.00 a.m. on the next Business Day. References to time in this Clause 20 are to local time in the country of the addressee.

20.3    Addresses for notices

(a)     The contact details of each Party for all communications in connection with this Agreement are:

(i)     in relation to the Seller:

Address: [•]

E-mail address: [•]

Telephone No.: [•]

Attention: [•]

(ii)    in relation to the Purchaser:

Address: Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands (C/O: 22/F South China Building, 1-3 Wyndham Street, Central, Hong Kong)

E-mail address: ivan_wong@petersonhk.com / mayc@petersonhk.com / amy_yuen@petersonhk.com / corp_cosec@petersonhk.com

Telephone No.: 852-2877 3828

Attention: Board of Directors / Ivan Wong / May Chan / Amy Yuen

(b) Each Party may change its contact details by giving not less than five (5) Business Days' written notice to the other Party.

(c) Where a Party nominates a particular department or officer to receive a communication, a communication will not be effective if it fails to specify that department or officer.

## 21. THIRD PARTY RIGHTS

A person who is not a Party has no rights under the Contracts (Rights of Third Parties) Ordinance (Cap. 623) to enforce or to enjoy the benefit of any term of this Agreement.

## 22. AMENDMENTS

Any amendment to the terms of this Agreement must be agreed by each Party in writing.

## 23. ENTIRE AGREEMENT

This Agreement, together with all agreements referred to herein, constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof.

## 24. GOVERNING LAW AND JURISDICTION

24.1 Governing Law

This Agreement is governed by Hong Kong law.

24.2 Jurisdiction

(a) The courts of the Hong Kong S.A.R have non-exclusive jurisdiction to settle any disputes in connection with this Agreement.

(b) The courts of the Hong Kong S.A.R. are appropriate and convenient courts to settle any such dispute.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

**SCHEDULE 1**
**PAIH DEBT DOCUMENTS**

1.  [•]

## SCHEDULE 2
## BANK ACCOUNT DETAILS

**Purchase Price**: [•] Dollars and [•] Cents (US$ [•]) to be paid on the Completion Date.

**Receiving Account**:

[•]

**SCHEDULE 3**
**PROPERTIES**

**Property Owner  Property Address**

1.   Rawley Trading       Flat A1, 20/F & Roof, Blk A, Evergreen Villa, 43 Stubbs Road and
     Limited             Car Parking Space No. 108, Hong Kong

2.   Fastact Group        Block 1, 14/ F and Car Port Space No. G122 and Car Parking Space
     Limited             No. 250, Repulse Bay Garden, Nos. 18-40 Belleview Drive, Hong
                         Kong

3.   Chasterton           House No. 36, Manderly Garden, 48 Deep Water Bay Road, Hong
     Group Limited        Kong

4.   Pacific Andes        House No. 34, Manderly Garden, 48 Deep Water Bay Road, Hong
     Enterprises          Kong
     (Hong Kong)
     Limited

5.   Bonaire              Unit 8B and Car Parking Space No. L39 on Lower Ground Floor,
     Developments         Celestial Garden, 5 Repulse Bay Road, Hong Kong
     Limited

6.   Grandluck            Apartment B33, 2/F, Block B3, Woodgreen Estate, 5 Shouson Hill
     Enterprises          Road, Hong Kong & Car parking Space No.10 & 20
     Limited

# SCHEDULE 4
## PAIH AFFILIATES

| No. | Name | Jurisdiction of Incorporation |
|-----|------|-------------------------------|
| 1. | Pacific Andes International Holdings (BVI) Limited | British Virgin Islands |
| 2. | ACE Field Limited | British Virgin Islands |
| 3. | Aqua Foods (Qingdao) Co Ltd | People's Republic of China |
| 4. | Bestmate Investments Limited | Independent State of Samoa |
| 5. | Bonaire Developments Limited | British Virgin Islands |
| 6. | Chasterton Group Limited | British Virgin Islands |
| 7. | Clamford Holding Limited | British Virgin Islands |
| 8. | Dynamic Choice Limited | Hong Kong S.A.R. |
| 9. | Europaco Limited | British Virgin Islands |
| 10. | Europaco (AP) Limited | British Virgin Islands |
| 11. | Europaco (BP) Limited | British Virgin Islands |
| 12. | Europaco (EP) Limited | British Virgin Islands |
| 13. | Europaco (GP) Limited | British Virgin Islands |
| 14. | Europaco (HP) Limited | Hong Kong S.A.R. |
| 15. | Fastact Group Limited | British Virgin Islands |
| 16. | Fortune Midas Limited | British Virgin Islands |
| 17. | Full Enrich Limited | Hong Kong S.A.R. |
| 18. | Global Research Group Inc. | British Virgin Islands |
| 19. | Global Research Services Inc. | British Virgin Islands |
| 20. | Glorious Ocean Limited | Hong Kong S.A.R. |
| 21. | Grandluck Enterprises Limited | British Virgin Islands |
| 22. | Heng Holdings (BVI) Limited | British Virgin Islands |
| 23. | Join Power Assets Limited | British Virgin Islands |

| 24. | Kyoshoku Company Limited | Japan |
|---|---|---|
| 25. | Kyoshoku Marketing Company Limited | Japan |
| 26. | Modern Energy Holdings Limited | British Virgin Islands |
| 27. | National Fish & Seafood Inc. | United States |
| 28. | National Fish and Seafood Ltd | Hong Kong S.A.R. |
| 29. | National Fish and Seafood Management Ltd. | Hong Kong S.A.R. |
| 30. | Nouvelle Foods International Ltd. | British Virgin Islands |
| 31. | Ocean Kingdom Enterprises Limited | Hong Kong S.A.R. |
| 32. | Onn Profits Limited | British Virgin Islands |
| 33. | Orient Ocean Limited | British Virgin Islands |
| 34. | Pacific Andes (Shanghai) Food Trading Company Limited | People's Republic of China |
| 35. | Pacific Andes Development Limited | British Virgin Islands |
| 36. | Pacific Andes Development Sdn Bhd | Malaysia |
| 37. | Pacific Andes Enterprises (Hong Kong) Limited | Hong Kong S.A.R. |
| 38. | Pacific Andes Food (BVI) Limited | British Virgin Islands |
| 39. | Pacific Andes Food Limited | People's Republic of China |
| 40. | Pacific Andes Treasury Management Limited | Hong Kong S.A.R. |
| 41. | Pacific Fruit Trading Limited | Hong Kong S.A.R. |
| 42. | Paco-EP Limited | Cyprus |
| 43. | Paco-GP Limited | Cyprus |
| 44. | Paco-HP Limited | Cyprus |
| 45. | Pacos (QP) Limited | Cyprus |
| 46. | Pacos Processing Limited | Cayman Islands |
| 47. | Pacos Processing Limited | Cyprus |
| 48. | PAE Limited | Hong Kong S.A.R. |

| 49. | Paramount Holdings Limited | Hong Kong S.A.R. |
|-----|----------------------------|------------------|
| 50. | Peaksville Limited | United Kingdom |
| 51. | Pelican Food Limited | British Virgin Islands |
| 52. | Poweroute Limited | British Virgin Islands |
| 53. | Qingdao Canning Foodstuff Co Limited | People's Republic of China |
| 54. | Qingdao Pacific Andes International Trading Company Limited | British Virgin Islands |
| 55. | Qingdao Pacific Andes International Trading Company Limited | People's Republic of China |
| 56. | Rawley Trading Limited | British Virgin Islands |
| 57. | Rich Reward Assets Limited | British Virgin Islands |
| 58. | Rich System Limited | Hong Kong S.A.R. |
| 59. | Silliker Hong Kong Limited | Hong Kong S.A.R. |
| 60. | Value Food Supply Limited | Hong Kong S.A.R. |
| 61. | Vision Invest Limited | British Virgin Islands |
| 62. | Waton Enterprises Limited | Hong Kong S.A.R. |
| 63. | Wealthy Nation Holdings Limited | British Virgin Islands |
| 64. | Xinxing Foodstuffs (Qingdao) Company Limited | People's Republic of China |

**SCHEDULE 5**
**NOTICE OF TRANSFER**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

*In re CHINA FISHERY GROUP LIMITED : (CAYMAN), et al.,*
**Case No. 16-11895 (JLG) (Jointly Administered)**


## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.


_____         _____
Name of Transferee                                      Name of Transferor

Name and Address where notices to transferee      Court Claim # (if known): _____
should be sent:                                                                 Amount of Claim: _____
                                                                                        Date Claim Filed: _____



Phone:_____                                 Phone:_____
Last Four Digits of Acct #: _____       Last Four Digits of Acct. #: _____


Name and Address where transferee payments should be sent (if
different from above):



Phone:_____
Last Four Digits of Acct #:_____


I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.


By:_____          Date:_____
      Transferee/Transferee's Agent


*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571

## SCHEDULE 6
## NOTICE OF ASSIGNMENT

From          :     [•] (the "**Existing Lender**")

To            :     [•] as borrower (the "**Borrower**")
                    [•] as guarantor (the "**Guarantor**")

Cc            :     **[ASIA UNION LIMITED]** (the "**New Lender**")

Dated         :

Dear Sirs

**Sale and Purchase Agreement dated_____ 2021
(the "Agreement")**

1.    We refer to:

      a.     [•]; and

      b.     [•].

2.    This is a notice of assignment. Terms defined in the Agreement shall have the same meaning in this notice of assignment.

3.    We hereby notify you that, with effect on and from _____ 2021 (the "**Assignment Date**"):

      a.      the Existing Lender assigned to the New Lender all its legal and beneficial rights, title, interests, claims, remedies and other benefits (howsoever described or arising) under or in connection with the Purchased Assets, and, on and from the Assignment Date, the New Lender shall have and hold all legal and beneficial rights, title, interests, claims, remedies and other benefits (howsoever described or arising) under and in connection with the Purchased Assets to the same extent as if the New Lender had been a beneficiary thereof instead and in the place of the Existing Lender; and

      b.     the Existing Lender agreed that each of the Borrower and the Guarantor does not have any further obligations to the Existing Lender but only to the New Lender under or in connection with any of the Purchased Assets, whether present or future, actual or contingent, including its obligation to repay the PAIH Debt to the Existing Lender.

4.    The address, e-mail address and attention details for any communication or document to be made or delivered to the New Lender under or in connection with the Purchased Assets is as follows:

Address: Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands (C/O: 22/F South China Building, 1-3 Wyndham Street, Central, Hong Kong)

E-mail address: ivan_wong@petersonhk.com / mayc@petersonhk.com / amy_yuen@petersonhk.com / corp_cosec@petersonhk.com

Attention: Board of Directors / Ivan Wong / May Chan / Amy Yuen

5.  This notice of assignment may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this notice of assignment.

6.  This notice of assignment is governed by Hong Kong law.

_____
For and on behalf of
[•]
(as Existing Lender)

# SIGNATURE PAGE

**The Seller**

Signed by                                                    )

)

for and on behalf of **[•]**:                          )

**The Purchaser**

Signed by                                    )
                                             )
for and on behalf of **[ASIA UNION**         )
**LIMITED]**:                                )

## **Exhibit B-3**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

In re:                                          :       Chapter 11
                                                :
CHINA FISHERY GROUP LIMITED                     :       Case No. 16-11895 (JLG)
(CAYMAN), *et al.*,                             :
                                                :       (Jointly Administered)
                    Debtors.[1]                 :
-------------------------------------------------------------------- x

### PERIODIC REPORT OF DEBTORS PURSUANT TO BANKRUPTCY RULE 2015.3 REGARDING VALUE, OPERATIONS AND PROFITABILITY OF ENTITIES IN WHICH THE ESTATE OF PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED (BERMUDA) HOLDS A SUBSTANTIAL OR CONTROLLING INTEREST

Dated:  February 19, 2019
        New York, New York

---

[1] The Debtors in these chapter 11 cases are as follows: China Fishery Group Limited (Cayman), Pacific Andes International Holdings Limited (Bermuda), N.S. Hong Investment (BVI) Limited, South Pacific Shipping Agency Limited (BVI), China Fisheries International Limited (Samoa), CFGL (Singapore) Private Limited, Chanery Investment Inc. (BVI), Champion Maritime Limited (BVI), Growing Management Limited (BVI), Target Shipping Limited (HK), Fortress Agents Limited (BVI), Ocean Expert International Limited (BVI), Protein Trading Limited (Samoa), CFG Peru Investments Pte. Limited (Singapore), Smart Group Limited (Cayman), Super Investment Limited (Cayman), Pacific Andes Resources Development Limited (Bermuda), Nouvelle Foods International Ltd. (BVI), Golden Target Pacific Limited (BVI), Pacific Andes International Holdings (BVI) Limited, Zhonggang Fisheries Limited (BVI), Admired Agents Limited (BVI), Chiksano Management Limited (BVI), Clamford Holding Limited (BVI),  Excel Concept Limited (BVI), Gain Star Management Limited (BVI), Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited (BVI), Loyal Mark Holdings Limited (BVI), Metro Island International Limited (BVI), Mission Excel International Limited (BVI), Natprop Investments Limited, Pioneer Logistics Limited (BVI), Sea Capital International Limited (BVI), Shine Bright Management Limited (BVI), Superb Choice International Limited (BVI), and Toyama Holdings Limited (BVI).

This is the report on the value, operations and profitability of those entities in which the estate of **Pacific Andes International Holdings Limited (Bermuda) (Case #16-11890)** holds a substantial or controlling interest, as required by Bankruptcy Rule 2015.3. This periodic report (the "Periodic Report") contains separate reports ("Entity Reports") on the value, operations and profitability of each entity listed on the attached summary sheet.

Each Entity Report consists of three exhibits. **Exhibit A** contains a valuation estimate for the entity as of a date not more than two years prior to the date of this report. It also contains a description of the valuation method used. **Exhibit B** contains a balance sheet, a statement of income (loss), a statement of cash flows and a statement of changes in shareholders' or partners' equity (deficit) for the period covered by the Entity Report, along with summarized footnotes. **Exhibit C** contains a description of the entity's business operations.

The undersigned, having reviewed the above listing of entities in which the estate of **Pacific Andes International Holdings, Limited (Bermuda)** holds a substantial or controlling interest, and being familiar with the Debtor's financial affairs, verifies under the penalty of perjury that the listing is complete, accurate and truthful to the best of his/her knowledge.

Date: _____

_____
Signature of Authorized Individual

_____Ng Puay Yee_____
Name of Authorized Individual

_____
Title of Authorized Individual

**General Notes to the Form 26 Report**

Bankruptcy Rule 2015.3 requires reporting of information regarding the value, operations and profitability of non-debtor entities, that are not publicly traded corporations, in which a debtor holds a substantial or controlling interest on Form 26 (the "Form 26 Report"). This Form 26 Report is prepared for Debtor, Pacific Andes International Holdings Limited (Bermuda) ("PAIH"). The Debtors are filing additional Form 26 Reports that includes the remaining Debtors' interests in entities in which they hold a substantial or controlling interest.

***Basis of the Financial Statement Presentation -*** The information contained herein is provided to fulfill the requirements of the Bankruptcy Rule 2015.3 and organized to comply with guidelines provided by the Office of the United States Trustee. The Debtors are part of a larger group of companies that comprise the Pacific Andes Organization ("PA Organization"). Only the Debtors included in the PA Organization are debtors under chapter 11 of the United States Bankruptcy Code. Accordingly, the accompanying unaudited financial statements included in this Form 26 Report do not include consolidated results for any of the Debtors or their affiliates. The financial statements and supplemental information contained herein are unaudited, preliminary and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects.

This information has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures, the Debtor believes that the financial information could be subject to changes and these changes could be material. The information furnished in this report includes primarily normal recurring adjustments, but does not include all of the adjustments that would typically be made in accordance with U.S. GAAP.

The results of operations contained herein are not necessarily indicative of results that are expected from any other period of for the full year and may not necessarily reflect the results of operations, financial position and cash flows of these entities in the future.

1

**Intercompany Transactions** – Intercompany transactions between any entity and related period ending balances have not been eliminated in the financial statements contained herein.  No conclusion as to the legal obligations or the related asset valuations associated with these intercompany transactions and balances is made by the presentation herein.

**Valuation information** – The valuation information provided herein is based on the book value of the non-Debtors (book value of assets less book value of liabilities).  The Debtors do not maintain fair market value or other basis of valuation for these entities.

1136831

FORM 26 - RULE 2015.3

United States Bankruptcy Court
Southern District of New York
Pacific Andes International Holdings Limited
Case No.: [16-11890]

**Entity Summary Sheet**

**PERIODIC REPORT REGARDING VALUE, OPERATIONS AND PROFITIBILITY OF ENTITIES IN
WHICH THE ESTATE OF PACIFIC ANDES INTERNATIONAL HOLDINGS LIMITED HOLDS A
SUBSTANTIAL OR CONTROLLING INTEREST**

| Name of Entity | Interest of the Estate | Tab |
|---|---|---|
| Pacific Andes Development Sdn. Bhd. | 100% | 1 |
| Global Research Group Inc | 50% | 2 |
| Fastact Group Limited | 100% | 3 |
| Pacific Andes Enterprises (Hong Kong) Limited | 100% | 4 |
| Aqua Foods (Qingdao) Co Ltd | 100% | 5 |
| Qingdao Canning & Foodstuff Co Limited | 100% | 6 |
| Onn Profits Limited | 100% | 7 |
| Pacific Andes Food (BVI) Limited | 100% | 8 |
| Pacific Andes (Shanghai) Food Company Limited | 100% | 9 |
| Qingdao Pacific Andes International Trading Company Limited (PRC) | 100% | 10 |
| Waton Enterprises Limited | 100% | 11 |
| Paramount Holdings Limited | 50% | 12 |
| Qingdao Pacific Andes International Trading Company Limited (BVI) | 100% | 13 |
| Chasterton Group Limited | 100% | 14 |
| Peaklane Development Limited | 100% | 15 |
| PAE Limited | 100% | 16 |
| Vision Invest Limited | 100% | 17 |
| Fortune Midas Limited | 100% | 18 |
| Pacific Andes Treasury Management Limited | 100% | 19 |
| Orient Ocean Limited | 100% | 20 |
| Pelican Food Limited | 100% | 21 |
| Pacific Andes Development Limited | 100% | 22 |
| Ace Field Limited | 100% | 23 |
| Xinxing Foodstuffs (Qingdao) Company Limited | 100% | 24 |
| Heng Holdings (BVI) Limited | 100% | 25 |
| PA Capital Investment Limited | 100% | 26 |
| Global Research Services Inc | 50% | 27 |
| Peaksville Limited | 100% | 28 |
| Rawley Trading Limited | 100% | 29 |
| Bestmate Investments Limited | 100% | 30 |
| Modern Energy Holdings Limited | 100% | 31 |
| Ocean Kingdom Enterprises Limited | 100% | 32 |
| Full Enrich Limited | 100% | 33 |
| Pacific Fruit Trading Limited | 100% | 34 |
| Rich Reward Assets Limited | 100% | 35 |
| Join Power Assets Limited | 100% | 36 |
| National Fish & Seafood Management Ltd | 100% | 37 |

| | | |
|---|---|---|
| Bonaire Developments Limited | 100% | 38 |
| Glorious Ocean Limited | 100% | 39 |
| Grandluck Enterprises Limited | 100% | 40 |
| Rich System Limited | 100% | 41 |
| Value Food Supply Limited (HK) | 100% | 42 |
| Grandway Capital Resources Limited | 100% | 43 |
| Wealthy Nation Holdings Limited | 100% | 44 |
| Dynamic Choice Limited | 100% | 45 |
| Pacific Andes Food Limited | 100% | 46 |
| Kyoshoku Company Limited | 60% | 47 |
| Kyoshoku Marketing  Company Limited | 60% | 48 |
| National Fish and Seafood Inc. | 60% | *Footnote #1* |
| National Fish and Seafood Ltd | 60% | *Footnote #1* |

*Footnote #1:  The Debtors were unable to obtain the information necessary to prepare reports for
National Fish and Seafood Inc. and National Fish and Seafood Ltd.*

**TAB 4 -  PACIFIC ANDES ENTERPRISES (HONG KONG) LIMITED**

**Exhibit A**
**Valuation Estimate for Pacific Andes Enterprises (Hong Kong) Limited**


Based on the unaudited management account as of June 28, 2018, the net assets of Pacific Andes Enterprises (Hong Kong) Limited are US$6,312,251. The unaudited management account is prepared on historical cost basis, except that certain properties are measured at revalued amounts or fair values as appropriate.

**Exhibit B-1**
**Balance Sheet for Pacific Andes Enterprises (Hong Kong) Limited**
**As of June 28, 2018**

|  | As at 28 Jun 2018 | As at 28 Sep 2017 |
|---|---|---|
|  | USD (Unaudited) | USD (Unaudited) |
| **Non-Current Assets** |  |  |
| Investments | 1 | 1 |
| Property, plant and equipments | 16,151,206 | 16,701,278 |
| Investment properties | - | - |
|  | 16,151,207 | 16,701,279 |
|  |  |  |
| **Current Assets** |  |  |
| Bank balances | 32,717 | 141,222 |
| Amount due from related companies | 20,849,957 | 14,746,679 |
| Other receivables and prepayment | 577,564 | 649,284 |
|  | 21,460,238 | 15,537,185 |
|  |  |  |
| **Total Assets** | 37,611,445 | 32,238,464 |
|  |  |  |
| **Current Liabilities** |  |  |
| Trade and other payables | (3,815,783) | (2,937,554) |
| Amount due to related companies | (24,897,171) | (19,562,806) |
| Bank borrowings | - | - |
|  | (28,712,954) | (22,500,360) |
|  |  |  |
| **Total assets less current liabilities** | 8,898,491 | 9,738,104 |
|  |  |  |
| **Non-Current Liabilities** |  |  |
| Deferred Taxation | (2,586,240) | (2,586,240) |
|  | 6,312,251 | 7,151,864 |
|  |  |  |
|  |  |  |
| **Share Capital and Reserves** |  |  |
| Share Capital | (1,282,077) | (1,282,077) |
| Properties revaluation reserve | (14,301,145) | (14,301,145) |
| Accumulated Losses (Retained earnings) | 9,270,971 | 8,431,358 |
|  | (6,312,251) | (7,151,864) |
|  |  |  |
|  | - | - |

*Note: The information is extracted from the management account of Pacific Andes Enterprises (Hong Kong) Limited. The management account is prepared in accordance with the International Financial Reporting Standards.*

**Exhibit B-2**

**Statement of Income (Loss) for Pacific Andes Enterprises (Hong Kong) Limited**
**Six Months Ended June 28, 2018**

| | 29 Dec 2017 to 28 Jun 2018 USD (Unaudited) |
|---|---|
| Revenue | 76,923 |
| Cost of Sales | - |
| Gross Profit | 76,923 |
| | |
| Other income | 14,377 |
| | |
| Selling & Distribution expenses | - |
| | |
| General & Administrative expenses | (547,959) |
| | |
| Finance cost | - |
| | |
| Profit (Loss) before tax | (456,659) |
| | |
| Taxation | - |
| | |
| Profit (Loss) for the year/period, after tax | (456,659) |
| | |
| (Accumulated losses) Retained earnings brought forward | (8,814,312) |
| | |
| Properties revaluation reserve release to retained earnings upon disposal of properties | - |
| | |
| (Accumulated losses) Retained earnings carried forward | (9,270,971) |
| | |
| | - |

*Note: The information is extracted from the management account of Pacific Andes Enterprises (Hong Kong) Limited. The management account is prepared in accordance with the International Financial Reporting Standards.*

**Exhibit B-3**
**Statement of Cash Flows for Pacific Andes Enterprises (Hong Kong) Limited**
**Six Months Ended June 28, 2018**

|  | 29 Dec 2017 to 28 Jun 2018 USD (Unaudited) |
|---|---|
| Net cash from operating activities | 850,617 |
| | |
| **Investing activities** | |
| Additions for property, plant and equipment | - |
| Proceeds on disposal of properties | - |
| Others (interest received) | - |
| Net cash from investing activities | - |
| | |
| **Financing activities** | |
| Advance from (repayment to) related companies | (925,839) |
| Additions (repayment) of bank loans | - |
| | |
| Net cash from (used in) financing activities | (925,839) |
| | |
| Net increase (decrease) in cash and cash equivalents | (75,222) |
| | |
| Cash and cash equivalents at the beginning of the year/period | 107,939 |
| | |
| Cash and cash equivalents at the end of the year/period | 32,717 |
| | - |

*Note: The information is extracted from the management account of Pacific Andes Enterprises (Hong Kong) Limited. The management account is prepared in accordance with the International Financial Reporting Standards.*

**Exhibit B-4**
**Statement of Changes in Shareholders' Equity for Pacific Andes Enterprises (Hong Kong) Limited**
**Six Months Ended June 28, 2018**

|  | 29 Dec 2017 to<br>28 Jun 2018<br>USD<br>(Unaudited) |
|---|---|
| Balance at the beginning of period | 6,768,910 |
| Profit (Loss) for the year/period, after tax | (456,659) |
| Revaluation of properties | - |
| Balance at the end of period | 6,312,251 |
|  | - |

*Note: The information is extracted from the management account of Pacific Andes Enterprises (Hong Kong) Limited. The management account is prepared in accordance with the International Financial Reporting Standards.*

**Exhibit C**
**Description of Operations for Pacific Andes Enterprises (Hong Kong) Limited**

**Principal product produced or services rendered and methods of distribution**
The Company's principal activities are property holdings and provision of adminsitrative services to group companies.

**Description of the status of a new product or segment if a public announcement has been made or information publicly disseminated**
None

**Sources and availability of raw materials**
None

**Any significant patents, trademarks, licenses, franchises, and concessions held**
None

**Seasonality of the business**
None

**Dependence upon a single customer or a few customers**
None

**Dollar amount of backlog orders believed to be firm**
None

**Exposure to renegotiation or redetermination or termination of significant contracts**
None

**Competitive conditions facing the entity**
None

**Description of properties owned**
Properties held in Hong Kong

**Significant legal proceedings**
None

**Material purchase commitments**
None

**Identified trends events or uncertainties that are likely to have a material impact on the entity's short-term liquidity, net sales, or income from continuing operations**
None